Mathias D. Maciejewski, Esq. (SBN 245025)
ROBHANA LEGAL, P.C.
606 South Olive Street, Suite 600
Los Angeles, California 90014
Telephone: 213-683-8000
Email: mathias.esq@gmail.com
Attorneys for Plaintiff 27450 YNEZ ROAD, LLC

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA — SANTA ANA DIVISION

| | |
|---|---|
| In re<br><br>YNEZ SHOPS, LLC, a California limited liability company,<br><br>Debtor and Debtor in Possession.<br>______________________<br><br>27450 YNEZ ROAD, LLC, a California limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>PRO TEMECULA TOWN CENTER, LLC, a California limited liability company; YNEZ SHOPS, LLC, a California limited liability company; and DOES 1 through 20, inclusive,<br><br>Defendants. | Lead Case No. 8:26-bk-10693-SC<br><br>Jointly administered with:<br>Case No. 8:26-bk-10694-SC<br>(Pro Temecula Town Center, LLC)<br><br>Chapter 11<br><br>Adv. Proc. No. _______________<br><br>**COMPLAINT FOR:**<br>(1) Declaratory Relief — No Obligation Under Section 4.2 of the OEA;<br>(2) Quiet Title;<br>(3) Declaratory Relief — No Statutory Assessment Lien or Nonjudicial Foreclosure Remedy;<br>(4) Cancellation and Reformation of Instrument;<br>(5) Slander of Title;<br>(6) Allowance and Payment of Administrative Expense;<br>(7) Injunctive Relief;<br>(8) Declaratory Relief — Recoupment; and<br>(9) Breach of Operation and Easement Agreement (Failure to Maintain) |

Plaintiff 27450 YNEZ ROAD, LLC ("Plaintiff") complains against PRO TEMECULA TOWN CENTER, LLC, a California limited liability company; YNEZ SHOPS, LLC, a California limited liability company; and DOES 1 through 20, inclusive and alleges as follows:

## I. NATURE OF THE ACTION

1. Plaintiff owns a single commercial parcel at 27450 Ynez Road, Temecula, California (APN 921-320-060-5), identified in the operative recorded instrument as Parcel 15 (the "Property"). Out of necessity, Plaintiff has self-maintained, and paid every cost of the Property since June 2012.

2. For many years, Temecula Town Center never contributed to, billed or assessed Plaintiff for common area or association charges, never delivered Plaintiff an annual budget, and never provided services to the Property. Plaintiff maintained its own parking lot, exterior lighting, landscaping, and security at its sole expense, and the successive owners of the Center did the same for theirs. That is how the parties performed, without exception, from 2012 to the present.

3. This Adversary Complaint is necessary because despite the more than ten years of agreed performance between the parties, Defendants now assert the opposite and misrepresent the Center to prospective buyers as being a recipient of $3,583.00 per month in common area charges from Plaintiff. Notwithstanding that in connection with their bankruptcy petitions, the Debtors scheduled their aged receivables at zero under penalty of perjury, and scheduled no claim of any kind against Plaintiff, Defendants have caused their marketing brochure to be published to prospective purchasers in a court-supervised sale process representing that Plaintiff pays $3,583.00 per month in common area charges. That representation is false, Defendants know it is false, it materially misstates the income at the Center - its value, and it disparages Plaintiff's title.

4. Plaintiff brings this adversary proceeding to establish that the Property is not subject to any obligation to contribute to common area expenses of the Temecula Town Center, to quiet its title against Defendants' adverse claim, to cancel and replace with an amended version any instrument recorded in support of that claim, and to recover for Defendants' postpetition disparagement of its title.

## II. JURISDICTION, VENUE, AND CORE STATUS

5. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157 and 1334, and General Order No. 13-05 of the United States District Court for the Central District of California. This adversary proceeding relates to the jointly administered chapter 11 cases of Pro Temecula Town Center, LLC, Case No. 8:26-bk-10694-SC, and Ynez Shops, LLC, Lead Case No. 8:26-bk-10693-SC, pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division. Fed. R. Bankr. P. 7008.

6. This adversary proceeding is core in part and non-core in part, and Plaintiff designates each Claim as follows pursuant to Federal Rule of Bankruptcy Procedure 7008. The First, Second, Third, and Fourth Claims for Relief, which determine the validity, extent, and enforceability of the servitude and lien right asserted against the Property, are core under 28 U.S.C. § 157(b)(2)(K) as to the lien right asserted and under 28 U.S.C. § 157(b)(2)(O) as to the servitude asserted, and arise under Federal Rules of Bankruptcy Procedure 7001(b) and 7001(i). The Sixth Claim, which seeks allowance of an administrative expense, is core under 28 U.S.C. § 157(b)(2)(A) and (B) and 11 U.S.C. § 503(b). The Seventh Claim arises under Federal Rule of Bankruptcy Procedure 7001(g) and is core under 28 U.S.C. § 157(b)(2)(A) and (O). The Eighth Claim arises under Federal Rule of Bankruptcy Procedure 7001(i) and is core under 28 U.S.C. § 157(b)(2)(B) and (O). Plaintiff alleges that the Fifth Claim (slander of title) and the Ninth Claim (breach of the OEA) are non-core but related to these cases within the meaning of 28 U.S.C. § 157(c)(1), except to the extent they seek allowance of an administrative expense, as to which they are core under 28 U.S.C. § 157(b)(2)(A) and (B).

7. Pursuant to Federal Rule of Bankruptcy Procedure 7008, Plaintiff states that it **does not consent** to the entry of final orders or judgment by the bankruptcy court on any claim determined to be non-core or as to which this Court lacks constitutional authority to enter final judgment under *Stern v. Marshall*, 564 U.S. 462 (2011). Plaintiff consents to this Court hearing the non-core Claims and submitting proposed findings of fact and conclusions of law to the district court

under 28 U.S.C. § 157(c)(1) and Federal Rule of Bankruptcy Procedure 9033. Plaintiff's withholding of consent is express, is not waived, and is not to be implied from Plaintiff's participation in this proceeding or in the underlying cases. See *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665 (2015). Nothing in this paragraph limits this Court's authority to hear any Claim and to proceed under 28 U.S.C. § 157(c)(1). See *Executive Benefits Ins. Agency v. Arkison*, 573 U.S. 25 (2014).

8. Venue is proper in this district under 28 U.S.C. § 1409(a) because this proceeding arises in and relates to cases under title 11 pending in this district.

9. The automatic stay of 11 U.S.C. § 362(a) does not bar the commencement of this adversary proceeding. The First through Fourth, Seventh, and Eighth Claims seek a determination of the nature and extent of the estates' interest, if any, in the Property, which is not property of the estates. Those Claims do not seek to recover on a prepetition claim against Defendants, to obtain possession of property of the estates, or to exercise control over property of the estates. By its terms, § 362(a)(1) reaches only the commencement of an action against the debtor that was or could have been commenced before the petition date, or that seeks to recover a claim arising before that date, and § 362(a)(3) reaches only acts to obtain possession of, or to exercise control over, property of the estate. Neither subsection reaches a declaratory determination of whether a servitude or lien right asserted by the estates encumbers property that a third party owns. The Fifth and Sixth Claims arise from postpetition conduct and are outside § 362(a)(1), which reaches only actions on claims that arose before the commencement of the cases. To the extent the Ninth Claim seeks damages for breaches occurring before March 3, 2026, Plaintiff does not seek to liquidate or collect that portion outside the claims-allowance process, and pleads it to preserve it and as a matter of recoupment. Out of an abundance of caution, Plaintiff has filed a concurrent motion for relief from the automatic stay to the extent any provision of § 362(a) is determined to apply.

## III. PARTIES

10. Plaintiff 27450 Ynez Road, LLC is a California limited liability company and the fee owner

of the Property.

11. Defendant Pro Temecula Town Center, LLC ("Pro Temecula") is a California limited liability company and the debtor and debtor in possession in Case No. 8:26-bk-10694-SC. Pro Temecula owns the real property comprising the Temecula Town Center (the "Center"). Its sole member is Henkin Investor Group, LLC.

12. Defendant Ynez Shops, LLC ("Ynez Shops") is a California limited liability company and the debtor and debtor in possession in Lead Case No. 8:26-bk-10693-SC. Pro Temecula and Ynez Shops are referred to collectively as "Defendants" or the "Debtors." The cases are jointly administered for procedural purposes only under Federal Rule of Bankruptcy Procedure 1015(b).

13. The true names and capacities of Defendants sued as Does 1 through 20 are unknown to Plaintiff, which will amend this Complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes that each such Defendant claims some interest in or obligation running against the Property adverse to Plaintiff. Defendants are the present owners of the parcels comprising the Center, are successors in interest under the OEA, and assert the claim against the Property alleged herein. Plaintiff will join any additional party necessary under Federal Rule of Civil Procedure 19, made applicable by Federal Rule of Bankruptcy Procedure 7019, upon determining that joinder is required to allow complete relief.

## IV. GENERAL ALLEGATIONS

### A. The Operation and Easement Agreement

14. On April 29, 1988, an Operation and Easement Agreement was recorded in the Official Records of Riverside County, California, as Instrument No. 156782 (as amended, the "OEA"). Attached hereto as Exhibit B is a true and correct copy of the OEA and Amendments 1-4.

15. The OEA has been amended five times: by First Amendment dated June 21, 1989, recorded as Instrument No. 259041; Second Amendment dated March 6, 1990, recorded as Instrument No. 141301; Third Amendment dated May 2, 2002, recorded as Document No. 2002-410325; Fourth Amendment dated September 9, 2003, recorded as Document No. 2003-705441; and Fifth

Amendment dated April 1, 2014, recorded as Document No. 2014-0194857.

16. Section 4.2 of the OEA addresses responsibility for costs related to common area expenses and their allocation. Section 4.2(H) purports to permit the recordation and enforcement of a lien for unpaid common area and maintenance charges. Section 6.1 provides that a non-defaulting party may cure another party's default and obtain reimbursement of sums reasonably expended to effect the cure.

17. The Fifth Amendment designated BACM 2006-5 Rancho California Limited Partnership, an entity affiliated with LNR Partners ("LNR"), as Operator under the OEA.

18. The OEA does not create a common interest development by declaration and no common area is owned in common or by an association, and no separate interests within the meaning of California Civil Code § 6500 et seq. The OEA creates reciprocal easements among separately owned fee parcels.

19. Plaintiff's Property was, at the time of the OEA's recordation, identified as Parcel 15.

**B. Plaintiff's 2012 Acquisition and the Seller's Representations**

20. In June 2012, Plaintiff acquired the Property from LNR, which at that time also owned the Center.

21. In connection with that acquisition, LNR and its broker delivered to Plaintiff operating financial statements for calendar years 2010 and 2011, together with a budget prepared by LNR for calendar year 2012 (the "2012 Budget"). Attached hereto as Exhibit C are true and correct copies of the 2010 and 2011 operating financial statements and the 2012 budget.

22. The financial statements showed association dues paid in 2010, and none in 2011. The 2012 Budget, under the heading "Other Expenses," showed association dues for the Property of **$0.00**.

23. The 2012 Budget separately itemized, as costs to be borne by the incoming owner of the Property, numerous expenses relating to the Property's own common areas — including parking lot lighting, parking lot sweeping, semi-annual curb painting and stall striping, field and grounds,

irrigation and sprinklers, pressure cleaning, sign repairs, and asphalt repairs. These costs were presented not as association or CAM charges, but as line items within the new owner's own responsibility.

24. The only line item in the 2012 Budget referencing the Center was a proportionate security cost, described as "participation in the adjacent Towne Center security patrols." No such charge was ever billed to Plaintiff, in that year or any year thereafter.

25. Before closing, LNR's broker confirmed to Plaintiff's principal that the Property was not part of the Center and would not be liable for association dues.

26. Plaintiff relied on these financial statements, on the 2012 Budget, and on the broker's representation in acquiring the Property and in structuring its ownership and operation of the Property thereafter.

**C. Fourteen Years of Self-Maintenance Without Contribution**

27. From June 2012 to the present, no owner or operator of the Center has ever delivered to Plaintiff an annual budget, an estimate, an annual statement, or an invoice for common area or association charges — with the sole exception of the January 2024 notice described below.

28. From June 2012 to the present, no owner or operator of the Center has provided landscaping, security, parking lot sweeping, lighting maintenance, or any other common area service to the Property.

29. Throughout that period, Plaintiff maintained the Property's common areas entirely at its own expense, including landscaping, cleaning, security, parking lot repairs, slurry sealing, striping, and the replacement of parking lot pole lighting.

30. By way of example, the Center's property manager contacted Plaintiff to advise that the Center was replacing pole lights in its portion of the parking lot and suggested that Plaintiff use the same contractor. Plaintiff did so, and replaced the pole lights serving the Property at its sole cost. No contribution was offered by any owner of the Center, and no reciprocal charge was made to Plaintiff that year or any year thereafter.

31. Plaintiff has expended not less than $250,000 on maintenance, repair, and capital improvements to the Property's common areas since 2012, in an amount according to proof but without contribution from any owner of the Center or any association.

32. During the same period, and in stark contrast, the Center fell into the state of disrepair described in Section G below.

**D. The 2024 Pre-Lien Notice and Plaintiff's Response**

33. On or about January 9, 2024, nearly twelve years after Plaintiff acquired the Property, Henkin Group Mom, LLC and Henkin Group II Mom, LLC, then the owners of the Center, caused a "Pre-Lien Notice for Unpaid CAM Charges" to be served on Plaintiff by certified mail through counsel at Buchalter (the "Pre-Lien Notice").

34. The Pre-Lien Notice was given expressly "pursuant to California Civil Code § 6812." It identified Plaintiff by name, identified the Property by its legal description and by APN 921-320-060-5, and identified Plaintiff as "the delinquent owner of the separate interest."

35. The Pre-Lien Notice sought $42,679.63 for calendar year 2021 and $43,000.45 for calendar year 2022, together with interest, collection costs, and attorney's fees. It stated that a Notice of Delinquent Assessment would be recorded against the Property and included the statutory warning that the Property "MAY BE SOLD WITHOUT COURT ACTION."

36. The supporting reconciliation attached to the Pre-Lien Notice allocated to Plaintiff a "Pro-rata Share" of **100.00%** of the Center's common area expenses, plus a 15% administrative fee.

37. By letter dated February 7, 2024, Plaintiff's counsel responded in detail, enclosing the 2010–2011 financial statements and the 2012 Budget, and asserting that any right to reimbursement had been waived and that the owners of the Center were estopped from making any claim for reimbursement. Plaintiff explained that Defendants' predecessors in interest waived, and are estopped from asserting, any right to reimbursement under Section 4.2 of the OEA. Plaintiff advised the Center in writing on February 7, 2024 that no reimbursement was owed under Section 4.2.

38. Plaintiff's February 7, 2024 letter further asserted that the Center's owners were liable to Plaintiff under Section 6.1 of the OEA for sums Plaintiff had expended, and for diminution in value, in an amount of at least several hundred thousand dollars.

39. No response of any kind was ever received. No lien was recorded. No invoice, statement, or demand for payment has been made upon Plaintiff at any time from February 7, 2024 through the date of this Complaint. During that period, the parties continued to perform under the OEA and to accept Plaintiff's performance without objection. Defendants knew of the right they now assert and of the facts giving rise to it, and by their silence and course of performance intentionally relinquished it. Plaintiff, reasonably relied on that silence and course of performance, continued to incur costs for self-maintaining its parcel and did not seek reimbursement, record a protest, and did not reserve against the assessment. Defendants are therefore estopped from asserting the claim now.

**E. The Bankruptcy Cases and the Debtors' Sworn Schedules**

40. On March 3, 2026, each Defendant filed a voluntary petition under chapter 11. The cases are jointly administered under Lead Case No. 8:26-bk-10693-SC. No trustee has been appointed and Defendants remain in possession.

41. On March 17, 2026, Pro Temecula filed its Schedules and Statement of Financial Affairs, signed under penalty of perjury by Jason Miller as Authorized Agent. [Case No. 8:26-bk-10694-SC, Dkt. No. 15.] Those schedules do not appear to have been amended.

42. In Schedule A/B, Part 3, Pro Temecula disclosed accounts receivable over 90 days old with a face amount of $1,218,860.49, and reported the entirety of that amount as $1,218,860.49, with a description of "doubtful or uncollectible." The resulting current value contributed to the total was zero. The total of Part 3 was reported as $566,396.29, consisting solely of receivables 90 days old or less.

43. In Schedule A/B, Part 11, Pro Temecula answered "No" to whether it owned any other assets not already reported. Line 74 (causes of action against third parties, whether or not a lawsuit

has been filed) was left blank. Line 75 (other contingent and unliquidated claims of every nature, including counterclaims and rights of setoff) was left blank. Pro Temecula scheduled no claim of any kind against Plaintiff.

44. In Schedule A/B, Part 9, Pro Temecula scheduled four parcels of real property with an aggregate value of $54,400,000: 29560 Rancho California Road #100; 29720 Rancho California Road; 27560 Ynez Road; and 27536 Ynez Road. The Property is not among them.

45. In Schedule G, Pro Temecula listed tenant leases only. The OEA is not listed. No easement agreement, operating agreement, reciprocal agreement, declaration, or association agreement of any kind appears on Schedule G.

46. The designation "27450" does not appear anywhere in the fifty-eight pages of Pro Temecula's Schedules and Statement of Financial Affairs.

47. Plaintiff was not scheduled as a creditor in either case, was not included on either Defendant's creditor matrix, and was not served with the notice of the claims bar date. Plaintiff first learned of these cases on or about September 3, 2026, from marketing brochure for the Center in connection with the Bankruptcy Sale. Plaintiff is a known creditor and the known holder of an interest adverse to the estates, whose identity and address were at all times reasonably ascertainable by Defendants from the Pre-Lien Notice served by their affiliate, from Plaintiff's February 7, 2024 letter, and from the OEA. A known creditor is entitled to actual notice of a bar date, and a bar date does not bind a known creditor who was not given such notice. *City of New York v. New York, New Haven & Hartford R.R. Co.*, 344 U.S. 293, 296-97 (1953); *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15 (1950). Plaintiff alleges that the claims bar date of July 13, 2026 is inapplicable to Plaintiff and bars no claim asserted herein, and in the alternative seeks leave to file a late proof of claim under Federal Rule of Bankruptcy Procedure 9006(b)(1). *Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership,* 507 U.S. 380, 395 (1993).

**F. The Postpetition Marketing Campaign**

48. In or about late-August or September 2026, and in any event after the March 3, 2026 petition date, Defendants caused Hilco Real Estate Sales and Onyx Asset Advisors, LLC to publish and distribute to prospective purchasers, brokers, and the public a marketing brochure offering the Center for sale (the “Brochure”). Attached hereto as Exhibit D is a true and correct copy of the subject Brochure. The Brochure is branded “BANKRUPTCY SALE,” identifies both Defendants and both case numbers, and sets a bid deadline of October 1, 2026.

49. The Brochure includes a document captioned “TEMECULA TOWN CENTER — RENT ROLL SUMMARY 7/16/26.” Under the heading “Non-Residents,” that rent roll lists “27450 Office Building” with “Other Charges” of $3,583.00 and a corresponding total of $3,583.00.

50. The plain and intended import of that entry, in a rent roll circulated to bidders as a statement of the Center’s income, is that Plaintiff is obligated to pay, and does pay, $3,583.00 per month in common area or association charges to the owner of the Center.

51. That representation is false. Plaintiff pays nothing, has never been billed, and is under no such obligation.

52. Defendants knew the representation was false when it was published. Defendants’ own affiliate served the Pre-Lien Notice on Plaintiff and received Plaintiff’s February 7, 2024 response.

53. Defendants’ own sworn schedules value their aged receivables at zero and disclose no claim against Plaintiff. Ownership of the Center has at all relevant times remained with the Henkin group of entities; Henkin Investor Group, LLC is Pro Temecula’s sole member.

54. Plaintiff has been damaged by the publication of the false representation, including by the costs and attorney’s fees necessarily incurred to clear its title of the adverse claim the Brochure asserts, in an amount to be proven at trial but not less than $30,000.

**G. The Center’s Deterioration and the City of Temecula’s Nuisance Action**

55. The Center comprises five parcels: APN 921-320-021 (29720 Rancho California Road),

owned by Pro Temecula; APN 921-320-038 (27644 Ynez Road), owned by Ynez Shops; APN 921-320-041 (27576 Ynez Road), owned by Ynez Shops; APN 921-320-052 (27536 Ynez Road), owned by Pro Temecula; and APN 921-320-056 (27520 Ynez Road), owned by Ynez Shops. The Center houses approximately sixty businesses.

56. On December 11, 2025, the City of Temecula (the "City") received a complaint regarding the accumulation of trash, rubbish, and debris at the Center. The City's Code Enforcement Division inspected the same day and observed unpermitted accumulations of trash and refuse. The City thereafter conducted at least eighty-five inspections, at each of which it documented violations that remained unabated.

57. Beginning December 11 and December 18, 2025, the City issued Notices of Violation to Defendants for violations of Temecula Municipal Code § 8.20.320 (failure to arrange for collection of refuse, recyclable, and compostable materials), § 8.12.020(J) (accumulation of trash, refuse, garbage, dirt, litter, animal or human feces, or debris in a manner causing or likely to cause the breeding or attraction of flies or other insects), § 8.12.020(S) (storage of trash containers visible from the street or public right-of-way), and § 17.42.020(B). Defendants failed to correct the violations by the stated compliance dates.

58. Between January 12 and January 27, 2026, the City issued thirty-eight Civil Penalty Notices and Orders across the five parcels, assessing civil penalties totaling $56,000: $2,000 as to 29720 Rancho California Road; $6,250 as to 27644 Ynez Road; $12,500 as to 27576 Ynez Road; $14,750 as to 27536 Ynez Road; and $20,500 as to 27520 Ynez Road. Defendants paid none of them.

59. The City further determined that Defendants had failed to provide active and uninterrupted water service to the shopping center and its tenants, in violation of Temecula Municipal Code § 15.04.01(d), incorporating California Plumbing Code §§ 601.2 and 422.1.

60. On March 2, 2026, the City and the People of the State of California filed a complaint in the Superior Court of California, County of Riverside, against both Defendants, seeking a

preliminary and permanent injunction to abate a public nuisance, the appointment of a receiver, declaratory relief, and recovery of administrative and civil penalties.

61. The following day, March 3, 2026, the Defendants filed their respective chapter 11 petitions.

62. On April 15, 2026, the City filed a joinder in the United States Trustee's motion to dismiss or convert, supported by the declaration of David A. Wood and a copy of its nuisance complaint. [Case No. 8:26-bk-10694-SC, Dkt. No. 39.] The City asked that the case not be dismissed, but that a chapter 11 trustee be appointed or the case converted to chapter 7.

63. Plaintiff's Property adjoins the Center, shares vehicular and pedestrian access with it under the OEA, and draws upon the same customer base. The conditions described above, including but not limited to accumulated refuse, uncollected trash, and interrupted water service at a sixty-tenant shopping center, were visible to and affected the users of Plaintiff's Property and diminished its value.

## V. CLAIMS FOR RELIEF

### <u>FIRST CLAIM FOR RELIEF</u>

**(Declaratory Relief — No Obligation Under Section 4.2 of the OEA)**

**(Fed. R. Bankr. P. 7001(i); Against All Defendants)**

64. Plaintiff realleges and incorporates by reference each preceding paragraph.

65. An actual and justiciable controversy exists between Plaintiff and Defendants concerning whether the Property is subject to any obligation to reimburse or contribute to common area expenses of the Center under Section 4.2 of the OEA.

66. Plaintiff contends, and is informed and believes that Defendants deny, that any such obligation has been waived, abandoned, and extinguished, and that Defendants are estopped from asserting it. California courts find waiver where a party intentionally relinquishes a right, or where that party's acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that the right has been relinquished. *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th

1, 31.

67. The waiver, abandonment, and estoppel arise from, among other facts: the written representation in the 2012 Budget that association dues for the Property were $0.00, made by the then-common owner of both the Property and the Center; Plaintiff's reliance on that representation in acquiring the Property; fourteen years during which no budget, statement, invoice, or demand was delivered and enforced against Plaintiff; fourteen years during which no service was ever provided to the Property; and Plaintiff's corresponding assumption of the entire cost of maintaining the Property's common areas.

68. Defendants' own conduct in these bankruptcy cases confirms the absence of any such obligation. Defendants scheduled their aged receivables at zero and scheduled no claim against Plaintiff. Defendants signed and filed those schedules under penalty of perjury, and have obtained relief from this Court on the strength of them. Having represented to this Court that no such claim exists, Defendants are judicially estopped from asserting the contrary now. *See New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001); *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782–85 (9th Cir. 2001). Defendants separately omitted the OEA from Schedule G and omitted Plaintiff from their schedules entirely, which bears upon the matters alleged in Paragraph 47 and upon the treatment of the OEA under 11 U.S.C. § 365.

69. Plaintiff seeks a judicial declaration that the Property is not subject to, and Plaintiff owes no sum on account of, any common area, CAM, assessment, or association charge under the OEA for any period, and that Defendants and their successors and assigns hold no right to assess, invoice, lien, or collect any such charge against the Property.

**<u>SECOND CLAIM FOR RELIEF</u>**

**(Quiet Title)**

**(Fed. R. Bankr. P. 7001(b); Cal. Code Civ. Proc. § 760.010 et seq.; Against All Defendants)**

70. Plaintiff realleges and incorporates by reference each preceding paragraph.

71. Plaintiff is the fee owner of the Property, commonly known as 27450 Ynez Road,

Temecula, California, and more particularly described by legal description in Exhibit A hereto. Cal. Code Civ. Proc. § 761.020(a).

72. Plaintiff seeks to quiet its title against Defendants' adverse claim that the Property is burdened by an obligation to contribute to common area expenses of the Center under Section 4.2 of the OEA, and by any lien right asserted under Section 4.2(H).

73. Defendants' claim is without merit for the reasons alleged above, and further because any such servitude has been abandoned within the meaning of California Civil Code §§ 880.020 et seq., and its enforcement is barred by laches.

74. Plaintiff seeks to quiet title as of the date of the filing of this Complaint. Cal. Code Civ. Proc. § 761.020(d). Plaintiff requests a judgment determining that the Property is free and clear of any obligation, assessment, charge, or lien arising under Section 4.2 of the OEA, binding upon Defendants and all persons claiming under them, including any purchaser of the Center.

75. This Complaint is verified. Although California Code of Civil Procedure § 761.020 does not govern the form of pleadings in this Court, which is governed by Federal Rule of Civil Procedure 8 as made applicable by Federal Rule of Bankruptcy Procedure 7008, Plaintiff verifies the Complaint so that the Second Claim satisfies that section.

**<u>THIRD CLAIM FOR RELIEF</u>**

**(Declaratory Relief — No Statutory Assessment Lien or Nonjudicial Foreclosure Remedy)**

**(Fed. R. Bankr. P. 7001(i); Against All Defendants)**

76. Plaintiff realleges and incorporates by reference each preceding paragraph.

77. The Pre-Lien Notice was given expressly under California Civil Code § 6812, a provision of the Commercial and Industrial Common Interest Development Act, Civil Code § 6500 et seq. (the "Act").

78. The Act applies only to a commercial or industrial common interest development. Its application requires, among other things, a recorded declaration creating separate interests and a common area. Civ. Code §§ 6531, 6534, 6580, 6582.

79. The Center is not a commercial or industrial common interest development. There is no declaration submitting the Property to any such development, no common area held in common or by an association, no association, and no separate interests. The OEA creates reciprocal easements among separately owned fee parcels.

80. An actual controversy exists as to whether the Center is a commercial or industrial common interest development and whether Defendants possess any statutory assessment lien right or nonjudicial foreclosure remedy against the Property. Plaintiff seeks a declaration that they do not, and that no notice of delinquent assessment may be recorded against the Property under Civil Code § 6808 or any related provision.

## FOURTH CLAIM FOR RELIEF

**(Cancellation or Reformation of Instrument — Cal. Civ. Code § 3412 et seq.)**

**(Pleaded Conditionally; Against All Defendants)**

81. Plaintiff realleges and incorporates by reference each preceding paragraph.

82. Plaintiff is informed and believes that Defendants or their predecessors continue to allow the recorded OEA to remain on title without recording an amendment that reflects the parties' agreement that Plaintiff does not owe a contribution for common area maintenance costs for the Center (the "OEA").

83. The OEA, as presently reflected in the public record without an amendment memorializing the parties' agreement and course of performance concerning Plaintiff's obligations under Section 4.2, creates a cloud upon Plaintiff's title by purporting to subject the Property to common area contribution obligations that have been waived, abandoned, and extinguished as alleged herein.

84. If the OEA remains of record without such amendment, Plaintiff will suffer serious injury, including impairment of Plaintiff's ability to sell, finance, or encumber the Property. Plaintiff therefore seeks an order requiring the OEA to be amended of record to reflect that Plaintiff has no obligation to contribute to the Center's common area expenses under Section 4.2.

**<u>FIFTH CLAIM FOR RELIEF</u>**

**(Slander of Title — Postpetition Conduct)**

**(Against All Defendants)**

85. Plaintiff realleges and incorporates by reference each preceding paragraph.

86. The elements of the tort are "(1) a publication, (2) without privilege or justification, (3) falsity, and (4) direct pecuniary loss." *Sumner Hill Homeowners' Ass'n v. Rio Mesa Holdings, LLC* (2012) 205 Cal.App.4th 999, 1030; accord *Manhattan Loft, LLC v. Mercury Liquors, Inc.* (2009) 173 Cal.App.4th 1040, 1051.

87. Defendants published the Brochure, including the rent roll entry attributing $3,583.00 in monthly charges to Plaintiff, to prospective purchasers, brokers, and the public. Publication occurred after the petition date and in the course of Defendants' operation of their businesses and administration of their estates. Hilco Real Estate Sales and Onyx Asset Advisors, LLC published the Brochure as agents of Defendants, acting with Defendants' knowledge, authority, and direction, and Defendants adopted and ratified the publication.

88. The representation is false. It disparages Plaintiff's title by asserting that the Property is burdened by a recurring monetary obligation running to the current and subsequent owner of the Center.

89. The publication was not privileged. It was made in a commercial marketing document distributed to prospective bidders, not in any judicial proceeding, and the litigation privilege of California Civil Code § 47(b) does not apply. To the extent any qualified privilege is asserted under § 47(c), it is defeated by malice: Defendants published the statement with knowledge of its falsity, or with reckless disregard for its truth, having received Plaintiff's February 7, 2024 letter and having themselves scheduled their aged receivables at zero and disclosed no claim against Plaintiff.

90. Plaintiff reasonably expects it will suffer damages when the new owner seeks reimbursement for common area costs as set forth in the Brochure. Plaintiff has also suffered

direct pecuniary loss, including attorney's fees and costs necessarily incurred to clear its title, which are recoverable as damages. *Sumner Hill*, 205 Cal.App.4th at 1030–1032, 1034–1035. Because the misstatement and disparagement was published in the marketing Brochure, those fees and costs alone are sufficient pecuniary damages to support this Claim. Plaintiff's damages are in an amount to be proven at trial but not less than $30,000.

91. Defendants acted with malice, oppression, or fraud within the meaning of California Civil Code § 3294, entitling Plaintiff to punitive damages.

**SIXTH CLAIM FOR RELIEF**

**(Allowance and Payment of Administrative Expense — 11 U.S.C. § 503(b)(1)(A))**

**(Against All Defendants)**

92. Plaintiff realleges and incorporates by reference each preceding paragraph.

93. The conduct alleged in the Fifth Claim occurred after the petition date and arose out of Defendants' operation of their businesses and the administration of their estates.

94. Damages arising from a postpetition tort committed by a debtor in possession in the course of operating the estate's business are an actual and necessary cost of preserving the estate and are entitled to administrative priority under 11 U.S.C. § 503(b)(1)(A). *Reading Co. v. Brown*, 391 U.S. 471, 482–85 (1968); *In re Abercrombie*, 139 F.3d 755 (9th Cir. 1998). The conduct alleged in the Fifth Claim was committed by Defendants in their capacity as debtors in possession, after the petition date, in the course of their operation of the estates' businesses and their marketing of the Center for sale, and Defendants' own acts gave rise to the liability asserted.

95. Plaintiff seeks allowance of an administrative expense claim against each estate in the amount of its damages, and an order directing payment. By asserting this Claim, Plaintiff does not submit any other Claim to the claims-allowance process, and reserves its right to trial by jury on the Fifth and Ninth Claims.

/ / /

/ / /

**SEVENTH CLAIM FOR RELIEF**

**(Injunctive Relief — Fed. R. Bankr. P. 7001(g))**

**(Against All Defendants)**

96. Plaintiff realleges and incorporates by reference each preceding paragraph.

97. Unless restrained, Defendants will continue to represent to prospective purchasers that the Property is obligated to pay common area charges, will convey or purport to convey that asserted obligation to a purchaser of the Center, and may record a notice of delinquent assessment or lien against the Property.

98. Plaintiff has no adequate remedy at law. Title to real property is unique, and a purchaser acquiring the Center in reliance on the Brochure may assert rights against the Property that would require separate and duplicative litigation to defeat.

99. Plaintiff seeks an order enjoining Defendants from (a) recording any lien, notice of delinquent assessment, or similar instrument against the Property; (b) representing to any prospective purchaser that the Property is subject to any common area, CAM, or association charge; and (c) selling, assigning, or transferring any purported claim against the Property, without first correcting the representation and disclosing this proceeding.

**EIGHTH CLAIM FOR RELIEF**

**(Declaratory Relief — Recoupment)**

**(Fed. R. Bankr. P. 7001(i); Against All Defendants)**

100. Plaintiff realleges and incorporates by reference each preceding paragraph.

101. In the event that Plaintiff is obligated to pay any amount to Defendants under the OEA, Section 6.1 of the OEA entitles a non-defaulting party that cures another party's default to reimbursement of sums reasonably expended. Defendants and their predecessors defaulted in their obligations under the OEA, including by failing to deliver annual budgets, failing to provide common area services to the Property, and permitting the Center to fall into disrepair.

102. Plaintiff's claims for reimbursement under Section 6.1 arise from the same transaction and

the same agreement as any charge Defendants assert against Plaintiff under Section 4.2. They are therefore available to Plaintiff by way of recoupment, are not subject to any claims bar date, and are not "claims" requiring the filing of a proof of claim. Recoupment differs from setoff: it applies where the opposing obligations arise from the same transaction, is not governed by 11 U.S.C. § 553, and is not barred by the automatic stay, a claims bar date, or discharge. *Newbery Corp. v. Fireman's Fund Insurance Co.*, 95 F.3d 1392, 1398-1403 (9th Cir. 1996); *In re TLC Hospitals, Inc.*, 224 F.3d 1008, 1011-12 (9th Cir. 2000). The obligations asserted under Sections 4.2 and 6.1 arise from the same recorded instrument and the same course of performance and are logically connected. The logical relationship between the opposing obligations is not established by factual and legal connection alone; recoupment carries an equitable assessment in each case. *Cooper v. Social Security Administration* (In re Cooper), No. 24-1084 (9th Cir. Mar. 20, 2025). It would be inequitable to permit Defendants to enforce Section 4.2 of the OEA against Plaintiff to seek reimbursement for common area maintenance, while refusing to honor their reciprocal obligations to Plaintiff under Section 6.1 of the same instrument.

103. Plaintiff seeks a declaration that, in the event any obligation under Section 4.2 is determined to exist, Plaintiff is entitled to recoup against it the full amount of Plaintiff's expenditures under Section 6.1, and that such recoupment extinguishes any net obligation of Plaintiff.

**<u>NINTH CLAIM FOR RELIEF</u>**

**(Breach of the Operation and Easement Agreement — Failure to Maintain the Center)**

**(Against All Defendants)**

104. Plaintiff realleges and incorporates by reference each preceding paragraph.

105. The OEA creates covenants, conditions, restrictions, and equitable servitudes that run with the land and that bind and benefit each parcel subject to it, including Plaintiff's Property. Plaintiff, as the owner of a benefited parcel, is entitled to enforce them.

106. Section 4.2 of the OEA obligates Defendants as the Operator, to operate, maintain, and

repair the Center and its common areas in a clean, safe, and first-class condition, and to provide utilities and refuse collection service thereto.

107. The parties' course of performance waived the cost-sharing and reimbursement provisions of Section 4.2 as applied to Plaintiff's Property. It did not waive the operation and maintenance covenants themselves, which each owner continued to perform as to its own parcels. A waiver of the right to collect reimbursement is not an abandonment of the duty to maintain.

108. To the extent this Claim is inconsistent with the First through Third Claims for Relief, it is pleaded in the alternative pursuant to Federal Rule of Civil Procedure 8(d)(2) and (3), made applicable by Federal Rule of Bankruptcy Procedure 7008.

109. Defendants and their predecessors breached the OEA by failing to arrange for the collection of refuse from the Center; by permitting the accumulation of trash, refuse, garbage, litter, and debris; by storing trash containers in violation of applicable law; by failing to provide active and uninterrupted water service to the Center and its tenants; and by otherwise permitting the Center to fall into a condition constituting a public nuisance.

110. Plaintiff performed all obligations required of it under the OEA, or was excused from performance.

111. As a direct and proximate result of Defendants' breaches, Plaintiff has suffered damages, including diminution in the fair market value of the Property, impairment of Plaintiff's ability to lease the Property and to realize market rents, and increased operating and security costs, in an amount to be proven at trial but not less than $700,000.

112. Defendants' breaches occurring on and after March 3, 2026 arose in the course of the administration of their estates, and damages arising therefrom are an actual and necessary cost of preserving the estates entitled to administrative priority under 11 U.S.C. § 503(b)(1)(A). Damages attributable to breaches occurring before March 3, 2026 constitute a prepetition claim. For the reasons alleged in Paragraph 47, Plaintiff is a known creditor that was given no notice of the bar date and is not bound by it; in the alternative, Plaintiff asserts the prepetition portion of this Claim

defensively, by way of recoupment against any obligation asserted under Section 4.2, as alleged in the Eighth Claim.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

1. For a declaration that the Property is not subject to, and Plaintiff owes no sum on account of, any common area, CAM, assessment, or association charge under the OEA for any period;

2. For a judgment quieting Plaintiff's title to the Property against Defendants and all persons claiming under them, including any purchaser of the Center, free and clear of any obligation or lien arising under Section 4.2 of the OEA;

3. For a declaration that Defendants hold no statutory assessment lien right or nonjudicial foreclosure remedy against the Property under California Civil Code § 6500 et seq.;

4. For an amendment to the OEA that removes Plaintiff's obligation to contribute to the common area expenses of the Center;

5. For compensatory damages according to proof;

6. For allowance of an administrative expense claim against each estate under 11 U.S.C. § 503(b)(1)(A) and an order directing its payment, and, in the alternative, for a determination that the claims bar date is inapplicable to Plaintiff or for leave to file a late proof of claim under Federal Rule of Bankruptcy Procedure 9006(b)(1);

7. For preliminary and permanent injunctive relief as set forth above;

8. For a declaration that Plaintiff may recoup its expenditures under Section 6.1 of the OEA against any obligation determined to exist under Section 4.2;

9. For damages for breach of the OEA, including diminution in the fair market value of the Property, according to proof;

10. For attorney fees as permitted by contract or law, including under California Civil Code § 1717 and as damages for slander of title;

11. For costs of suit; and

12. For such other and further relief as the Court deems just and proper.

DATED: September 24, 2026

ROBHANA LEGAL, P.C.

By: ______________________________

Mathias D. Maciejewski
Attorneys for Plaintiff

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all claims so triable, including the Fifth Claim for Relief. Plaintiff does not consent to the entry of final orders or judgment by the bankruptcy court on the Fifth Claim and does not consent to a jury trial before the bankruptcy court. See 28 U.S.C. § 157(e); *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989).

DATED: September 24, 2026

ROBHANA LEGAL, P.C.

By: ______________________________

Mathias D. Maciejewski
Attorneys for Plaintiff

# VERIFICATION

I, Robin Hanasab, declare:

I am the Manager of 27450 Ynez Road, LLC, the Plaintiff in this action. I have read the foregoing Complaint and know its contents. The matters stated therein are true of my own knowledge, except as to those matters stated on information and belief, and as to those matters I believe them to be true. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 9-24, 2026, at Los Angeles, California.

Robin Hanasab

# EXHIBIT A

FIRST AMERICAN TITLE INSURANCE COMPANY
NATIONAL COMMERCIAL SERVICES
LOS ANGELES OFFICE

06/11/2012 08:00 AM Fees: $31.00
Page 1 of 3 Doc T Tax Paid
Recorded in Official Records
County of Riverside
Larry W. Ward
Assessor, County Clerk & Recorder

RECORDING REQUESTED BY
AND WHEN RECORDED RETURN TO:

27450 Ynez Rd, LLC
606 South Olive Street, Suite 600
Los Angeles, CA 90014

**This document was electronically submitted to the County of Riverside for recording**
Receipted by: LCWEATHERS

DTT OK-D

(Space above this line for Recorder's use)

ASSESSOR'S PARCEL NO. 921-320-060-5

TRA no. 013-004

**GRANT DEED**

DTT: NO SHOW

**THIS GRANT DEED**, dated as of the 1st day of June, 2012, is made by **JPMCC 2005-CIBC13 YNEZ ROAD LIMITED PARTNERSHIP**, a Delaware limited partnership ("**Grantor**"), in favor of **27450 YNEZ RD, LLC**, a California limited liability company ("**Grantee**"):

WITNESSETH THAT:

In accordance with Section 11932 of the California Revenue and Taxation Code, Grantor has declared the amount of transfer tax that is due by a separate statement which is not being recorded with this Grant Deed.

For good and valuable consideration, receipt of which is hereby acknowledged, Grantor hereby grants to Grantee the real property in the City of Temecula, County of Riverside, State of California, more particularly described on the attached **Exhibit A** (the "**Property**") and all buildings and improvements now located on the Property.

Subject however, to:

(a) Real property taxes and assessments for the fiscal year 2011-2012 and thereafter;

(b) Zoning and other regulatory laws and ordinances affecting the Property;

(c) Matters which would be disclosed by an accurate survey;

(d) Any plat affecting the Property; and

(e) Easements, rights of way, limitations, conditions, covenants, restrictions, and other matters of record.

Grantor disclaims any and all express or implied warranties regarding the Property other than the implied warranties stated in Section 1113 of the California Civil Code.

**[SIGNATURE PAGE FOLLOWS]**



NCS-533582-21

Grantor has executed this Deed the day and year first above written.

**GRANTOR:**

**JPMCC 2005-CIBC13 YNEZ ROAD LIMITED PARTNERSHIP**, a Delaware limited partnership

By: JPMCC 2005-CIBC13 YNEZ ROAD GP, LLC, a Delaware limited liability company, its general partner

By: LNR Partners California Manager, LLC, a California limited liability company, successor by statutory conversion to LNR Partners California Manager, Inc., a California corporation, its manager

By: ____________________
Rodolfo S. Lauredo
Vice President

STATE OF FLORIDA )
) SS.
COUNTY OF MIAMI-DADE )

The foregoing instrument was acknowledged before me on May 18, 2012 by Rodolfo S. Lauredo, as Vice President of LNR Partners California Manager, LLC, a California limited liability company, successor by statutory conversion to LNR Partners California Manager, Inc., a California corporation, as manager for JPMCC 2005-CIBC13 YNEZ ROAD GP, LLC, a Delaware limited liability company, as general partner of **JPMCC 2005-CIBC13 YNEZ ROAD LIMITED PARTNERSHIP**, a Delaware limited partnership, on behalf of the partnership. He is personally known to me or has produced a driver's license as identification.

____________________
Notary Public
Print Name: ____________________
Serial No. (if any): ____________________

NOTARY PUBLIC STATE OF FLORIDA
RODOLFO RINCON
Notary Public - State of Florida
My Comm. Expires Oct 6, 2013
Commission # DD 931124
Bonded Through National Notary Assn.

# EXHIBIT A

## LEGAL DESCRIPTION

PARCEL A, AS SHOWN AND DESCRIBED IN THE NOTICE OF LOT LINE ADJUSTMENT AS EVIDENCED BY DOCUMENT RECORDED JULY 16, 1999 AS INSTRUMENT NO. 1999-319192 OF OFFICIAL RECORDS, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

PARCEL A:
BEING THAT CERTAIN PARCEL OF LAND DESCRIBED IN GRANT DEED RECORDED MAY 15, 1998 AS INSTRUMENT NO. 197157, TOGETHER WITH A PORTION OF THAT CERTAIN PARCEL OF LAND DESCRIBED AS PARCEL "I" IN GRANT DEED RECORDED DECEMBER 18, 1997 AS INSTRUMENT NO. 464346 ALL IN THE OFFICE OF THE RIVERSIDE COUNTY RECORDER, RIVERSIDE, CALIFORNIA, DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST WESTERLY CORNER OF THAT PARCEL OF LAND DESCRIBED IN SAID INSTRUMENT NO. 197157, SAID POINT ALSO BEING THE MOST WESTERLY CORNER OF PARCEL 15 AND ON THE EASTERLY RIGHT OF WAY LINE OF YNEZ ROAD AS SHOWN ON PARCEL MAP NO. 22863 RECORDED IN PARCEL MAP BOOK 150, PAGES 51 THROUGH 57 INCLUSIVE RECORDS OF RIVERSIDE COUNTY, CALIFORNIA; THENCE, ON THE EASTERLY RIGHT OF WAY LINE OF YNEZ ROAD, SOUTH 09° 00' 39" EAST, 487.36 FEET; THENCE LEAVING SAID RIGHT OF WAY LINE, SOUTH 78° 47' 10" EAST, 40.60 FEET; THENCE NORTH 80° 59' 21" EAST, 164.58 FEET TO THE BEGINNING OF A NON TANGENT CURVE CONCAVE EASTERLY AND HAVING A RADIUS OF 407.32 FEET, A RADIAL LINE TO SAID POINT BEARS NORTH 87° 19' 56" EAST; THENCE NORTHERLY ON SAID CURVE THROUGH A CENTRAL ANGLE OF 16° 19' 35", 116.07 FEET TO A POINT OF REVERSE CURVATURE TO WHICH A RADIAL LINE BEARS NORTH 76° 20' 29" WEST; THENCE, NORTHERLY ON SAID CURVE THROUGH A CENTRAL ANGLE OF 22° 40' 10", 161.16 FEET; THENCE NORTH 10° 12' 18" WEST, 143.93 FEET, TO THE BEGINNING OF A CURVE CONCAVE EASTERLY HAVING A RADIUS OF 95.00 FEET; THENCE, NORTHEASTERLY ON SAID CURVE THROUGH A CENTRAL ANGLE OF 09° 45' 47" 16.19 FEET TO A POINT ON A NON-TANGENT LINE TO WHICH A RADIAL LINE BEARS NORTH 89° 14' 52" WEST;
THENCE, NORTH 53° 44' 11" WEST, 91.76 FEET;
THENCE, NORTH 36° 15' 49" EAST, 29.00 FEET;
THENCE, NORTH 53° 44' 11" WEST, 42.76 FEET;
THENCE, NORTH 57° 46' 44" WEST, 25.24 FEET;
THENCE, SOUTH 72° 21' 20" WEST, 61.11 FEET;
THENCE, NORTH 01° 04' 16" WEST, 55.54 FEET;
THENCE, NORTH 77° 56' 08" EAST, 12.22 FEET;
THENCE, NORTH 30° 36' 41" EAST, 27.84 FEET;
THENCE, NORTH 59° 22' 04" WEST, 42.34 FEET;
THENCE, NORTH 28° 20' 07" WEST, 42.25 FEET;
THENCE, SOUTH 54° 08' 29" EAST, 12.70 FEET;
THENCE, SOUTH 01° 04' 16" EAST, 65.32 FEET;
THENCE, SOUTH 72° 21' 20" WEST, 35.13 FEET;
THENCE, SOUTH 35° 50' 34" WEST, 60.16 FEET;
THENCE, SOUTH 80° 59' 21" WEST, 10.00 FEET TO THE TRUE POINT OF BEGINNING.

PARCEL B:
NON-EXCLUSIVE EASEMENTS FOR VEHICULAR AND PEDESTRIAN INGRESS AND EGRESS, LANDSCAPING, DRAINAGE AND UNDERGROUND UTILITIES AS SET FORTH IN THE GRANT OF EASEMENT RECORDED JUNE 9, 1988 AS INSTRUMENT NO. 156778, OFFICIAL RECORDS OF RIVERSIDE COUNTY, CALIFORNIA.

PARCEL C:
NON-EXCLUSIVE EASEMENTS FOR THE PASSAGE AND PARKING OF VEHICULAR, PEDESTRIAN, UTILITIES, CORRIDOR EASEMENTS AS SET FORTH IN THE OPERATION AND EASEMENT AGREEMENT RECORDED JUNE 9, 1988 AS INSTRUMENT NO. 156782, AND AS AMENDED BY DOCUMENTS RECORDED AUGUST 2, 1989 AS INSTRUMENT NO. 259041, AUGUST 14, 1989 AS INSTRUMENT NO. 274852 AND APRIL 18, 1990 AS INSTRUMENT NO. 141301 ALL OF OFFICIAL RECORDS OF RIVERSIDE COUNTY, CALIFORNIA.

# EXHIBIT B

156782

RECEIVED FOR RECORD
AT [illegible] O'CLOCK A.M.
At Request of
TICOR TITLE INSURANCE CC
JUN 9 1988
Recorded in Official Records of Riverside County, California
Recorder
Fees $

181/88

**RECORDING REQUESTED BY:**

**WHEN RECORDED MAIL TO:**
**BROBECK, PHLEGER & HARRISON**
**ATTN: Ellen B. Spellman, Esq.**
**225 Broadway, Suite 2100**
**San Diego, California 92101**

**Space Above for Recorder's Use**

---

**<u>OPERATION AND EASEMENT AGREEMENT</u>**

4882346R

**PROJECT:** Rancho California Town Center

**PARTIES:** Dayton Hudson Corporation

Albertson's, Inc.

Radnor/LandGrant Rancho California Town Center Partnership

Confidentially provided to
Paul Meade
12.130.164.240
07/15/2013 3:22 PM

156782

## OPERATION AND EASEMENT AGREEMENT
## TABLE OF CONTENTS


| Section | | Page |
|---|---|---|
| | PARTIES | 1 |
| Article I | DEFINITIONS | 2 |
| 1.1 | Approving Parties | 2 |
| 1.2 | Building Area | 2 |
| 1.3 | Corridor | 2 |
| 1.4 | Common Area | 2 |
| 1.5 | Floor Area | 3 |
| 1.6 | Major | 3 |
| 1.7 | Occupant | 4 |
| 1.8 | Outside Sales Area | 4 |
| 1.9 | Party | 4 |
| 1.10 | Person | 5 |
| 1.11 | Permittee | 5 |
| 1.12 | Parcel | 6 |
| Article II | EASEMENTS | 6 |
| 2.1 | Ingress and Egress | 6 |
| 2.2 | Utilities | 9 |
| 2.3 | Construction, Maintenance and Reconstruction | 11 |
| 2.4 | Corridor Easement | 12 |
| 2.5 | Restriction | 13 |
| Article III | CONSTRUCTION | 14 |
| 3.1 | General Requirements | 14 |
| 3.2 | Common Area | 16 |
| 3.3 | Building Improvement | 19 |
| Article IV | MAINTENANCE AND REPAIR | 25 |
| 4.1 | Utilities | 25 |
| 4.2 | Common Area | 26 |
| 4.3 | Building Improvements and Outside Sales Area | 39 |


Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

156782

| | | |
|---|---|---|
| Article V | OPERATION OF THE SHOPPING CENTER...... | 41 |
| 5.1 | Uses.................................. | 41 |
| 5.2 | Lighting.............................. | 47 |
| 5.3 | Signs................................. | 49 |
| 5.4 | Insurance............................. | 53 |
| 5.5 | Taxes and Assessments................. | 59 |
| 5.6 | Liens................................. | 60 |
| Article VI | MISCELLANEOUS......................... | 60 |
| 6.1 | Default............................... | 60 |
| 6.2 | Interest.............................. | 60 |
| 6.3 | Estoppel Certificate.................. | 62 |
| 6.4 | Notices............................... | 62 |
| 6.5 | Approval Rights....................... | 63 |
| 6.6 | Condemnation.......................... | 64 |
| 6.7 | Binding Effect........................ | 65 |
| 6.8 | Singular and Plural................... | 65 |
| 6.9 | Counterparts and Signature Pages...... | 66 |
| 6.10 | Negation of Partnership.............. | 66 |
| 6.11 | Not a Public Dedication.............. | 66 |
| 6.12 | Excusable Delays..................... | 66 |
| 6.13 | Severability......................... | 67 |
| 6.14 | Amendments........................... | 67 |
| 6.15 | Captions and Capitalized Terms....... | 67 |
| 6.16 | Minimization of Damages.............. | 68 |
| 6.17 | OEA Shall Continue Notwithstanding Breach................................ | 68 |
| 6.18 | Time................................. | 69 |
| 6.19 | Non Waiver........................... | 69 |
| Article VII | TERM................................ | 69 |
| 7.1 | Term of this OEA..................... | 69 |

Confidentially Provided to
Paul Meade
12.130.154.240
07/15/2013 3:22 PM

156782

Exhibit A Legal Description of Target Parcel
Exhibit B Legal Description of Albertson's Parcel
Exhibit C Legal Description of Developer Parcels
Exhibit D Legal Description of Access Easement
Exhibit E Parcel Map
Exhibit F Submission Guidelines
Exhibit X Site Plan

Confidentially provided to
Paul Meade
12.130.164.240
07/15/2013 3:22 PM

156782

# OPERATION AND EASEMENT AGREEMENT

THIS AGREEMENT ("OEA") is made and entered into as of the 20th day of April, 1988 between DAYTON HUDSON CORPORATION, a Minnesota corporation ("Target"), ALBERTSON'S, INC., a Delaware corporation ("Albertson's") and RADNOR/LANDGRANT RANCHO CALIFORNIA TOWN CENTER PARTNERSHIP, a California general partnership ("Developer").

## WITNESSETH

WHEREAS, Target is the owner of a certain tract of land described in Exhibit A attached hereto and is located as shown on Exhibit E attached hereto; and

WHEREAS, Albertson's is the owner of a certain tract of land described in Exhibit B attached hereto and is located as shown on Exhibit E; and

WHEREAS, Developer is the owner of a certain tracts of land described in Exhibit C attached hereto and are located as shown on Exhibit E, and is the holder of an easement grant which permits the passage of pedestrian and vehicle travel over and across a tract of land described in Exhibit D attached hereto and located as shown on Exhibit E; and

WHEREAS, all of the lands referred to above, including the access easement area, (collectively the "Shopping Center") are contiguous and adjacent as shown on Exhibit E; and

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

041288/#10/OEARCTCP

156782

**WHEREAS**, the signatories hereto intend to develop and operate their respective properties in conjunction with each other as integral parts of a retail shopping complex as shown on Exhibit X attached hereto (the "Site Plan") and in order to effectuate the common use and operation thereof they desire to enter into certain covenants and agreements as a part of a general plan, and to grant to each other certain reciprocal easements in, to, over, and across their respective Parcels.

**NOW, THEREFORE**, in consideration of the promises, the covenants and agreements hereinafter set forth and in furtherance of the parties understanding, it is agreed as follows:

## ARTICLE I
## DEFINITIONS

1.1 Approving Parties. "Approving Parties" shall mean each designated "Party" with respect to Parcels 6, 7 and 11.

1.2 Building Area. "Building Area" shall mean the limited areas designated on the Site Plan within which buildings and Outside Sales Areas (hereinafter defined) may be constructed, placed or located; for the purpose of this OEA, a building shall be deemed to include any appurtenant canopy, loading dock, receiving area or truck ramp, trash compactors, utility transformers, trash storage area, signs and the recycling facility referred to in 4.3(A) hereof.

1.3 Corridor. "Corridor" shall mean the limited areas designated on the Site Plan which are intended to be used by the Permittees (hereinafter defined) of the buildings immediately adjacent thereto.

1.4 Common Area. "Common Area" shall mean all areas within the exterior boundaries of the Shopping Center, exclusive of (i) buildings and (ii) any Outside Sales Area.

Confidentially Provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

156782

1.5 Floor Area. "Floor Area" shall mean the actual number of square feet of space contained on each floor within a building, including any mezzanine or basement space used either for retail sales or services purposes or for the storage of merchandise, as measured from the exterior faces of the exterior walls or store front and/or the center line of any common walls, and including any Outside Sales Area unless specifically excluded below; provided, however, that the following areas shall not be included in such calculations: supporting mezzanine office space, any space used for building utilities or mechanical equipment, any recycling facility and the first 15,000 square feet of any Outside Sales Area located on Parcel 6, and up to 1,500 square feet of space used by the Operator to store equipment, tools, decorations, etc. used solely in the operation and maintenance of the Common Area. Each Party shall direct its architect to make a determination of the total Floor Area of any building on such Party's Parcel (hereinafter defined) within one hundred twenty (120) days of the date of completion of such building. Within a reasonable time thereafter, such Party shall certify to all other Parties the Floor Area applicable to each building.

During any period of rebuilding, repairing, replacement or reconstruction of a building, the Floor Area of that building shall be deemed to be the same as existed immediately prior to that period. Upon completion of such rebuilding, repairing, replacement or reconstruction, the Party upon whose Parcel such building is located, shall cause a new determination of Floor Area for such building to be made in the manner described above, and such determination shall be sent to any Party requesting the same.

1.6 Major. "Major" shall mean the Party owning Parcel 6, and the Party owning Parcel 7.

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

1.7 Occupant. "Occupant" shall mean any Person from time to time entitled to the use and occupancy of any portion of a building in the Shopping Center under an ownership right or any lease, sublease, license, concession, or other similar agreement.

1567782

1.8 Outside Sales Area. "Outside Sales Area" shall mean a permanently defined area immediately adjacent to a building which is used exclusively by an Occupant of such building for any of the following purposes: the sale or display of merchandise, the storage of merchandise, or the accommodation of customers (such as outdoor seating for a restaurant) and which is accessed primarily through the Occupant's portion of the building.

1.9 Party. "Party" shall mean each signatory hereto and their respective successors and assigns who become owners of a Parcel within the Shopping Center. Each Party shall be liable for the performance of all covenants, obligations and undertakings herein set forth with respect to its Parcel during such period of ownership. If a Parcel is owned by more than one Person, the Person or Persons holding at least 51% of the ownership interests in the Parcel shall jointly designate one of their number as an agent to act on behalf of all Persons with respect to such Parcel and that agent shall be deemed the "Party" for such Parcel. A Party transferring any portion of its ownership in a Parcel shall give notice to all other Parties of such transfer and shall include therein at least the following information:

(i) the name and address of the transferee; and

(ii) a copy of the legal description of the portion of the Parcel transferred.

Confidentially Provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

156782

Notwithstanding anything to the contrary, if the portion sold is to an unaffiliated Person (hereinafter defined) and the transferor immediately thereafter leases such portion back from such purchaser, such transferor, or its successor to the leasehold estate shall, for the purpose of this OEA, be deemed to be the "Party" with respect to the portion sold so long as such leasehold estate exists. In addition, the owner of a Parcel may, at its election and in writing to the other Parties, designate any lessee of its Parcel as the "Party" for such Parcel and during the period of such designation the owner shall be bound by the actions taken or waived by such designated "Party".

1.10 Person. "Person" shall mean any individual, partnership, firm, association, corporation, trust, or any other form of business or government entity.

1.11 Permittee. "Permittee" shall mean all Occupants and the officers, directors, employees, agents, contractors, customers, vendors, suppliers, visitors, invitees, licensees, subtenants, and concessionaires of Occupants insofar as their activities relate to the intended use of the Shopping Center. Among others, Persons engaging in the following activities on the Common Area will not be considered to be Permittees:

(i) Exhibiting any placard, sign, or notice;
(ii) Distributing any circular, handbill, placard, or booklet;
(iii) Soliciting memberships or contributions;
(iv) Parading, picketing, or demonstrating; and
(v) Failing to follow regulations relating to the use of the Shopping Center.

Confidentially provided to Paul Meade to 12.130.164.240 07/15/2013 3:22 PM

1.12 Parcel. "Parcel" shall mean any or all of the portions of the Shopping Center identified on Exhibit E as Parcels 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16 and 17, as the context requires.

156782

## ARTICLE II
## EASEMENTS

2.1 Ingress and Egress.

(A) During the term of this OEA each Party hereby grants and conveys to each other Party for its use and for the use of its Permittees, in common with others entitled to use the same, a non-exclusive easement for the passage and parking of vehicles over and across the parking and driveway areas of the grantor's Parcel (including the access easement area) as the same may from time to time be constructed and maintained for such use and for the passage and accommodation of pedestrians over and across the parking, driveways and sidewalk areas of the grantor's Parcel (including the access easement area) as the same may from time to time be constructed and maintained for such use. Each Party agrees to cause the Common Area on its Parcel to be constructed substantially as shown on the Site Plan and further agrees that its portion of the Common Area shall not thereafter be changed without the approval of the Approving Parties, subject only to the reservations set forth below. Such easement rights shall be subject to the following reservations:

(i) In connection with any construction, reconstruction, repair or maintenance on its Parcel, each Party reserves the right to temporarily create a staging and/or storage area in the Common Area on its Parcel at such location as will not unreasonably interfere with access between such Parcel and the other areas of the Shopping Center.

Confidentially Provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

156782

(ii) Each party reserves the right to make, at its own expense, any insignificant change, modification or alteration in its portion of the Common Area, (including the installation of convenience facilities such as mailboxes, benches and telephones) provided that:

(a) the accessibility of such Common Area for pedestrian and vehicular traffic (as it relates to the remainder of the Shopping Center, including pedestrian access along sidewalks) is not unreasonably restricted or hindered.

(b) there shall be maintained at all times within such Common Area, a sufficient number of vehicular parking spaces to meet the parking requirements set forth in 3.2(E), and all parking stalls and rows and vehicular traffic lanes shall remain generally as shown on tne Site Plan; in addition, no more than one percent (1%) of the original parking spaces located on such Parcel shall be eliminated without the approval of the Approving Parties;

(c) no governmental rule, ordinance or regulation shall be violated as a result of such action, and such action shall not result in any other Party being in violation of any governmental rule, ordinance or regulation;

(d) no change shall be made in the access points between the Common Area and the public streets; provided, however, that additional access points may be created with the approval of the Approving Parties, such approval not to be unreasonably withheld;

(e) at least thirty (30) days prior to making any such change, modification or alteration, the Party desiring to do such work shall deliver to each other Party copies of the plans therefor, and provided further that such work shall not occur between October 1st and the following January 31st.

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

156782

(iii) Each Party reserves the right to close off its portion of the Common Area for such reasonable period of time as may be legally necessary, in the opinion of such Party's counsel, to prevent the acquisition of prescriptive rights by anyone; provided, however, that prior to closing off any portion of the Common Area, as herein provided, such Party shall give written notice to each other Party of its intention to do so, and shall attempt to coordinate such closing with each other Party so that no unreasonable interference in the passage of pedestrians or vehicles shall occur; if an alternative to physically closing off a Parcel is reasonably available to prevent the acquisition of third Person rights, the Parties agree to utilize such other means.

(iv) Each Party reserves the right at any time and from time to time to exclude and restrain any Person who is not a Permittee from using its Common Area.

(B) There are hereby established specific right-of-ways as shown on the Site Plan each of which is intended to insure that access will at all times be available to the designated benefiting Parcels. Each Party hereby grants and conveys a perpetual non-exclusive easement for the passage and accommodation of vehicular and pedestrian travel upon, over and across that portion of the grantor's Parcel which is covered by the specified "Shared Access Area"; such easement shall be appurtenant to and for the benefit of the Parcel designated below and shall be utilized by the owners thereof and their respective Permittees:

(i) Shared Access Area #1 - Benefits Parcels 14, 11, 5, 15, 6, 17 and 16;

(ii) Shared Access Area #2 - Benefits Parcels 4, 6, 11 and 3;

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

(iii) Shared Access Area #3 - Benefits Parcels 2 and 1;

(iv) Shared Access Area #4 - Benefits Parcels 8, 9, 10, 7, 11, 13, 12 and 15.

156782

After termination of this OEA, each Shared Access Area shall be maintained by a Person selected by a majority of the grantors in a safe and good condition and no portion thereof shall be changed, modified or blocked off without the consent of the Parties benefiting thereby; the cost of maintenance shall be allocated on an equal basis to each Party benefiting therefrom, subject to any different allocation set forth in the grant of the access easement described in Exhibit D.

2.2 Utilities.

(A) Each Party hereby grants and conveys to each other Party non-exclusive perpetual easements in, to, over, under, along and across those portions of the Common Area (exclusive of any portion located within a Building Area) located on the grantor's Parcel necessary for the installation, operation, flow, passage, use, maintenance, connection, repair, relocation, and removal of lines or systems for utilities serving the grantee's Parcel, including but not limited to, sanitary sewers, storm drains, water (fire and domestic), gas, electrical, telephone and communication lines. Except with respect to ground mounted electrical transformers at the rear of a building or as may be necessary during periods of construction, repair, or temporary service, all utilities shall be underground unless required to be above ground by the utility providing such service. Prior to exercising the right granted herein, the grantee shall first provide the grantor with a written statement describing the need for such easement, shall identify the proposed location of the utility, and shall furnish a certificate of insurance showing that its contractor has obtained the minimum insurance coverage

Confidentially Provided to Paul Meade 12.130.154.240 07/15/2013 3:22 PM

1567782

required by 5.4(C) hereof. Any Party installing utilities pursuant to the provisions of this subparagraph shall pay all costs and expenses with respect thereto and shall cause all work in connection therewith (including general clean-up and proper surface and/or subsurface restoration) to be completed as quickly as possible and in a manner so as to minimize interference with the use of the Common Area.

(B) The initial location and width of any utility shall be subject to the prior written approval of the Party whose Common Area is to be burdened thereby, such approval not to be unreasonably withheld. The easement area shall be no larger than whatever is necessary to reasonably satisfy the utility company as to a public utility or five feet (5') on each side of the centerline as to a private line. The grantor shall have the right at any time to relocate a utility line upon thirty (30) days' prior written notice, provided that such relocation:

(i) shall not interfere with or diminish the utility services to the grantee;

(ii) shall not reduce or unreasonably impair the usefulness or function of such utility;

(iii) shall be performed without cost or expense to grantee;

(iv) shall be completed using materials and design standards which equal or exceed those originally used; and

(v) shall have been approved by the utility company and the appropriate governmental or quasi-governmental agencies having jurisdiction thereover.

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

1567782

Documentation of the initial or relocated easement area (as built survey) shall be at the expense of the installing Party, shall be accomplished as soon as possible and shall be provided to the grantor or the grantee, as the case may be, as well as to the Operator.

2.3 Construction, Maintenance and Reconstruction.

(A) In order to accommodate any footings, foundations, columns or walls which may be constructed or reconstructed immediately adjacent to the common boundary lines between (i) Parcels 6 and 11, and (ii) Parcels 7, 10 and 11, and which may overlap each of those common boundary lines, each Party, with respect to its Parcel, grants and conveys to the Party owning the adjacent Parcel a non-exclusive easement in, to, and under that portion of its Parcel adjacent to such common boundary line in space not theretofore occupied by any then existing structure for the construction, maintenance and replacement of footings and foundations to a maximum distance of (a) five feet (5') onto the grantor's Parcel with regards to the Parcels identified in (i) above, and (b) two feet (2') onto the grantor's Parcel with respect to the Parcels identified in (ii) above, and a non-exclusive easement in, to and above that portion of its Parcel adjacent to such common boundary line in space not theretofore occupied by any then existing structure for the construction, maintenance and replacement of building walls, over-hangs, and canopies to a maximum distance of six inches (6"), except that on Parcel 6 there shall also be permitted an easement over a portion of the Common Area immediately adjacent to Shop F, for the construction, maintenance and replacement of a canopy forming a part of the Shop F improvements, to a maximum distance of four feet (4') and provided such canopy structure is placed at least ten feet (10') above the surface of the ground. Each grant of easement shall include the reasonable right of access necessary to exercise and enjoy such grant. Each easement shall continue in effect for the term of this OEA and thereafter for so long as

Confidentially Provided to Paul Meade 12:30:04.240 07/15/2013 3:22 PM

1567782

the building utilizing the easement area exists (including a reasonable period to permit reconstruction or replacement of such building if the same shall be destroyed, damaged, or demolished) and shall include the reasonable right of access necessary to exercise and enjoy such grant.

(B) Prior to utilizing the easement right set forth in (A) above, the grantee shall advise the grantor of its intention to use the same, shall provide plans and specifications and proposed construction techniques for the improvements to be located within the easement area, and shall give the grantor an opportunity to commence any construction activities which it contemplates undertaking at approximately the same time to the end that both shall be able to utilize subterranean construction techniques which will permit the placement above ground of a building on their respective Parcels immediately adjacent to the common boundary line. If a common subterranean construction element is used by such Parties, it is specifically understood that each shall assume and pay its reasonable share of the cost and expense of the initial construction and, so long as both Parties are benefitting therefrom, subsequent maintenance thereof. In the event any building utilizing a common subterranean element is destroyed and not replaced or is removed, the common subterranean construction element shall be left in place for the benefit of any building utilizing the same located on the adjoining Parcel.

2.4 Corridor Easement. There are hereby established specific right-of-ways (the "Corridor") along the common boundary lines between (i) Parcels 6 and 11 and (ii) Parcels 7 and 10 as shown on the Site Plan; the Parties with regards to Parcels 6 and 11, and the Parties with regards to Parcels 7 and 10, hereby grant and convey to each other for its use and for the use of the Permittees of the buildings located upon such Parcels a perpetual non-exclusive easement for the passage and accommodation of

Confidentially Provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

156782

pedestrians over and across that portion of its Parcel covered by the Corridor; such easement shall be appurtenant to and for the benefit of the adjoining Parcel and shall survive termination of this Agreement. Developer agrees to hard surface the Corridor, install adequate lighting therein and place "exiting only" doors at each end; provided however, Developer may elect to install a security door at the end of the Corridor which connects with a receiving/loading area so that deliveries of merchandise may be accommodated through such area. In the event Developer elects to cover the Corridor, it shall also install any required lighting, flooring or paving, HVAC systems and all other construction components necessary or required to permit such enclosure. Once created, the Corridors shall be maintained as part of the Common Area. Notwithstanding the foregoing, each Corridor may be utilized for the delivery of merchandise to the Occupants of the adjoining buildings only if such use does not jeopardize the qualifying and/or use of such Corridor as a fire exit for the buildings located on Parcel 6 and Parcel 7, respectively. Each Corridor easement shall continue in effect for the term of this OEA and thereafter so long as the building adjacent thereto needs the same for fire exit or delivery purposes (including a reasonable period to permit reconstruction or replacement of the building exiting into such area if the same shall be destroyed, damaged or demolished).

2.5 <u>Restriction</u>. No Party shall grant any easement for the purpose set forth in this Article for the benefit of any property not within the Shopping Center; provided, however, that the foregoing shall not prohibit the granting or dedicating of utility easements by a Party on its Parcel to governmental or quasi-governmental authorities or to public utilities, or for the access easement area designated on the Site Plan.

Confidentially Provided to Paul Medeiros 12:13016424 07/15/2013 3:22 PM

1567782

## ARTICLE III
## CONSTRUCTION

3.1 General Requirements.

(A) Each Party agrees that all construction activities performed by it within the Shopping Center shall be undertaken in compliance with all laws, rules, regulations, orders, and ordinances of the city, county, state, and federal governments, or any department or agency thereof, affecting improvements constructed within the Shopping Center. Every building shall be either equipped with automatic sprinkler systems which meet all the standards of the Insurance Services Office (or other similar local organization having jurisdiction) or constructed in such a manner as to not adversely affect the fire rating of any building constructed upon another Parcel, it being the intent of this requirement to allow buildings located on each Parcel to be rated for fire purposes as separate and distinct units without deficiency charge.

(B) Each Party agrees that its construction activities shall be effected as expeditiously as possible and in such a manner as to not:

(i) cause any unreasonable increase in the cost of constructing improvements upon another Party's Parcel;

(ii) unreasonably interfere with construction work being performed on any other part of the Shopping Center;

(iii) unreasonably interfere with the use, occupancy (including the ability to receive merchandise) or enjoyment of any part of the remainder of the Shopping Center by any other Party or its Permittees;

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

(iv) cause any other Party to be in violation of any law, rule, regulation, order or ordinance applicable to its Parcel of the city, county, state, federal government, or any department or agency thereof.

156782

(C) Each Party agrees to defend, indemnify and hold harmless each other Party from all claims, actions, proceedings and costs incurred in connection therewith (including reasonable attorneys' fees and costs of suit) resulting from any accident, injury or loss or damage whatsoever occurring to any Person or to the property of any Person arising out of or resulting from the performance of any construction activities performed or authorized by such indemnifying Party.

(D) Prior to constructing, reconstructing, remodeling, or enlarging a building or changing the Common Area on its Parcel, a Party shall give the Approving Parties at least 30 days prior notice of the proposed location of any staging and storage area. If any Party intends to locate a staging area within 500 feet of the Parcel of a Major, then the Major affected thereby shall have the right to approve such location. All storage of materials and the parking of construction vehicles, including vehicles of workers, shall occur only on the constructing Party's Parcel, and all laborers, suppliers, contractors and others connected with such construction activities shall use only the access points located upon the constructing Party's Parcel. If substantial work is to be performed, the constructing Party shall, at the request of any Approving Party, fence off the staging and storage area. Upon completion of such work, the constructing Party shall restore the affected Common Area to a condition at least equal to that existing prior to commencement of such work.

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

156782

(E) Each Party hereby grants and conveys to each other Party and to its respective contractors, materialmen and laborers a temporary license for access and passage over and across the Common Area of the grantor's Parcel as shall be reasonably necessary for the grantee to construct and/or maintain improvements upon the grantee's Parcel; provided, however, that such license shall be in effect only during periods when actual construction and/or maintenance is being performed and provided further that the use of such license shall not be exercised so as to unreasonably interfere with the use and operation of the Common Area by others. Prior to exercising the rights granted herein, the grantee shall first provide the grantor with a written statement describing the need for such license, and shall furnish a certificate of insurance showing that its contractor has obtained the minimum insurance coverage required by 5.4(C) hereof. Any Party availing itself of the temporary license shall promptly pay all costs and expenses associated with such work, shall diligently complete such work as quickly as possible, and shall promptly clean the area and restore the affected portion of the Common Area to a condition which is equal to or better than the condition which existed prior to the commencement of such work. Notwithstanding the foregoing, in the event a labor dispute between the contractors, laborers, suppliers and/or others connected with construction activities, each Party shall have the right to prohibit the contractors, laborers, suppliers and/or others working for another Party from using the Common Area on its Parcel.

3.2 Common Area. Developer, Target and Albertson's have agreed that the Common Area of the Shopping Center shall be developed as shown on the Site Plan. Developer agrees to cause the Common Area to be substantially completed on or before January 16, 1989 in accordance with the provisions of that certain Site Development Agreement executed contemporaneously herewith by the Approving Parties. All construction vehicles,

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

1567782

workmen and suppliers for buildings under construction after March 1, 1989 shall be required to use the northwesterly access road along Ynez Road in order to diminish any interference with the use by the Permitees of the Common Area close to Occupants open for business. All Common Area work shall be done in a good and workmanlike manner and in accordance with good engineering standards; provided, however, the following minimum general design standards shall be complied with:

(A) Subject to compliance with any requirements to minimize the impact on Mount Palomar Observatory, the lighting system shall be designed to produce a minimum maintained lighting intensity measured at grade at all points in the Common Area of 1.00 foot candle; provided however, that the drive area immediately in front of the entrance to the buildings on Parcel 6 and Parcel 7 shall have not less than a minimum maintained lighting intensity measured at grade of 5.0 foot candles and 2.0 foot candles, respectively. Each Major may elect to have an over-ride switch installed so that each is able to turn on (but not off) the light standards located on its Parcel. The type and design of the light standards shall be approved by the Approving Parties.

(B) The slope in the parking area (excluding entrances) shall not exceed a maximum of four percent (4%), nor be less than a minimum of one percent (1%).

(C) All sidewalks shall be concrete or other material approved by the Approving Parties. The paved portions of the Common Area shall be paved in accordance with a paving recommendation obtained from a reputable engineering firm approved by the Approving Parties.

(D) Utilities that are placed underground shall be at depths designated by consultants approved by the Approving Parties. Design and working drawings may be prepared by the utility company providing the service.

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

156782

(E) The parking area on each Parcel shall contain sufficient ground level, automobile size, parking spaces in order to comply with the following minimum requirements:

(i) five (5.0) parking spaces for each one thousand (1,000) square feet of Floor Area located thereon; provided however, that with respect to any theatre, the parking requirement applicable thereto shall be one (1) parking space for each four (4) seats.

plus, as to the particular Parcel:

(ii) if a business use contains a drive-up unit (such as remote banking teller or food ordering/dispensing facility), then there shall also be created space for stacking not less than five (5) automobiles for each drive-up unit; and

(iii) for each single restaurant which has less than five thousand (5,000) square feet of Floor Area, then five (5) additional parking spaces for each one thousand (1,000) square feet of Floor Area devoted to such use; or

(iv) for each single restaurant which has five thousand (5,000) square feet of Floor Area or more, then ten (10) additional parking spaces for each one thousand (1,000) square feet of Floor Area devoted to such use;

provided however, if a restaurant is operated incidentally to the main business operation (incidental operation shall mean occupying less than 10% of the Occupant's Floor Area), then the Floor Area attributable to such restaurant shall be excluded from the application of (iii) and (iv) above, and provided further, any restaurant located on Parcels 1, 2, 8, 9, and 12 regardless of size, shall be excluded from the application of (iv) above.

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

1567782

The foregoing requirements as well as all governmental regulations, ordinances and similar orders relating to parking shall be satisfied throughout the term of this OEA and without reliance on the parking spaces that may be available on another Parcel; provided however, that if more than one Parcel is owned by the same Party, then the parking requirements set forth above may be satisfied by aggregating the Parcels commonly owned. In the event of a condemnation of part of a Parcel or sale or transfer in lieu thereof that reduces the number of usable parking spaces below that which is required herein, the Party whose Parcel is so affected shall use its best efforts (including using proceeds from the condemnation award or settlement) to restore and/or substitute parking spaces in order to comply with the parking requirements set forth above. If such compliance is not possible, such Party shall not be deemed in default hereunder, but shall not be permitted to expand the amount of Floor Area located upon its Parcel. If such Floor Area is thereafter reduced, then it may not subsequently be increased unless the parking requirement is satisfied.

(F) During the term of this OEA, no Party shall substantially alter the grade elevations on any portion of its Parcel without the prior approval of the other Parties.

3.3 <u>Building Improvement</u>.

(A) The Parties hereby agree that (i) all buildings and Outside Sales Areas may be located only within the Building Areas designated on the Site Plan, and (ii) if a maximum Floor Area designation for any Building Area is shown on the Site Plan, such size limitation shall not be exceeded; provided however, that an excess of one percent (1%) or less shall not be considered a violation of this prohibition, nor shall additional parking spaces be required to cover such minimal excess Floor Area.

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

156782

Subject to Developer's completion of the Common Area as specified in 3.2 above, including the timely delivery of the Building Area pads for Parcels 6 and 7, (i) Target agrees to cause to be constructed on Parcel 6 a building containing approximately 101,909 square feet of Floor Area, and at its option an Outside Sales Area containing not more than 11,000 square feet, and it further agrees to open such building for business with the public as a "Target" retail store on the later of July 31, 1989 or 30 days after completion of Common Area; (ii) Albertson's agrees to cause to be constructed on Parcel 7 a building containing approximately 42,630 square feet of Floor Area, and it further agrees to open such building for business with the public as an "Albertson's" grocery store on the later of February 15, 1989 or 30 days after completion of Common Area. After initially opening for business, neither Major shall be obligated to continue such business operation, it being agreed and understood that the hours of business, the number and types of departments to be operated, the particular contents, wares and merchandise to be offered for sale and the services to be rendered, the methods and extent of merchandising and storage thereof, and the manner of operating such business in every respect, or if at all, shall be within the sole and absolute discretion of each such respective Party. Developer agrees to cause to be constructed buildings containing at least 55,279 square feet of Floor Area within Shops F, G, J, K and L on or before February 1, 1989, and it further agrees to use reasonable efforts to cause such Floor Area to be occupied under leases which require such Occupants to open their "stores" for business with the public on the later of February 15, 1989 or the date the first of Albertson's or Target opens their buildings for business. Developer further agrees, solely for the benefit of Albertson's, to cause to be constructed within the Building Area designated on the Site Plan as "Anchor 1" on Parcel 11, a drug store building containing approximately 21,450 square feet of Floor Area on or before May 15, 1989.

1567782

(B) In order to produce an architecturally compatible Shopping Center, the Approving Parties have agreed that the initial building construction and any additions, exterior remodeling or reconstruction of existing improvements thereafter shall be performed only in accordance with approved plans for such work as provided herein. The Party proposing such work shall submit to the Approving Parties for approval detailed plans ("Plans") as required by Exhibit F attached hereto and made a part hereof. Upon submission of any disapproval or recommendation for change, the submitting Party and the Approving Parties shall mutually consult to establish approved Plans for the proposed work. The Approving Parties shall not arbitrarily or unreasonably withhold approval of the Plans or recommend changes in the Plans which otherwise conform with the requirements hereof. In addition, the Approving Parties shall not withhold approval of exterior remodeling or exterior reconstruction which does not either substantially enlarge an existing structure, or substantially change an existing structure, and which continues to be architecturally and aesthetically compatible and harmonious with the other Shopping Center buildings. In no event shall the Approving Parties require any other Party to utilize design standards superior to those utilized by the requiring Party in the construction of improvements on its Parcel. Approval of Plans by the Approving Parties shall not constitute assumption of responsibility for the accuracy, sufficiency, or propriety thereof, nor shall such approval constitute a representation or warranty that the Plans comply with applicable laws. No material deviation shall be made from the approved Plans. Notwithstanding anything contained herein, Albertson's and Target shall not be obligated to submit Plans with respect to their respective initial store building; provided however such buildings must nevertheless comply with the architectural theme established for the buildings of the Shopping Center.

Confidentially Provided to Paul Neale 12.130.164.210 07/15/2013 3:22 PM

156782

(C) Where applicable, each Party hereby specifically consents to the placement of buildings along the common boundary line between their Parcels and each agrees to support any request by another for a side-yard or setback variance if the same is required in order to accommodate such construction.

(D) Developer acknowledges that Target intends to construct on Parcel 6 a "Target store" building which is generally classified under applicable building code regulation as an "unlimited area" building. (By way of explanation, but not limitation, such building classification is designated II-N or V-N under the Uniform Building Code.) So long as Target plans to construct a building of such classification, or so long as a building of such classification exists on Parcel 6 (including any restoration or reconstruction thereof), Developer with respect to Parcels 5, 11, 14, 15, 16 and 17 (the "Restricted Parcels"), agrees that any building to be placed or constructed thereon shall comply with the following requirements:

(i) no building shall be constructed within 60' of the Building Area on the Parcel 6 unless such building, hereinafter referred to as the "adjacent building," shall be located immediately adjacent to the common boundary line and is attached to the "unlimited area" building on the Parcel 6, when and so long as such "unlimited area" building exists.

(ii) if an "adjacent building" exists, then no building shall be located within 60' of the "adjacent building" unless such building is attached to the "adjacent building"; the "adjacent building" and all other building on the Restricted Parcels that are attached to the "adjacent building" and to each other are hereinafter referred to as the "building group."

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

(iii) any building that is not part of the "building group," shall be located at least 60' distant from the "building group."

(iv) the "adjacent building" or the "building group," as the case may be, shall comply with the building code requirements applicable to an "unlimited area" building, including without limitation the installation of an approved sprinkler system for fire protection.

1567782

In order to confirm the existence of a sixty foot (60') yard or clear area around the Target building and the buildings, if any, which are included within (i) and (ii) above, it may be necessary to place of record an instrument establishing the same. Developer agrees to join in the execution of such instrument in a form reasonably satisfactory to it. In addition to the requirements set forth above, no building located on the Restricted Parcels shall be placed or constructed in a manner which will itself preclude the construction of a building of such "unlimited area" classification on Parcel 6.

(E) The second Party to construct a building along the common boundary line shall do so in a manner that does not result in damage to the improvements in place on the adjoining Parcel. Developer shall undertake and assume at its sole cost the obligation of completing the nominal attachment (flashing and seal) of its buildings to that of each Major's; subsequent maintenance of such nominal attachment shall be performed by Operator as part of Common Area Maintenance. In performing such attachment, the wall of one building shall not receive support from nor apply pressure to the wall of the other building; no building shall be constructed in such a manner as to adversely affect the structural integrity of any adjoining building.

Confidentially Provided to Paul Meade 12.130.164.240 07/15/2013 3:32 PM

156782

(F) If a portion of any Building Area is at one point in time paved and used as Common Area, such portion may be subsequently used for building purposes provided that all parking requirements and other provisions relating to such Parcel are complied with. Likewise, such building may be subsequently razed, and until replaced, the area previously occupied by such building shall be improved at the expense of the Party owning the Parcel to the same standards as the other Common Area, either as automobile parking and drive area or as landscaped area, and it shall thereafter be maintained as part of the Common Area until again used for building purposes. If any Party has not commenced construction of a building on any portion of its Building Area as of the day the first of Target or Albertson's opens for business with the public, such Party shall, within a reasonable period of time (not to exceed 60 days), cause the undeveloped portions of its Building Area to be either hard surfaced or sodded, and thereafter maintained in an attractive condition until construction of a building thereon is commenced.

(G) No building or Common Area structure shall exceed the following height restrictions:

| | | |
|---|---|---|
| (i) | On Parcel 1 | - 24 feet (not more than one story) |
| (ii) | On Parcels 2, 3 and 8 | - 22 feet (not more than one story) |
| (iii) | On Parcel 4 | - 27 feet (not more than one story, plus mezzanine) |
| (iv) | On Parcels 5 and 13 | - 25 feet (not more than one story) |
| (v) | On Parcel 6 | - 35 feet |
| (vi) | On Parcel 7 | - 35 feet |
| (vii) | On Parcels 9 and 12 | - 28 feet |
| (viii) | On Parcel 10 | - 26 feet (not more than one story) |

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

1567782

| | | |
|---|---|---|
| (ix) | On Parcel 11 | - 30 feet (not more than one story, plus mezzanine) |
| (x) | On Parcels 14,15,16 and 17 | - 35 feet |
| (xi) | On Common Area | |
| | - Tower | - 50 feet |
| | - Cross Road Cover | - 30 feet |
| | - Center Pylon Signs/ Ynez Road | - 20 feet |
| | - Center Pylon Signs/ Rancho California Road | - 20 feet |
| | - Monument Signs | - 8 feet |
| | - All Other Structures | - 12 feet |

The height of any building shall be measured perpendicular from the finish grade of the Building Area to the top of the highest single portion of the building, including any screening parapet, penthouse, mechanical equipment or similar appurtenance located on the roof of such building; the height of any Common Area structure shall be measured from its base to the highest single point.

## ARTICLE IV
## MAINTENANCE AND REPAIR

4.1 Utilities.

(A) Each Party shall repair and maintain in first-class condition all utility facilities, lines, and systems located on its Parcel that serve only its Parcel unless the same are maintained by a public or quasi-public utility or authority.

(B) The grantee of a utility easement referred to in 2.2(A) (exclusive of an easement in which common utility lines and systems are located, which facilities shall be maintained as part of the Common Area), shall maintain and repair at its cost any facilities installed pursuant to such grant which exclusively serve such grantee's Parcel unless the same are granted or dedicated to and accepted by a utility or a governmental agency

Confidentially provided to Paul Meade 12.130.64.240 07/15/2013 3:22 PM

1567782

acceptable to the grantor which agrees to maintain and replace the same. Any maintenance and repair of nondedicated utilities located on another Party's Parcel shall be performed only after two (2) weeks' notice to the grantor (except in an emergency the work may be initiated with reasonable notice) and shall be done after normal business hours whenever possible and shall otherwise be performed in such a manner as to cause as little disturbance in the use of the grantor's Parcel as is practicable under the circumstances. Any Party performing or causing to be performed maintenance or repair work agrees to promptly pay all costs and expenses associated therewith to diligently complete such work as quickly as possible and to promptly clean the area and restore the affected portion of the Common Area to a condition equal to or better than the condition which existed prior to the commencement of such work.

4.2 Common Area.

(A) The minimum standard of maintenance for the improved Common Area shall be comparable to the standard of maintenance followed in other first-class retail developments of comparable size in the Riverside, California area and in any event in compliance with all applicable governmental laws, rules, regulations orders and ordinances, and the provisions of this OEA. All Common Area improvements, including drive and parking overlays, shall be repaired or replaced with materials at least equal to the quality of the materials being repaired or replaced so as to maintain the architectural and aesthetic harmony and integration of the Shopping Center as a whole. The maintenance and repair obligation in any event shall include but not be limited to the following:

(i) Drive and Parking areas. Maintaining all paved surfaces and curbs in a smooth and evenly covered condition which maintenance work shall include, without limitation,

Confidentially provided to Paul Meade 12.130.164.210 07/15/2013 3:22 PM

1567782

cleaning sweeping, restriping, repairing, resealing and resurfacing. (For the purpose of this section, an overlay of the drive and parking area shall be considered a repair or maintenance item.)

(ii) Debris and Refuse. Periodic removal of all papers, debris, filth, refuse, ice and snow, including sweeping to the extent necessary to keep the Common Area in a first-class, clean and orderly condition. All sweeping shall be at appropriate intervals during such times as shall not interfere with the conduct of business or use of the Common Area by persons intending to conduct business with Occupants of the Shopping Center.

(iii) Sign and Markers. Placing, cleaning, keeping in repair, replacing and repainting any appropriate directional signs or markers, including any handicapped parking signs; maintaining the Center Pylon Sign structures and the sign box thereon which identifies the name of the Shopping Center.

(iv) Lighting. Operating, keeping in repair, cleaning and replacing when necessary such Common Area lighting facilities as may be reasonably required, including all lighting necessary or appropriate for Common Area security.

(v) Landscaped Areas. Cleaning and maintaining all landscaped areas, including landscaping and planters adjacent to exterior walls of buildings; repairing automatic sprinkler systems or water lines in the Common Area; irrigating, weeding, pruning, fertilizing and replacing shurbs and other landscaping as necessary to maintain a viable growth condition; provided, however, that if any Occupant requires or installs "special" landscaping (i.e. beyond the standard landscaping requirements for the remainder of the Shopping

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

1567782

Center), the maintenance and cost of such special landscaping shall be borne solely by such Occupant without cost or expense to the other Parties and shall not be included in Common Area maintenance costs.

(vi) Utilities. Maintaining, cleaning, and repairing any and all common storm drains, utility lines, sewers and other utility systems and services located in the Common Area which are necessary for the operation of the Common Area, and the maintenance and replacement of the trunk line portion of common utility lines serving the Building Areas; in addition, so long as the Shopping Center is obligated to maintain specified offsite drainage facilities located across Ynez Road at the northwest corner of the Shopping Center, such facilities shall be included within the scope of this clause.

(vii) Obstructions. Keeping Common Area free from any obstructions including those caused by the sale or display of merchandise, unless such obstruction is permitted under the provisions of this OEA or is approved by the Approving Parties.

(viii) Sidewalks. Cleaning (including washing and/or steam cleaning), maintenance and repair of all sidewalks, including those adjacent and contiguous to buildings located within the Shopping Center. Sidewalks shall be cleaned at appropriate intervals during such time as shall not interfere with the conduct of business or use of the Common Area.

(ix) Security Personnel. Providing of professional security personnel within the Common Area, if reasonably required.

Confidentially Provided to Paul Meade 12.130.164.240 07/15/2013 3:32 PM

1567782

(x) Traffic. Supervision of traffic at entrances and exits to the Shopping Center and within the Shopping Center as conditions reasonably require in order to maintain an orderly and proper traffic flow, but only with the prior written approval of the Approving Parties.

(xi) Casualty. All repairs, replacements and restoration required after damage or destruction caused by casualty.

Notwithstanding anything to the contrary, each Party shall maintain and repair, at its sole cost, in a clean, sightly and safe condition any exterior shipping/receiving dock area, any truck ramp or truck parking area, any refuse or dumpster area, and any separate utility lines or any lateral utility lines extending to and from common trunk lines.

(B) From and after the later to occur of either the date (i) upon which the Common Area of the Shopping Center is substantially completed or (ii) of the opening for business by the Occupant of either Parcel 6 or Parcel 7, the "Operator" (hereinafter designated) shall maintain the Common Area or cause it to be maintained, in good order, condition and repair, and shall perform other duties or functions as may be specifically designated elsewhere in this OEA. The "Operator" shall be the Person or Persons designated from time to time by a Majority of the Parties, as provided herein. The Operator shall be a professional commercial property management company or shall contract with such a company to perform the maintenance and operation of the Common Area. Operator may hire companies affiliated with it to perform the maintenance and operation of the Common Area, but only if the rates charged by such companies are competitive with those of other companies furnishing similar services in the San Diego area, it being agreed that this provision shall be construed strictly against the Operator. Each

Confidentially Provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

1567782

Party shall have a vote equal to such Party's allocation of the Common Area Maintenance Costs and Administrative Fee as set forth in paragraph (D) below. The Parties, as the owners of all the Parcels within the Shopping Center, hereby designate Developer as the initial "Operator." Developer shall serve as the Operator until it either resigns or is removed, in which event a new Operator shall be elected by at least fifty-one percent (51%) of the total voting power of the Parties, which 51% shall include the votes of at least two of the three Approving Parties. Developer and/or any successor Operator can be removed if an event of bankruptcy occurs with respect to such Person or if it fails to maintain the Shopping Center in accordance with the standards of maintenance specified in Section 4.2, by the vote of at least fifty-one percent (51%) of the total voting power of the Parties, which 51% shall include the votes of at least two of the three Approving Parties. As used herein, an "event of bankruptcy" means the filing by or against the Operator of an order for relief under the Federal Bankruptcy Code or any state bankruptcy law, the making of a general assignment for the benefit of creditors, or the appointment of a receiver for the benefit of creditors, or the appointment of a receiver with respect to substantially all of the Operator's assets, unless such receiver is removed within sixty (60) days. Each Party grants to the Operator, its agents, employees and/or contract persons or any other Party acting pursuant to rights granted under this OEA, a license to enter upon the grantor's Parcel to discharge the duties to operate, maintain and repair the Common Area pursuant to 4.2.

Operator shall expend only such funds as are reasonably necessary for the operation and maintenance of the Common Area and the performance of its other duties or functions as specified herein and shall promptly pay such costs ("Common Area Maintenance Costs") when incurred. For the purpose of this OEA, Common Area Maintenance Costs shall not include:

Confidentially Provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

1567782

(i) any late charges or fees;

(ii) any costs to clean up or repair the Common Area resulting from promotional activities or from construction, maintenance or replacement of buildings;

(iii) real property taxes and assessments;

(iv) Operator's profit, administrative and overhead costs,(such as rent, legal, supplies, utilities and wages or salaries paid to management or supervisory personnel), it being further agreed that if a person is involved with other than Common Area operational and maintenance matters at the Shopping Center, then Operator shall allocate such person's time to properly reflect his varied duties; and

(v) entertainment, transportation, meals and lodging of anyone.

In lieu of Operator's profit, administrative and overhead costs, Operator shall be permitted to charge an amount ("Administration Fee") computed by multiplying the Common Area Maintenance Costs by fifteen percent (15%); provided however, that with respect to the shares attributable to Parcels 6 and 7, the Administrative Fee shall be computed by multiplying the Common Area Maintenance Costs (exclusive of insurance premiums, the mark-up portion of fees paid to third parties who perform the Common Area operation and maintenance on Operator's behalf, and utility charges) by five percent (5%), and in no event shall the five percent (5%) service charge for any single item of Common Area Maintenance Costs exceed $350.00 unless the charge for such item was separately identified in the Budget (defined below).

Confidentially Provided To Paul Meade 12.130.164.240 07/15/2013 3:22 PM

1567782

(C) Operator shall, at least 90 days prior to the beginning of each calendar year, submit to each Major for approval an estimated budget ("Budget") for the projected Common Area Maintenance Costs and the Administration Fee for operating and maintaining the Common Area of the Shopping Center for the ensuing calendar year. The Budget shall identify separate cost estimates for at least the following categories:

(i) sweeping and cleaning of the parking, drive and sidewalk areas; including removal of snow and ice, where appropriate;

(ii) repair and maintenance of lighting standards and replacement of bulbs, ballasts and lens;

(iii) repair and maintenance of sidewalks;

(iv) repair and maintenance of drive and parking areas;

(v) repair and maintenance of landscaping;

(vi) repair and maintenance of common utility lines and systems;

(vii) trash removal;

(viii) premium for public liability insurance required under 5.4(A) below;

(ix) security, if any;

(x) rental or purchase of equipment and supplies;

(xi) utilities, including electricity for lighting; and

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

(xii) depreciation or trade-in allowance applicable to items purchased for Common Area purposes.

156782

If an item of repair or maintenance is to be accomplished in phases over a period of calendar years, such as resurfacing of the drive and/or parking areas, then the Budget shall separately identify the cost attributable to such year (including the area of the Common Area affected), and shall note the anticipated cost and timing (indicating the area of the Common Area affected) of such phased work during succeeding calendar years.

If any Major disapproves the proposed Budget, the Majors and Operator shall consult with each other to establish a final approved Budget. If a Major does not approve the Budget by December 1st, Operator shall have the right to terminate its maintenance obligation with respect to the Common Area located on the Parcel of the objecting Major by giving written notice of such termination to the objecting Major prior to December 10th. If the notice is given, then Operator shall maintain and operate the balance of the Shopping Center and the objecting Major shall maintain and operate its Parcel as though it was a withdrawing Major pursuant to (G) below, commencing on the following January 1st. If the notice is not given, then Operator shall continue to maintain and operate the Common Area for the next calendar year. Operator shall use its best efforts to operate and maintain the Common Area of the Shopping Center in accordance with the Budget; provided however, Operator shall have the right to make emergency repairs to the Common Area to prevent injury or damage to person or property, it being understood that Operator shall nevertheless advise the Majors of such emergency condition as soon as reasonably possible including the action taken and the cost thereof. If the cost of the emergency action exceeds $5,000.00 then Operator may submit a supplemental billing to each Party, including therewith evidence supporting such payment, and each Party shall pay its share thereof within thirty (30) days;

Confidentially Provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

156782

if the cost limitation set forth above is not exceeded then such costs shall be included as part of the Common Area Maintenance Costs at the year end. Operator may also submit a supplemental billing for the costs incurred to repair and restore the Common Area or any portion thereof after casualty.

(D) Common Area Maintenance Costs and the Administration Fee shall be allocated between the Parcels as follows:

( i) Commencing with the date the Operator is obligated to maintain the Common Area and continuing until the day prior to the period set forth in (ii) below:

| | | |
|---|---|---|
| Parcel 6 | - | 29.178% |
| Parcel 7 | - | 12.206% |
| All other Parcels, | - | 58.616% |

(portions to be allocated by Developer pursuant to a recorded declaration against such Parcels)

During this period of time Operator shall keep separate records identifying Common Area Maintenance Costs applicable to Common Area located on Parcels 14, 15, 16 and 17 and all such costs, including any Administration Fee, shall be paid by Developer.

(ii) Commencing with the first day of the month following the opening of any business operation located on Parcels 14, 15, 16 and 17;

| | | |
|---|---|---|
| Parcel 6 | - | 18.699% |
| Parcel 7 | - | 7.822% |
| All other Parcels | - | 73.479% |

(portions to be allocated by Developer pursuant to a recorded declaration against such Parcels)

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

1567782

Each Party shall pay to Operator in equal monthly payments, in advance, its share based either upon the amount set forth in the approved Budget, or with respect to a Major, if a Budget is not approved, then the lesser of the amount set forth in the unapproved Budget or the monthly payment established for the prior year. The Operator shall reasonably estimate the first calendar year's expense and each Party shall make its first payment together with its prorata share (30 day proration) for the partial month, if any, in the month following Operator's undertaking of such maintenance and repair of the Common Area. If a business opens on Parcels 14, 15, 16 or 17 during a calendar year, no adjustment shall be made in the monthly payment, but a prorated adjustment shall be made when the year-end figures are computed. Within 45 days after the end of each calendar year, Operator shall provide each Party with a certified statement setting forth the actual Common Area Maintenance Costs paid by it for the operation and maintenance of such Common Area, the Administration Fee, and such Party's share thereof, together with supporting invoices and other materials. If the amount paid by the Party for such calendar year shall have exceeded its share, Operator shall refund the excess to the Party at the time such certified statement is delivered, or if the amount paid by the Party for such calendar year shall be less than its share, such Party shall pay the balance of its share to Operator within 30 days after receipt of such certified statement. Within two years after receipt of any such certified statement, each Party shall have the right to audit Operator's books and records pertaining to the operation and maintenance of the Common Area for the calendar year covered by such certified statement; the Party shall notify Operator of its intent to audit at least 15 days prior to the designated audit date. In the event that such audit shall disclose any error in the determination of the costs of operating and maintaining the Common Area or in calculating the Party's share thereof, an appropriate adjustment shall be made forthwith. The cost of any audit shall be assumed by the Party,

Confidentially provided to Paul Meade

1567782

unless such Party shall be entitled to a refund which is in excess of three percent (3%) of the amount calculated by Operator as its share of such costs for the calendar year, in which case Operator shall pay the cost of such audit.

(E) Operator agrees to defend, indemnify and hold each Party harmless from and against any mechanic's, materialmen's and/or laborers' liens, and all costs, expenses and liabilities in connection therewith, including reasonable attorney's fees, arising out of the maintenance by Operator of the Common Area pursuant to the provisions of this paragraph, and in the event that a Party's Parcel shall become subject to any such lien, Operator shall upon request promptly cause such lien to be released and discharged of record, either by paying the indebtedness which gave rise to such lien or by posting such bond or other security as shall be required by law to obtain such release and discharge. The foregoing provision shall not apply to any lien filed by Operator to secure the payments by any Party hereunder. If any Major elects to take over the maintenance of the Common Area on its Parcel, such Major shall defend, indemnify and hold harmless Operator and the other Parties in identical fashion with respect to such liens.

(F) In the event any of the Common Area is damaged or destroyed by any cause whatsoever, whether insured or uninsured, during the term of this OEA, other than damage caused by ordinary use or wear and tear, the Operator shall repair or restore such Common Area with all due diligence; provided however that if the estimated cost to repair or restore such Common Area exceeds $500,000 (which amount shall be increased by $100,000 every five (5) years upon the anniversary date of this OEA) then such repair or restoration shall be made only if Parties having at least 75% of the Common Area Maintenance Costs allocated to their respective Parcels pursuant to 4.2(D) above, irrespective of any Major's election to maintain its own Parcel, approve such restoration; provided further that any Party shall have the right

Confidentially Provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

156782

to pay the amount above the threshold limit in which case no approval for such repair or restoration shall be necessary. If an approval by the Parties is necessary, the Operator shall call a meeting of the Parties at the Shopping Center within 15 days after receiving the cost estimate. Any costs incurred by Operator pursuant to this clause shall be prorated among all of the Parties according to allocations set forth in (D) above and shall be payable as if it were an emergency action.

(G) A Major shall have the right, upon not less than sixty (60) days' written notice given to Operator, to take over and assume the maintenance of the Common Area upon its Parcel, provided that such notice shall be effective only as of the last day of a calendar quarter. If a Major assumes the maintenance of the Common Area upon its Parcel, it agrees that following the effective date of such assumption, it will perform all of the functions required of Operator with respect to its Parcel, except as specified below, and shall pay all costs and expenses incurred in connection therewith. Notwithstanding the foregoing, Operator shall continue to (i) maintain the common utility systems of the Shopping Center regardless of location, (ii) light all of the Common Area of the Shopping Center, (iii) maintain the Shopping Center's Common Area liability insurance program; provided however, if the insurance rate is increased solely on account of such Major's withdrawal, such Major shall pay the increase, it being understood that the burden of proof to establish such increase shall be on the Operator and shall be construed strictly against the Operator, (iv) maintain the Shopping Center's security program, if any was previously established, and (v) repair and replace those portions of the Common Area which are damaged or destroyed by casualty. Upon such assumption by a Major, it shall be released from the obligation to contribute towards Operator's maintenance and operation of the balance of the Common Area, except with respect to those functions identified above for which continued participation is mandatory;

Confidentially Provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

156782

such withdrawing Major's share of costs relating to its continuing obligations shall be paid according to the allocation set forth in (D) above.

Any Major that has assumed the operation and maintenance of the Common Area on its Parcel pursuant to the above paragraph, shall have the right to cause the Operator to resume the operation and maintenance of its Common Area upon the satisfaction of the following conditions:

( i) Such Major shall give the Operator at least 60 days' prior notice of its intention to have the Operator reassume the operation and maintenance of its Common Area; provided however, such date for reassumption shall always be the first day of a calendar quarter; and

(ii) Such Major shall, at its sole cost and expense, cause the Common Area on its Parcel to be brought to at least the same standard of maintenance, repair and condition as then exists on the other portions of the Common Area then being maintained by the Operator prior to the date established for Operator to reassume the maintenance and operation thereof. The determination of whether such standards have been met shall be made by Operator, in its sole, but reasonable, opinion.

Provided the above conditions are satisfied, concurrently with the designated date, Operator shall resume full operation and maintenance of the Common Area located on such Major's Parcel and such Major shall be responsible for its share of the costs and expenses of Operator's performance as set forth in (D) above.

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

1567825

(H) The Operator shall have a lien upon each Parcel, upon recordation of a claim of lien in the Official Records of Riverside County, California, with a copy to the Party whose Parcel is burdened thereby, to secure the payment of such Party of its respective portion of the Common Area Maintenance Costs and the Administrative Fee. An assessment lien, once recorded, shall not be subordinate to any monetary lien, other than a first trust deed or first mortgage, made in good faith and for value and of record prior to the assessment lien. Such lien may be foreclosed in accordance with the laws pertaining to the foreclosure of mortgages.

4.3 <u>Building Improvements and Outside Sales Area.</u>

(A) After completion of construction, each Party covenants and agrees to maintain and keep the building improvements and Outside Sales Area, if any, located on its Parcel in first-class condition and state of repair, in compliance with all governmental laws, rules, regulations, orders, and ordinances exercising jurisdiction thereover, and in compliance with the provisions of this OEA, including the architectural theme. Each Party further agrees to store all trash and garbage in adequate containers, to locate such containers so that they are not readily visible from the parking area, and to arrange for regular removal of such trash or garbage.

Currently, Albertson's because it is the operator of a grocery store, is obligated to maintain a recycling facility at its premises. The Parties have designated on the Site Plan the location for the recycling facility applicable to the Albertson's operation; if it is necessary to relocate the facility, the new location shall be subject to the reasonable approval of the Approving Parties. Albertson's agrees to construct the recycling facility, including screening approved by the Approving Parties, at its sole expense; the maintenance and operation of the

Confidentially Provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

156782

recycling facility shall be the sole obligation of the Parcel 7 Party, but shall not be considered as Floor Area. When the recycling facility is no longer required, such Party shall raze the same and restore the surface for parking purposes as part of the Common Area. If another grocery or other business operation requires the establishment of a recycling center, the Party owning the Parcel upon which such operation shall be located shall submit to the Approving Parties for approval the location for such facility; provided however, that if the existing recycling facility is sufficient to satisfy the legal obligation with respect to such recycling center, then the new facility shall not be permitted and such additional operator shall pay to the Parcel 7 Party one-half of the cost to install such facility, plus one-half of all operating and maintenance costs thereafter.

(B) In the event any of the building improvements are damaged by fire or other casualty (whether insured or not), the Party upon whose Parcel such building improvements are located immediately shall remove the debris resulting from such event and provide a sightly barrier and within a reasonable time thereafter shall either (i) repair or restore the building improvements so damaged, such repair or restoration to be performed in accordance with all provisions of this OEA, or (ii) erect other building improvements in such location, provided all provisions of this OEA are complied with, or (iii) demolish the damaged portion of such building improvements and restore the area to an attractive condition in which event the area shall be Common Area until a replacement building is erected. Such Party shall have the option to choose which of the foregoing alternatives to perform, but such Party shall be obligated to perform one of such alternatives. Such Party shall give notice to each other Party within ninety (90) days from the date of such casualty of which alternative it elects.

Confidentially provided to Paul Meade 12.30.64.240 07/15/2013 3:22 PM

1567782

## ARTICLE V
## OPERATION OF THE SHOPPING CENTER

5.1 Uses.

(A) No part of the Shopping Center shall be used for any purpose other than for retail sales, retail services, restaurants or commercial purposes, provided any retail service uses located on Parcels 1-5 and 8-17 shall be of the type defined below and shall not occupy more than five percent (5%) of the total Floor Area on such Parcels, collectively. Retail service uses shall mean financial institutions, dry cleaners, beauty salons, barber shops, real estate and stock brokerage offices, travel or insurance agencies, escrow and title companies, shoe repair stores, check cashing services and similar uses providing services directly to the public for retail fees.

(B) No use shall be permitted in the Shopping Center which is inconsistent with the operation of a first-class retail shopping center. Without limiting the generality of the foregoing, the following uses shall not be permitted:

(i) Any use which emits an obnoxious odor, noise, or sound which can be heard or smelled outside of any building in the Shopping Center;

(ii) Any operation primarily used as a warehouse operation and any assembling, manufacturing, distilling, refining, smelting, agricultural, or mining operation;

(iii) Any "second hand" store or "surplus" store;

(iv) Any mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction, or maintenance);

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

1567782

(v) Any dumping, disposing, incineration, or reduction of garbage (exclusive of garbage compactors located near the rear of any building);

(vi) Any fire sale, bankruptcy sale (unless pursuant to a court order) or auction house operation;

(vii) Any central laundry or dry cleaning plant; provided, however, this prohibition shall not be applicable to a laundromat nor to on-site service oriented to pickup and delivery by the ultimate consumer, including nominal supporting facilities, as the same may be found in retail shopping districts in the metropolitan area where the Shopping Center is located;

(viii) Any automobile, truck, trailer or recreational vehicles sales, leasing, display or repair;

(ix) Any bowling alley;

(x) Any skating rink;

(xi) Any living quarters, sleeping apartments, or lodging rooms;

(xii) Any veterinary hospital or animal raising facilities (except that this prohibition shall not prohibit pet shops);

(xiii) Any mortuary;

(xiv) Any establishment selling or exhibiting pornographic materials; provided however, this prohibition shall not be applicable to any x-rated video tape sales or rental operation where such products are segregated to prevent access to minors.

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

1567782

(xv) Any bar, tavern, restaurant or other establishment whose reasonably projected annual gross revenues from the sale of alcoholic beverages for on-premises consumption exceeds sixty percent (60%) of the gross revenues of such business;

(xvi) Any flea market, amusement arcade, pool or billiard hall, or dance hall;

(xvii) Any training or educational facility, including but not limited to: beauty schools, barber colleges, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided however, this prohibition shall not be applicable to on-site employee training by an occupant incidental to the conduct of its business at the Shopping Center.

(C) The following use and occupancy restrictions shall be applicable to Parcels 1-5 and 8-17;

(i) No restaurant containing more than 1,500 square feet of Floor Area shall be located within the Building Areas shown on the Site Plan as follows: Anchor 1 and Anchor 2; Shops F, G, J, K and the southern one-half of L; provided however, that no more than five (5) restaurants, each containing 1,500 or less square feet of Floor Area, shall be permitted within such combined designated areas; and provided further that no more than two (2) such restaurants shall be located within any single designated area;

(ii) No toy store exceeding 5,000 square feet of Floor Area shall be permitted;

(iii) Junior department stores and/or apparel stores containing more than 15,000 square feet of Floor Area shall be permitted only on Parcels 5, 14 and 16;

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

156782

(iv) No more than 10% of the Floor Area may be used for office purposes;

(v) No portion thereof shall be used as a supermarket (which shall be defined as any store or department containing at least 5,000 square feet of Floor Area, including aisle space, primarily devoted to the retail sale of food for off-premises consumption), bakery or delicatessen, or for the sale of alcoholic beverages, fresh or frozen meat, fish, poultry or produce for off-premises consumption; provided however, the foregoing restrictions shall not be applicable to: (A) sales of alcoholic beverages incidental to a restaurant or food service use or a drug store consisting of 20,000 square feet or more; (B) sales of food for off-premises consumption operated as part of a restaurant or cafe business, as long as such use does not include a food display counter exceeding twelve feet in length, and, notwithstanding the foregoing restriction, a La Petite Boulangerie as it is known in the industry today shall be permitted; or (C) specialty shops which do not exceed 5,000 square feet in size, selling pre-prepared, ready-to-eat food products, similar to those stores currently operating as donut shops, sandwich shops, cookie stores, bagel shops, and smoked meat and cheese stores.

(vi) Medical, dental, professional or business offices shall not be located in Shops K and L, nor on Parcel 2;

(vii) Only one (1) "fast food" restaurant that does not serve alcoholic beverages shall be permitted on either Parcel 2 or Parcel 3; no other restaurant shall be permitted on such Parcels;

(viii) Only one (1) theatre shall be permitted; provided however it must be located only on Parcel 13, 15 or 16;

Confidentially Provided to Paul Meade 12.130.154.240 07/15/2013 3:22 PM

156782

(ix) No health spa, fitness center or workout facility, nor reading room shall be permitted unless located on Parcels 14, 15, 16 or 17;

(x) No car wash shall be permitted unless located on Parcel 2 and then only if it is not a "customer operated" service facility;

(xi) Restaurants (exclusive of the "fast food" type) shall be permitted on either Parcel 8 or Parcel 9, but not both; provided however, no more than two (2) restaurants shall be permitted, nor shall such restaurant use contain in the aggregate more than 5,000 square feet of Floor Area;

(xii) Only one (1) video arcade shall be permitted; provided however, it shall not exceed 2,000 square feet of Floor Area, nor shall it be located in Shops F, G, K or L.

(D) Unless the owner of Parcel 11 consents in writing, no portion of the Shopping Center, exclusive of Parcel 6 and the space designated on the Site Plan as Anchor 1 on Parcel 11, shall be used for a pharmacy selling prescription drugs to the general public; provided however, this restriction shall terminate as applied to Parcel 7 if a pharmacy ceases to be operated by a major drug store retailer within the space designated as Anchor 1 on Parcel 11 for a period of twelve (12) consecutive months.

(E) The name "Target" shall not be used to identify the Shopping Center or any business or trade conducted therein, without the approval of Target.

(F) No merchandise, equipment or services shall be displayed, offered for sale or lease, or stored within the Common Area; provided however, that the foregoing prohibition shall not be applicable to (i) the storage of shopping carts on Parcels 6

Confidentially Provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

156782

and 7, and on that portion of Parcel 11 adjacent to Anchor 1; (ii) the seasonal display and sale of bedding plants on the sidewalk in front of the buildings located on Parcels 6 and 7, and on that portion of Parcel 11 in front of Anchor 1; (iii) temporary Shopping Center promotions, except that no promotional activities will be allowed without the prior written approval of the Approving Parties, such approval may be withheld by each in its sole and absolute discretion, or (iv) the seasonal sale of merchandise by the Occupant of Parcel 6 or by the Occupant of Parcel 7 from its parking lot, provided:

(a) such sales shall be limited to no more than four (4) occasions per calendar year for a cumulative total of not more than sixty (60) day duration;

(b) the sales area shall be limited to not more than twenty (20) parking spaces;

(c) all booths, stands, displays and other structures erected in connection with such sales shall be maintained in a safe and attractive condition and shall be promptly removed at no expense to other Parties when the sales activities are terminated;

(d) the Common Area shall be promptly restored to its condition immediately prior to said activity at no expense to the other Parties; and

(e) the sales shall not interfere with the free movement of vehicular traffic within the Shopping Center or with access to or from the Shopping Center, or any part thereof.

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

156782

(G) No Permittee shall be charged for the right to use the Common Area.

(H) Each Party shall use its best efforts to cause the employees of the Occupants of its Parcel to park their vehicles only on such Parcel, or in designated employee parking areas approved by the Approving Parties.

5.2 Lighting.

(A) After completion of the Common Area lighting system on the Shopping Center, the Operator hereby covenants and agrees to keep the Shopping Center fully illuminated each day from dusk to at least 10:30 p.m., unless a different time is approved by the Approving Parties. Except as may be required pursuant to (B) below, no Common Area lights shall be on after the approved time. Each Party agrees to keep any exterior building security lights on from dusk until dawn.

(B) It is recognized that business establishments within the Shopping Center may be open for business at different hours, and that a business establishment which intends to be open beyond the approved time specified above may wish to have the Common Area lights located on another Parcel continue to be lit beyond the required period. Accordingly, any Party shall have the right to require the Operator to keep all or any portion of the Common Area lights illuminated beyond the required period set forth above. The requesting Party shall provide at least a fifteen (15) days' prior written notice, shall state the days and extended hours during which it wishes the lights to be kept on, shall specify approximately which areas of the Shopping Center are to be lit and shall pay to the Operator the following amount:

(i) If the period is less than thirty (30) days, then the deposit shall be one hundred ten percent (110%) of the reasonable cost (as estimated by the Operator) of electrical power for such extended period of illumination.

Confidentially Provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

156782

(ii) If the period is thirty (30) days or more, then the payment shall be one hundred ten percent (110%) of the reasonable cost (as estimated by the Operator) of electrical power for such extended period of illumination based on thirty (30) days of operation. If the period is greater than thirty (30) days, then the requesting Party shall renew such prepayment deposit at the end of each thirty (30) day period, subject to adjustment in such amount as the Operator shall reasonably determine.

The requesting Party agrees to pay one hundred ten percent (110%) of the cost of electrical power to provide such extra-hours illumination. If the requesting Party is of the opinion that the payments exceed one hundred ten percent (110%) of such costs, the Party and the Operator shall attempt to agree on the cost of such electrical power and if they cannot do so, then the amount to be paid shall be estimated by the electrical utility company furnishing such power, or if the utility fails to do so, by a reputable engineer. Each Party acknowledges and understands that the Shopping Center lighting system may be zoned and therefore more light standards may be lit than required in order to satisfy the lighting requests. Upon the failure of a requesting Party to pay any amount required hereby, the Operator shall have the right to discontinue such additional lighting and to exercise other remedies herein provided. Any such request for additional lighting may be withdrawn or terminated at any time upon fifteen (15) days' advance written notice from the requesting Party, and a new request may be made from time to time. In the event the Operator incurs additional costs to accommodate the demand of the requesting Party, including but not limited to any cost of wiring or installing separate switching equipment, the requesting Party shall reimburse the Operator for such costs upon demand.

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

1567782

Notwithstanding the foregoing, if a Major is the requesting Party, such Major shall pay only 100% of the cost of electrical power and its payment for such use shall be in arrears (but still monthly or shorter period, as the case may be), rather than in advance.

(C) As an alternative to the process of lighting another's Parcel as set forth in (B) above, a Party ("Constructing Party") may install, with the consent of the other Party ("Consenting Party"), a secondary wiring system, from the Constructing Party's Parcel to the light standards on the Consenting Party's Parcel, which would permit a portion or all of the lighting on the Consenting Party's Parcel to be operated contemporaneously with the lighting on the Constructing Party's Parcel. All costs and expenses associated with the installation, maintenance, replacement, and operation of such secondary wiring, including the cost of energy to light any portion of the Consenting Party's Parcel, shall be assumed and promptly paid by the Constructing Party. The Constructing Party shall submit to the Consenting Party for approval appropriate plans and specifications for the installation of such secondary wiring systems. If such submission is disapproved, the Constructing Party shall revise the submission to accommodate the reasonable objections of the Consenting Party and then it shall resubmit such plans and specifications to the Consenting Party for its approval.

5.3 <u>Signs</u>.

No exterior identification signs shall be allowed within the Shopping Center except as set forth hereinafter.

(A) No freestanding sign shall be permitted within the Shopping Center unless constructed in areas designated on the Site Plan, and only one such sign may be located in each designated area; provided however, that each Party shall be permitted to place within the Common Area located on its Parcel

Confidentially Provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

156782

directional signs or informational signs such as "Handicapped Parking", the temporary display of leasing information and the temporary erection of one sign identifying each contractor working on a construction job.

If only two (2) pylon signs are permitted by governmental regulation, then only two "Center Pylon Signs" at the locations designated #2 and #4 on the Site Plan shall be constructed and maintained. Each Center Pylon Sign shall include the name of the Shopping Center affixed to the structural portion thereof together with space for the signs of three (3) Occupants. With respect to each sign, the order (top to bottom) and allocation of space shall be as follows:

(a) sign #2 - names of one (1) Occupant of Parcel 7 -- 33-1/3%; name of one (1) Occupant of Parcel 6 -- 33-1/3%; and name of not more than one (1) Occupant designated by the Parcel 11 Party -- 33-1/3%.

(b) sign #4 - name of one (1) Occupant of Parcel 6 -- 33-1/3%; name of one (1) Occupant of Parcel 7 -- 33-1/3%; and name of not more than one (1) Occupant designated by the Parcel 11 Party -- 33-1/3%.

If four (4) pylon signs are permitted by governmental regulation, then three (3) "Center Pylon Signs" at the locations designated #2, #3 and #4 on the Site Plan, and one (1) "Major Tenant Pylon Sign" at the location designated #1 on the Site Plan shall be developed and maintained. Each Center Pylon Sign shall include the name of the Shopping Center affixed to the structural portion thereof together with space for the signs of three (3) Occupants. With respect to each sign, the order (top to bottom) and allocation of space shall be as follows:

(c) sign #1 - Name of not more than one (1) Occupant of Parcel 6 -- 100%

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:12 PM

156782

(d) sign #2 - Name of one (1) Occupant of Parcel 7 -- 33-1/3%; and names of not more than two (2) Occupants designated by the Parcel 11 Party -- 33-1/3% each.

(e) sign #3 - Name of one (1) Occupant of Parcel 7 -- 33-1/3%; and names of not more than two (2) Occupants designated by the Parcel 11 Party -- 33-1/3% each.

(f) sign #4 - Name of not more than one (1) Occupant of Parcel 6 -- 33-1/3%; and names of not more than two (2) Occupants designated by the Parcel 11 Party -- 33-1/3% each.

The Approving Parties shall have the right to approve the design and size of all pylon signs, including the space for the name of the Shopping Center on Center Pylon Signs; provided however, that the Approving Parties hereby approve the use by Target and Albertson's of their respective standard prototype identification logo or sign attachment as used in their business operations as the same exists from time to time. The design and construction of each Center Pylon Sign and Major Tenant Pylon Sign structure shall be undertaken by Developer as part of the Site Improvement Work pursuant to the Site Development Agreement and the repair, maintenance and replacement of such structure, exclusive of each Occupant's sign box which shall be the sole obligation of such Occupant, shall be performed by the Operator as part of the Common Area Maintenance.

Each "Monument Sign" shall identify only one Occupant of the Parcel upon which the sign is located. The standard design of the Monument Signs shall be approved by the Approving Parties, and shall not exceed 7 feet in height, nor 13 feet in length. The construction of each Monument Sign, and its subsequent repair, maintenance and replacement, shall be the responsibility of the Occupant identified thereon.

Confidentially provided to Paul Meade to 12.130.164.240 07/15/2013 3:22 PM

156782

(B) Any Occupant occupying less than twenty-five thousand (25,000) square feet of Floor Area may not have more than one (1) identification sign placed on the exterior of the building it occupies; provided however, that if any such Occupant is located at the corner of a building, then such Occupant may have an identification sign on each side of such corner; and provided further that if one Person occupies the entirety of the space identified on the Site Plan as Anchor, then such Occupant may have two (2) identification signs placed on the exterior of such building. Any Occupant occupying at least twenty-five thousand (25,000) square feet of Floor Area may have more than one identification sign placed on the exterior of the building it occupies.

No exterior identification sign attached to a building shall be of the type set forth below:

(i) placed on canopy roofs extending above the building roof, placed on penthouse walls, or placed so as to project above the parapet, canopy, or top of the wall upon which it is mounted;

(ii) placed at any angle to the building; provided, however, the foregoing shall not apply to any sign located under a sidewalk canopy if such sign is at least eight (8) feet above the sidewalk;

(iii) painted on the surface of any building.

No exterior sign shall identify leased departments or concessionaires, or specific brands or products for sale or services provided within a business establishment; provided however, that the foregoing shall not be applicable to either

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

Parcel 7 so long as at least 85% of the Floor Area located thereon is used for supermarket and/or superdrug or grocery store purposes, or to any Occupant's standard identification sign or logo format.

1567782

(C) No identification signs attached to the exterior of buildings nor freestanding signs shall be of the type set forth below:

(i) flashing, moving or audible signs;

(ii) signs employing exposed raceways, exposed neon tubes, exposed ballast boxes, or exposed transformers; provided however, that with the approval of the Approving Parties, which approval may be withheld in the sole and absolute discretion of each Approving Party, the foregoing may be permitted in unusual situations;

(iii) paper or cardboard signs, temporary signs (exclusive of contractor signs), stickers or decals; provided, however, the foregoing shall not prohibit the placement at the entrance of each Occupant's space a small sticker or decal, indicating hours of business, emergency telephone numbers, the acceptance of credit cards and other similar bits of information.

5.4 <u>Insurance.</u>

(A) Operator shall maintain or cause to be maintained in full force and effect Comprehensive Public Liability Insurance covering the Common Area of the Shopping Center with a combined single limit of liability of not less than Five Million Dollars ($5,000,000.00) for bodily or personal injury or death, and for property damage, arising out of any one occurence. The Operator

Confidentially Provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

1567782

shall submit to the Majors for approval the name of the insurer and the form of the policy, including the amount of the deductible. Such insurance shall include the following provisions:

(i) shall provide that the policy may not be canceled or materially reduced in amount or coverage without at least thirty (30) days' prior written notice by the insurer to each insured;

(ii) shall name the Parties as named insureds;

(iii) shall provide for severability of interests;

(iv) shall provide that an act or omission of one of the insureds or additional insureds which would void or otherwise reduce coverage, shall not reduce or void the coverage as to the other named insureds; and

(v) shall provide for contractual liability coverage with respect to the indemnity obligation set forth below.

Operator covenants to defend, indemnify and hold harmless each Party and its directors, officers, agents, representatives and employees from and against all claims, including any action or proceeding brought thereon, and all costs, expenses and liabilities (including reasonable attorneys' fees) asserted or incurred in connection with or arising as a result of the death of, or any injury, loss or damage whatsoever to any Person, or to the property of any Person, as shall occur due to the performance or failure to perform by Operator of its duties or obligations with respect to the maintenance of the Common Area, except to the extent claims are caused by the negligence or by the willful act or omission of the indemnified Party or its directors, officers, contractors, licensees, concessionaires, agents, representatives

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

1567782

or employees. If any Major elects to take over the maintenance of the Common Area on its Parcel, such Major shall defend, indemnify and hold harmless Operator and the other Parties in identical fashion with respect to such obligations; provided however, that such withdrawing Major shall continue to be covered by Operator's Common Area liability insurance program.

(B) Except to the extent coverage is provided by the insurance required to be maintained under (A) above, each Party (as to its Parcel) shall maintain or cause to be maintained in full force and effect Comprehensive Public Liability Insurance with a combined single limit of liability of not less than Five Million Dollars ($5,000,000.00) for bodily or personal injury or death, and for property damage, arising out of any one occurrence. Such insurance shall include the following provisions:

(i) shall provide that the policy may not be canceled or materially reduced in amount or coverage without at least thirty (30) days' prior written notice by the insurer to each insured and any aditional insureds;

(ii) shall name the other Parties as additional insureds;

(iii) shall provide for severability of interests;

(iv) shall provide that an act or omission of one of the insureds or additional insureds which would void or otherwise reduce coverage, shall not reduce or void the coverage as to the other additional insureds or the insured, respectively; and

(v) shall provide for contractual liability coverage with respect to the indemnity obligation set forth below.

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

1567782

Each Party ("Indemnitor") covenants and agrees to indemnify, defend and hold harmless each other Party ("Indemnitee") from and against all claims, costs, expenses and liability (including reasonable attorney's fees and cost of suit incurred in connection with all claims) including any action or proceedings brought thereon, arising from or as a result of the injury to or death of any Person, or damage to the property of any Person which shall occur on the Parcel owned by each Indemnitor, except for claims caused by the negligence or willful act or omission of such Indemnitees, its licensees, concessionaires, agents, servants, or employees, or the agents, servants, or employees of any licensee or concessionaire thereof.

(C) Prior to commencing any construction activities within the Shopping Center, each Party shall obtain or require its contractor to obtain and thereafter maintain so long as such construction activity is occurring, at least the minimum insurance coverages set forth below:

(i) Workers' Compensation - statutory limits

(ii) Employers Liability - $100,000

(iii) Comprehensive General and Comprehensive Auto Liability as follows:

(a) Bodily Injury - $1,000,000 per occurrence

(b) Property Damage - $1,000,000 per occurrence

(c) Independent Contractors Liability or Owner's Protective Liability; same coverage as set forth in (a) and (b) above;

(d) Products/Completed Operations Coverage which shall be kept in effect for two (2) years after completion of work;

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

1567-32

(e) "XCU" Hazard Endorsement, if applicable;

(f) "Broad Form" Property Damage Endorsement;

(g) "Personal Injury" Endorsements;

(h) "Blanket Contractual Liability" Endorsement.

If the construction activity involves the use of another Party's Parcel, then the owner of such Parcel shall be an additional named insured and such insurance shall provide that the same shall not be canceled without at least thirty (30) days prior written notice to the named insureds. If such insurance is canceled or expires then the constructing Party shall immediately stop all work on or use of another Party's Parcel until either the required insurance is reinstated or replacement insurance obtained.

(D) Effective upon the commencement of construction of improvements, the constructing Party will carry or cause to be carried, fire insurance with an extended coverage endorsement with a financially responsible insurance company or companies, in an amount at least equal to ninety percent (90%) of the replacement cost (exclusive of the cost of excavation, foundations, and footings) of the buildings and improvements, such coverage extending at least to the following perils: loss or damage by fire, windstorm, cyclone, tornado, hail, explosion, riot, riot attending a strike, civil commotion, malicious mischief, vandalism, aircraft, vehicle, smoke damage, and sprinkler leakage.

Each Party (the "Releasing Party") hereby releases and waives for itself and on behalf of its insurer, any other Party (the "Released Party") from any liability for any loss or damage to all property of such Releasing Party located upon any portion of

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:32 PM

1567782

the Shopping Center, which loss or damage is of the type generally covered by fire insurance with an extended coverage endorsement, irrespective either of any negligence on the part of the Released Party which may have contributed to or caused such loss, or of the amount of such insurance required or actually carried. Each Party agrees to use its best efforts to obtain, if needed, appropriate endorsements to its policies of insurance with respect to the foregoing release; provided, however, that failure to obtain such endorsements shall not affect the release hereinabove given. Each Party ("Indemnitor") covenants and agrees to indemnify, defend and hold harmless each other Party ("Indemnitee") from and against all claims asserted by or through any Permittees of the Indemnitor's Parcel for any loss or damage to the property of such Permittee located upon the respective Indemnitor's Parcel, which loss or damage is of the type generally covered by fire insurance with an extended coverage endorsement irrespective of any negligence on the part of the Indemnitee which may have contributed to or caused such loss.

(E) With respect to any insurance required by (B) above:

(i) Such insurance shall be procured from companies licensed in the State of California and shall be rated by Best's Insurance Reports not less than A/X; the limits of such policies shall be reviewed by the Approving Parties and approved as to sufficiency at least every five (5) years;

(ii) Such insurance may be carried under (a) an individual policy covering this location, (b) a blanket policy or policies which includes other liabilities, properties and locations of such Party, (c) a plan of self-insurance, provided that the Party so self-insuring has and maintains $75,000,000 or more of net current

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

1567782

assets and $100,000,000 or more of net worth as evidenced by such Party's annual report that is audited by an independent certified public accountant, or (d) a combination of any of the foregoing insurance programs;

(iii) To the extent any deductible is permitted or allowed as a part of such insurance, the Party electing to utilize the deductible feature shall be deemed to be covering the amount thereof under an informal plan of self-insurance; provided however, that in no event shall any deductible exceed $50,000.00 unless such Party qualifies for self-insurance pursuant to (ii)(C) above; and

(iv) Each Party agrees to furnish to any Party requesting the same, a certificate(s) of insurance evidencing that the insurance required to be carried by such requested Party is in full force and effect.

5.5 Taxes and Assessments. Each Party shall pay, or cause to be paid prior to delinquency, all taxes and assessments with respect to its Parcel, the buildings, and improvements located thereon and any personal property owned or leased by such Party in the Shopping Center, provided that if the taxes or assessments or any part thereof may be paid in installments, the Party may pay each such installment as and when the same becomes due and payable. Nothing contained in this subsection shall prevent any Party from contesting at its cost and expense any such taxes and assessments with respect to its Parcel in any manner such Party elects, so long as such contest is maintained with reasonable diligence and in good faith. At the time as such contest is concluded (allowing for appeal to the highest appellate court), the contesting Party shall promptly pay all such taxes and assessments determined to be owing, together with all interest, penalties and costs thereon.

Confidentially Provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

1567782

5.6 Liens. In the event any mechanic's lien is filed against the Parcel of one Party as a result of services performed or materials furnished for the use of another Party, the Party permitting or causing such lien to be so filed agrees to cause such lien to be discharged prior to entry of final judgment (after all appeals) for the foreclosure of such lien and further agrees to indemnify, defend, and hold harmless the other Party and its Parcel against liability, loss, damage, costs or expenses (including reasonable attorneys' fees and cost of suit) on account of such claim of lien. Upon request of the Party whose Parcel is subject to such lien, the Party permitting or causing such lien to be filed agrees to promptly cause such lien to be released and discharged of record, either by paying the indebtedness which gave rise to such lien or by posting bond or other security as shall be required by law to obtain such release and discharge. Nothing herein shall prevent a Party permitting or causing such lien from contesting the validity thereof in any manner such Party chooses so long as such contest is pursued with reasonable diligence. In the event such contest is determined adversely (allowing for appeal to the highest appellate court), such Party shall promptly pay in full the required amount, together with any interest, penalties, costs, or other charges necessary to release such lien.

ARTICLE VI
MISCELLANEOUS

6.1 Default.

(A) If any Party fails to comply with any provision herein ("Defaulting Party"), then any other Party ("Non-Defaulting Party") may, upon forty-five (45) days' prior written notice to the Defaulting Party, proceed to cure the default (and shall have a license to do so) by the payment of money or performance of some other action for the account of the Defaulting Party. The foregoing right to cure shall not be exercised if within the

Confidentially provided to Paul Meade to 12.130.164.240 07/15/2013 3:22 PM

156782

forty-five (45) day notice period (i) the Defaulting Party cures the default, or (ii) if the default is curable, but cannot reasonably be cured within that time period, the Defaulting Party begins to cure such default within such time period and diligently pursues such action to completion. The forty-five (45) day notice period shall not be required if, using reasonable judgment, the Non-Defaulting Party deems that an emergency exists which requires immediate attention. In the event of such an emergency, the Non-Defaulting Party shall give whatever notice to the Defaulting Party as is reasonable under the circumstances.

(B) Within ten (10) days of written demand (including providing copies of invoices reflecting costs) the Defaulting Party shall reimburse the Non-Defaulting Party for any sum reasonably expended by the Non-Defaulting Party to cure the default, together with interest thereon. It is agreed that the Non-Defaulting Party shall have a lien upon the Parcel of the Defaulting Party, upon recordation of a claim of lien in the Official Records of Riverside County, California, to secure the payment of the Defaulting Party of the costs incurred by the Non-Defaulting Party to cure such default. Such lien may be foreclosed in accordance with the laws pertaining to foreclosure of mortgages; the priority of such lien shall be determined by the date of its recording.

(C) In the event any Party shall institute any action or proceeding against another Party relating to the provisions of this OEA, or if any default hereunder, or to collect any amounts owing hereunder, or if an arbitration proceeding is commenced by agreement of the Parties to any dispute, the unsuccessful litigant in such action or proceeding shall reimburse the successful litigant therein for costs and expenses incurred by the successful litigant in connection with such action or proceeding and any appeals therefrom, including attorneys' fees and court costs.

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

156782

(D) All remedies are cumulative and shall be deemed additional to any and all other remedies to which any Party may be entitled in law or in equity. Each Party shall also have the right to restrain by injunction any violation or threatened violation by any other Party of any of the terms, covenants, or conditions of this OEA, or to obtain a decree to compel performance of any such terms, covenants, or conditions, it being agreed that the remedy at law for a breach of any such term, covenant, or condition (except those, if any, requiring the payment of a liquidated sum) is not adequate.

6.2 <u>Interest</u>. Wherever and as often as one Party shall not have paid any sum payable hereunder to another Party within five (5) days of the due date, such delinquent Party shall pay interest on such amount from the due date to and including the date such payment is received by the Party entitled thereto, at the lesser of:

(A) The highest rate permitted by law to be paid on such type of obligation by the Party obligated to make such payment or the Party to whom such payment is due, whichever is less; or

(B) 3% in excess of the Reference Rate from time to time publicly announced by Bank of America, San Diego office; if such institution is not located in San Diego, then the Approving Parties shall, by a majority vote, select another substantial institutional lender with an office located in San Diego.

6.3 <u>Estoppel Certificate</u>. Each Party agrees that upon written request (which shall not be more frequent than three (3) times during any calendar year) of any other Party, it will issue to a prospective mortgagee or successor of such other Party or to such other Party, an estoppel certificate stating to the best of the issuer's knowledge that as of such date:

Confidentially provided to Paul Meade 12.130.154.240 07/15/2013 3:22 PM

156782

(A) whether the Party to whom the request has been directed knows of any default by the requesting Party under this OEA, and if there are known defaults, specifying the nature thereof;

(B) whether this OEA has been assigned, modified or amended in any way by the requested Party (and if it has, then stating the nature thereof);

(C) whether this OEA is in full force and effect;

Such statement shall act as a waiver of any claim by the Party furnishing it to the extent such claim is based upon facts contrary to those asserted in the statement and to the extent the claim is asserted against a bona fide encumbrancer or purchaser for value without knowledge of facts to the contrary of those contained in the statement, and who has acted in reasonable reliance upon the statement; however, such statement shall in no event subject the Party furnishing it to any liability whatsoever, notwithstanding the negligent or otherwise inadvertent failure of such Party to disclose correct and/or relevant information.

6.4 Notices.

All notices, demands, statements, and requests (collectively the "notice") required or permitted to be given under this OEA must be in writing and shall be deemed to have been properly given or served as of the date hereinafter specified: (i) on the date of personal service upon the person to whom the notice is addressed or if such person is not available the date such notice is left at the address of the person to whom it is directed, (ii) on the date the notice is postmarked by the United States Post Office, provided it is sent prepaid, registered or certified mail, return receipt requested, and (iii) on the date the notice is delivered by a courier service (including Federal Express,

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

1567782

Express Mail, Emery or similar operation) to the address of the person to whom it is directed, provided it is sent prepaid, return receipt requested. Any request for approval shall be subject to the provisions of 6.5 below. The address of the signatories to this OEA is set forth below.

| | |
|---|---|
| Albertson's | Albertson's Inc.<br>250 Parkcenter Boulevard<br>P.O. Box 20<br>Boise, ID 83726<br>Attn: Legal Department |
| Target: | Dayton Hudson Corporation<br>Target Stores-Real Estate<br>Attn: Property Administration<br>33 S. Sixth Street<br>Minneapolis, MN 55402 |
| Developer: | Radnor/LandGrant Rancho California<br>Town Center Partnership<br>c/o LandGrant Development<br>12625 High Bluff Drive<br>Suite 212<br>San Diego, CA 92130 |

Each Party shall have the right from time to time and at any time, upon at least ten (10) days prior written notice thereof in accordance with the provisions hereof, to change its respective address and to specify any other address within the United States of America; provided, however, notwithstanding anything herein contained to the contrary, in order for the notice of address change to be effective it must actually be received. Refusal to accept delivery of a notice or the inability to deliver a notice because of an address change shall not defeat or delay the giving of a notice.

6.5 Approval Rights. Unless otherwise herein provided, (i) whenever approval is required, such approval shall not be unreasonably withheld or delayed, and (ii) if the approval of the Approving Parties is requested such approval must be unanimous. Unless provision is made for a different time period, approval shall be given or withheld within thirty (30) days of the receipt

Confidentially Provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

of the request for approval, if the transmittal requesting such approval stated in capitalized letters the following: IF A RESPONSE TO THIS REQUEST FOR APPROVAL IS NOT GIVEN WITHIN 30 DAYS OF THE RECEIPT HEREOF, YOUR APPROVAL SHALL AUTOMATICALLY BE DEEMED GIVEN. Failure of a requesting Party to include such statement shall negate the "deemed approved" presumption. If a disapproval is not given within the required time period, the requested Party shall be deemed to have given its approval. If a Party shall disapprove, the reasons therefor shall be clearly stated. Except with respect to an approval given by lapse of time, all approvals and disapprovals shall be in writing.

156782

6.6 Condemnation. In the event any portion of the Shopping Center shall be condemned, the award shall be paid to the Party owning the land or the improvement taken, except that (i) if the taking includes improvements belonging to more than one Party, such as utility lines or signs, the portion of the award allocable thereto shall be used to relocate, replace or restore such jointly owned improvements to a useful condition, and (ii) if the taking includes easement rights which are intended to extend beyond the term of the OEA, the portion of the award allocable to each such easement right shall be paid to the respective grantee thereof. In addition to the foregoing, if a separate claim can be filed for the taking of any other property interest existing pursuant to this OEA which does not reduce or diminish the amount paid to the Party owning the land or the improvement taken, then the owner of such other property interest shall have the right to seek an award for the taking thereof.

6.7 Binding Effect. The terms of this OEA and all easements granted hereunder shall constitute covenants running with the land and shall inure to the benefit of and be binding upon the signatories hereto and their respective successors and assigns who become Parties hereunder. This OEA is not intended to

Confidentially Provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

1567782

supersede, modify, amend, or otherwise change the provisions of any prior instrument affecting the land burdened hereby. This OEA is executed with the intent of complying with California Civil Code Section 1468.

6.8 Singular and Plural. Whenever required by the context of this OEA, the singular shall include the plural, and vice versa, and the masculine shall include the feminine and neuter genders, and vice versa.

6.9 Counterparts and Signature Pages. This OEA may be executed in several counterparts, each of which shall be deemed an original. The signatures to this OEA may be executed and notarized on separate pages, and when attached to this OEA shall constitute one complete document.

6.10 Negation of Partnership. None of the terms or provisions of this OEA shall be deemed to create a partnership between or among the Parties in their respective businesses or otherwise, nor shall it cause them to be considered joint venturers or members of any joint enterprise. Each Party shall be considered a separate owner, and no Party shall have the right to act as an agent for another Party, unless expressly authorized to do so herein or by separate written instrument signed by the Party to be charged.

6.11 Not a Public Dedication. Nothing herein contained shall be deemed to be a gift or dedication of any portion of the Shopping Center or of any Parcel or portion thereof to the general public, or for any public use or purpose whatsoever. Except as herein specifically provided, no right, privileges or immunities of any Party hereto shall inure to the benefit of any third-party Person, nor shall any third-party Person be deemed to be a beneficiary of any of the provisions contained herein.

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

1567782

6.12 <u>Excusable Delays</u>. Whenever performance is required of any Party hereunder, that Party shall use all due diligence to perform and take all necessary measures in good faith to perform; provided, however, that if completion of performance shall be delayed at any time by reason of acts of God, war, civil commotion, riots, strikes, picketing or other labor disputes, unavailability of labor or materials, damage to work in progress by reason of fire or other casualty, governmental requirements, or any cause beyond the reasonable control of a Party, then the time for performance as herein specified shall be appropriately extended by the amount of the delay actually so caused. The provisions of this section shall not operate to excuse any Party from the prompt payment of any monies required by this OEA.

6.13 <u>Severability</u>. Invalidation of any of the provisions contained in this OEA, or of the application thereof to any person by judgment or court order shall in no way affect any of the other provisions hereof or the application thereof to any other person and the same shall remain in full force and effect.

6.14 <u>Amendments</u>. This OEA may be amended by, and only by, a written agreement signed by Parties holding at least seventy-five percent (75%) of the total voting power of the Parties (with each Party holding votes equal to his allocation of the Common Area Maintenance Costs and Administration Fee as described in Section 4.2), which 75% shall include each of the Approving Parties, and shall be effective only when recorded in the Official Records of Riverside County, California; provided however, that Site Plan modifications made pursuant to 2.1 above shall not be deemed amendments; and provided further, that this OEA shall not be terminated, "substantially" amended or property released herefrom absent the prior written consent of the Planning Director (or its successor who performs substantially the same duties as now structured of the County of Riverside.) A proposed amendment shall be considered "substantial" if it materially affects the

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

1567782

extent, usage or maintenance of the Common Area. Except for those instances requiring the County of Riverside's approval, no consent to the amendment of this OEA shall ever be required of any Occupant or Person other than the Parties, nor shall any Occupant or Person other than the Parties have any right to enforce any of the provisions hereof. A party may arbitrarily withhold its consent to a proposed amendment.

6.15 Captions and Capitalized Terms. The captions preceding the text of each article and section are included only for convenience of reference. Captions shall be disregarded in the construction and interpretation of the OEA. Capitalized terms are also selected only for convenience of reference and do not necessarily have any connection to the meaning that might otherwise be attached to such term in a context outside of this OEA.

6.16 Minimization of Damages. In all situations arising out of this OEA, all Parties shall attempt to avoid and minimize the damages resulting from the conduct of any other Party. Each Party hereto shall take all reasonable measures to effectuate the provisions of this OEA.

6.17 OEA Shall Continue Notwithstanding Breach. It is expressly agreed that no breach of this OEA shall (i) entitle any Party to cancel, rescind or, otherwise terminate this OEA, or (ii) defeat or render invalid the lien of any mortgage or deed of trust made in good faith and for value as to any part of the Shopping Center, but that the terms and conditions of the OEA shall be binding upon any Person acquiring any portion of the Shopping Center by foreclosure of such mortgage, trustee's sale, deed in lieu of foreclosure or otherwise. However, such limitation shall not affect in any manner any other rights or remedies which a Party may have hereunder by reason of any such breach.

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

156792

6.18 <u>Time</u>. Time is of the essence of this OEA.

6.19 <u>Non Waiver</u>. The failure of any Party to insist upon strict performance of any of the terms, covenants or conditions hereof shall not be deemed a waiver of any rights or remedies which that Party may have hereunder or at law or equity and shall not be deemed a waiver of any subsequent breach or default in any of such terms, covenants or conditions.

## ARTICLE VII
## TERM

7.1 <u>Term of this OEA</u>. This OEA shall be effective as of the date first above written and shall continue in full force and effect until 11:59 p.m. on December 31, 2049; provided, however, that the easements referred to in Article II hereof which are specified as being perpetual or as continuing beyond the term of this OEA shall continue in force and effect as provided therein. Upon termination of this OEA, all rights and privileges derived from and all duties and obligations created and imposed by the provisions of the OEA, except as relates to the easements mentioned above, shall terminate and have no further force or effect; provided, however, that the termination of this OEA shall not limit or affect any remedy at law or in equity that a Party may have against any other Party with respect to any liability or obligation arising or to be performed under this OEA prior to the date of such termination.

Confidentially Provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

156782

**IN WITNESS WHEREOF,** the Parties have caused this OEA to be executed effective as of the day and year first above written.

RADNOR/LANDGRANT RANCHO CALIFORNIA TOWN CENTER PARTNERSHIP
("Developer")

RADNOR/LANDGRANT RANCHO CALIFORNIA TOWN CENTER PARTNERSHIP, a California general partnership

By: RADNOR/LANDGRANT-RANCHO PARTNERSHIP, a California general partnership, General Partner

By: RADNOR/RANCHO CALIFORNIA CORPORATION, a Delaware corporation, General Partner

By: ______________________
(Print Name and Title)

By: ______________________
(Print Name and Title)

By: RANCHO CALIFORNIA SHOPPING CENTER ASSOCIATES, A CALIFORNIA LIMITED PARTNERSHIP, General Partner

By: LGD-RANCHO CALIFORNIA, A CALIFORNIA LIMITED PARTNERSHIP, General Partner

By: LANDGRANT DEVELOPMENT, INC., a California corporation, General Partner

By: ______________________
(Print Name and Title)

By: ______________________
(Print Name and Title)

DAYTON HUDSON CORPORATION
("Target")

By: ______________________
Name: Jack D. Fontaine
Title: Sr. Vice President
Target Stores

ALBERTSON'S, INC.
("Albertson's")

By: ______________________
Name: Thomas R. Saldin
Title: Sr. Vice President

ATTEST:

By: ______________________
Name: Leslie M. Bock
Title: Secretary

SEAL

07/15/2013 3:22 PM

156782

STATE OF CALIFORNIA )
) ss
COUNTY OF SAN DIEGO )

On April 29, 1988, before me, the undersigned, a Notary Public in and for said State, personally appeared W. P. Laugaland, personally known to and ~~____~~ me or proved to me on the basis of satisfactory evidence to be the persons who executed this instrument as the Vice President and ~~____, respectively~~, or on behalf of RADNOR/RANCHO CALIFORNIA CORPORATION, the corporation that executed this instrument on behalf of RADNOR/LANDGRANT-RANCHO PARTNERSHIP, the partnership that executed this instrument on behalf of RADNOR/LANDGRANT RANCHO CALIFORNIA TOWN CENTER PARTNERSHIP, the partnership that executed this instrument and acknowledged to me that the corporation executed this instrument pursuant to its by-laws or a resolution of its board of directors as such partner of RADNOR/LANDGRANT-RANCHO PARTNERSHIP, that such partnership executed this instrument as such partner of RADNOR/LANDGRANT RANCHO CALIFORNIA TOWN CENTER PARTNERSHIP, and that such partnership executed it.

WITNESS my hand and official seal.

OFFICIAL SEAL
ERIN J GILL
NOTARY PUBLIC - CALIFORNIA
SAN DIEGO COUNTY
My comm. expires MAY 27, 1991

Erin J. Gill
Notary Public in and for Said State

STATE OF CALIFORNIA )
) ss
COUNTY OF SAN DIEGO )

On April 26, 1988, before me, the undersigned, a Notary Public in and for said State, personally appeared C. Samuel Marasco, personally known to and ~~____~~ me or proved to me on the basis of satisfactory evidence to be the persons who executed this instrument as the President and ~~____, respectively~~, or on behalf of LANDGRANT DEVELOPMENT, INC., the corporation that executed this instrument on behalf of LGD-RANCHO CALIFORNIA, A CALIFORNIA LIMITED PARTNERSHIP, the partnership that executed this instrument on behalf of RANCHO CALIFORNIA SHOPPING CENTER ASSOCIATES, A CALIFORNIA LIMITED PARTNERSHIP, the partnership that executed this instrument, on behalf of RADNOR/LANDGRANT RANCHO CALIFORNIA TOWN CENTER PARTNERSHIP, the partnership that executed this instrument and acknowledged to me that the corporation executed this instrument pursuant to its by-laws or a resolution of its board of directors as such partner of LGD-RANCHO CALIFORNIA, A CALIFORNIA LIMITED PARTNERSHIP, that such partnership executed this instrument as such partner of RANCHO CALIFORNIA SHOPPING CENTER ASSOCIATES, A CALIFORNIA LIMITED PARTNERSHIP, that such partnership executed this instrument as such partner of RADNOR/LANDGRANT RANCHO CALIFORNIA TOWN CENTER PARTNERSHIP, and that such partnership executed it.

WITNESS my hand and official seal.

OFFICIAL SEAL
ERIN J GILL
NOTARY PUBLIC - CALIFORNIA
SAN DIEGO COUNTY
My comm. expires MAY 27, 1991

Erin J. Gill
Notary Public in and for Said State

STATE OF CALIFORNIA )
) ss
COUNTY OF SAN DIEGO )

156782

On April 29, 1988, before me, the undersigned, a Notary Public in and for said State, personally appeared A. J. Taranton, Jr., personally known to me or proved to me on the basis of satisfactory evidence to be the person who executed this instrument as the Vice President, or on behalf of LANDGRANT DEVELOPMENT, INC., the corporation that executed this instrument on behalf of LGD-RANCHO CALIFORNIA, A CALIFORNIA LIMITED PARTNERSHIP, the partnership that executed this instrument on behalf of RANCHO CALIFORNIA SHOPPING CENTER ASSOCIATES, A CALIFORNIA LIMITED PARTNERSHIP, the partnership that executed this instrument, on behalf of RADNOR/LANDGRANT RANCHO CALIFORNIA TOWN CENTER PARTNERSHIP, the partnership that executed this instrument and acknowledged to me that the corporation executed this instrument pursuant to its by-laws or a resolution of its board of directors as such partner of LGD-RANCHO CALIFORNIA, A CALIFORNIA LIMITED PARTNERSHIP, that such partnership executed this instrument as such partner of RANCHO CALIFORNIA SHOPPING CENTER ASSOCIATES, A CALIFORNIA LIMITED PARTNERSHIP, that such partnership executed this instrument as such partner of RADNOR/LANDGRANT RANCHO CALIFORNIA TOWN CENTER PARTNERSHIP, and that such partnership executed it.

WITNESS my hand and official seal.

OFFICIAL SEAL
ERIN J GILL
NOTARY PUBLIC - CALIFORNIA
SAN DIEGO COUNTY
My comm. expires MAY 27, 1991

Erin J. Gill
Notary Public in and for Said State

EJG:0782j

Confidentially provided to Paul Meade 12.130.164.40 07/15/2013 3:22 PM

STATE OF MINNESOTA
COUNTY OF HENNEPIN } ss.

156782

The foregoing instrument was acknowledged before me this 19th day of April, 1988, by ~~William E. Harder,~~ Jack D. Fontaine the Sr. Vice President of Dayton Hudson Corporation, a Target Stores Minnesota corporation, on behalf of the corporation.

BETH RUTHERFORD
NOTARY PUBLIC-MINNESOTA
HENNEPIN COUNTY
MY COMMISSION EXPIRES 4-16-93

Notary Public

My commission expires: 4-16-93

Confidentially provided to
Paul Meade
12.130.164.240
07/15/2013 3:22 PM

STATE OF IDAHO )
) ss
COUNTY OF ADA )

156782

On April 15, 1988, before me, the undersigned, a Notary Public in and for said State, personally appeared Thomas R. Saldin and Leslie M. Bock, personally known to me or proved to me on the basis of satisfactory evidence to be the person who executed this instrument as the Senior Vice President, and Secretary, respectively, of the corporation that executed this instrument, and acknowledged to me that such corporation executed this instrument pursuant to its by-laws or a resolution of its board of directors.

WITNESS my hand and official seal.

My commission expires: 9-28-88

Melissa G. Pearson
Notary Public in and for Said State

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

1567782

EXHIBIT "A"

LEGAL DESCRIPTION OF TARGET PARCEL

Parcel 6 of Parcel Map No. 22863 in the County of Riverside, State of California, according to the Map Recorded in Book 150, Pages 51, through 57 inclusive of Parcel Maps in the Office of the County Recorder of said County.

TWT:1489t

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

1567782

## EXHIBIT "B"

### LEGAL DESCRIPTION OF ALBERTSON'S PARCEL

Parcel 7 of Parcel Map No. 22863 in the County of Riverside, State of California, according to the Map Recorded in Book 150, Pages 51, through 57 inclusive of Parcel Maps in the Office of the County Recorder of said County.

TWT:1490t

Confidentially provided to
Paul Meade
12.130.164.240
07/15/2013 3:22 PM

1567782

# EXHIBIT "C"

## LEGAL DESCRIPTION OF DEVELOPER PARCELS

Parcels 1, 2, 3, 4, 5, 8, 9, 10, 11, 13, 14, 15, 16 and 17 of Parcel Map No. 22863 in the County of Riverside, State of California, according to the Map Recorded in Book 150, Pages 51, through 57 inclusive of Parcel Maps in the Office of the County Recorder of said County.

TWT:1491t

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

156782

EXHIBIT "D"

LEGAL DESCRIPTION OF ACCESS EASEMENT

RECIPROCAL EASEMENT FOR INGRESS AND EGRESS

THOSE PORTIONS OF LOT 18, TRACT NO. 3334 AS SHOWN BY MAP FILED IN BOOK 54 PAGES 25 TO 30 OF MAPS AND PARCEL 10 OF PARCEL MAP 22863 AS SHOWN BY MAP FILED IN BOOK 150 PAGES 51 TO 57 OF PARCEL MAPS, RECORDS OF RIVERSIDE COUNTY, STATE OF CALIFORNIA DESCRIBED AS FOLLOWS:

PARCEL "A"

A STRIP OF LAND 60.00 FEET IN WIDTH LYING 30.00 FEET TO EACH SIDE OF THE FOLLOWING DESCRIBED CENTERLINE:
BEGINNING AT THE MOST WESTERLY CORNER OF PARCEL 10 OF SAID PARCEL MAP 22863; THENCE EASTERLY ALONG THE BOUNDARY LINE OF SAID PARCEL 10, BEING A CURVE, CONCAVE NORTHERLY, HAVING A RADIUS OF 1000.00 FEET, THROUGH A CENTRAL ANGLE OF 6°58'20" A DISTANCE OF 121.69 FEET. THE SIDELINES OF SAID STRIP ARE TO BE PROLONGED OR SHORTENED SO AS TO TERMINATE WESTERLY IN THE EASTERLY LINE OF YNEZ ROAD AS SAID ROAD IS SHOWN ON SAID PARCEL MAP AND EASTERLY IN A LINE WHICH IS RADIAL TO THE EASTERLY TERMINUS OF THE ABOVE DESCRIBED CENTERLINE.

PARCEL "B"

A STRIP OF LAND 20.00 FEET IN WIDTH, THE SOUTHEASTERLY LINE OF WHICH IS DESCRIBED AS FOLLOWS:
BEGINNING AT THE EASTERLY TERMINUS OF THE CENTERLINE OF SAID PARCEL "A"; THENCE EASTERLY, ALONG THE EASTERLY CONTINUATION OF THAT CURVE IN PARCEL "A" DESCRIBED AS HAVING A RADIUS OF 1000.00 FEET, THROUGH A CENTRAL ANGLE OF 10°23'06" A DISTANCE OF 181.25 FEET TO THE BOUNDARY LINE OF PARCEL 10 OF SAID PARCEL MAP 22863.

THE SIDELINES OF SAID STRIP ARE TO BE PROLONGED OR SHORTENED SO AS TO TERMINATE WESTERLY IN THE EASTERLY LINE OF SAID PARCEL "A" AND EASTERLY IN SAID BOUNDARY LINE OF PARCEL 10 OF PARCEL MAP 22863.

Confidentially provided to Pamela de 12.30.0.240 07/15/2013 3:52 PM

156782

APR 12 '88 13:30 NBS/LOWRY, HEMET, CA

**EXHIBIT "E"**

**PARCEL MAP**

P.2



156782

# EXHIBIT F
## SUBMISSION GUIDELINES

1. During the conceptual design phase, the constructing party shall submit to the other parties the following:

   A. Site Design Documents to Indicate the Following:
      - Parking configurations and car parking count
      - Typical bay width and stall dimensions
      - Drive widths
      - Setbacks
      - Curb cuts
      - Spot elevations or rough contours
      - Rough landscape scope
      - Lighting pole locations
      - Preliminary utility strategies

   B. Building Design Single Line Plans to Indicate the Following:
      - Exterior wall configuration
      - Doors and store front extent
      - Canopies and overhangs
      - Probable column locations at exterior and abutting adjacent building on interior

   C. Exterior Elevation Drawings to Indicate the Following:
      - Opaque wall areas with doors and store fronts

2. After approval has been granted of conceptual design phase submitted in accordance with the guidelines specified in 1 above, the constructing party shall submit final design phase plans to the other parties as follows:

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

156782

A. **Site Design Documents Delineating Information Outlined in the Concept Phase with the Following Added Detail:**
- o Refined grading plans
- o Selected lighting fixtures and resultant lighting levels in foot candles
- o Landscaping showing generic planting materials and locations
- o Proposed paving section designs and location
- o Utility layouts including hydrants and sizes proposed
- o Proposed details for curbs, site structures, manholes, etc.
- o Proposed site signage designs and locations

B. **Building Design Plans Delineating Information Outlined in the Concept Phase with the Following Added Detail:**
- o Exterior wall thicknesses
- o Structural columns or bearing walls at building exterior and proposed foundation design at adjoining wall between abutting buildings
- o Where common footings are to be shared provide wall or column load information for design of that footing
- o Proposed roof plan showing slopes and location of penthouses or other major mechanical equipment
- o References of key flashing details of roof to adjoining building

C. **Exterior Elevation Drawings Delineating Information Outlined in the Concept Phase with the Following Added Detail:**
- o Proposed building sign standards
- o Paint color chips and samples of other materials such as brick or concrete aggregates (glass or aluminum finishes may be annotated on the elevations)

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

156782

- Proposed large scale details of key section conditions to show exterior design intent
- Major penthouses or rooftop equipment profiles
- Features such as special masonry patterns, bands or special materials and textures
- Rain leaders or scuppers
- Wall sections at various exterior locations including at the demising wall to the adjoining building with key vertical dimensioning

3. If a building is to have a through-the-wall pedestrian access connection to an adjoining building, then the final design phase submission shall also include (to the owner of such adjoining building) the following:

   - Plans of the pedestrian mall circulation showing any variations in floor elevations
   - Elevations/sections of the proposed mall space showing store front sign bulkheads and key dimensions
   - Proposed ceiling design including special features such as variations in height or skylights
   - Floor material patterns
   - Landscaping and mall seating areas
   - Proposed interior sign guidelines
   - Paint color chips and samples of other materials such as brick or concrete aggregates (glass or aluminum finishes may be annotated on the plans or elevations)
   - Proposed large scale details of key section conditions to show interior design intent

Confidentially provided to Paul Meade 12.130.164.240 07/15/2013 3:22 PM

**EXHIBIT "X"**
**SITE PLAN**




Confidentially Provided to Paul Meade 72.130.164.240 07/15/2013 3:22 PM


156782
RANCHO CALIFORNIA TOWN CENTER
LANDGRANT DEVELOPMENT
planning and architecture
SITE PLAN
EXHIBIT X-2
RANCHO CALIFORNIA TOWN CENTER
RIVERSIDE COUNTY, CALIFORNIA
RANCHO CALIFORNIA ROAD
YNEZ ROAD
SHARED ACCESS AREA
X-2


YNEZ
ROAD
DRAINAGE
CHANNEL
SHARED ACCESS AREA 1
SHOPS A
SHOPS B
SHOPS C
SHOPS D
MAJOR 5
ANCHOR 3
MAJOR 4
X-3
SITE PLAN
EXHIBIT X-3
RANCHO CALIFORNIA TOWN CENTER
RIVERSIDE COUNTY, CALIFORNIA
RANCHO CALIFORNIA TOWN CENTER
LANDGRANT DEVELOPMENT
planning and architecture

AB

Recording Requested By:

TICOR Title Insurance Company of California

When Recorded, Mail to:

BROBECK, PHLEGER & HARRISON
Attn: Ellen B. Spellman
225 Broadway, Suite 2100
San Diego, CA 92101

RECEIVED FOR RECORD AT 2:00 O'CLOCK P.M. AUG - 2 1989 Recorded in Official Records of Riverside County, California

06/21/89

THIS SPACE FOR RECORDER'S USE ONLY

37/16

259041

Aug. 2, 1989

Photographed By TICOR

259041

490638 GR

# FIRST AMENDMENT TO OPERATION AND EASEMENT AGREEMENT

This FIRST AMENDMENT ("Amendment"), dated as of June 21, 1989, amends the Operation and Easement Agreement ("OEA") dated April 29, 1988 and recorded on June 9, 1988 as Instrument No. 156782 of the Official Records of Riverside County, California, by and among DAYTON HUDSON CORPORATION, a Minnesota corporation ("Target"), ALBERTSON'S, INC., a Delaware corporation ("Albertson's"), and RADNOR/LANDGRANT RANCHO CALIFORNIA TOWN CENTER PARTNERSHIP, a California general partnership ("Developer"), with reference to the following facts:

## RECITALS

A. Target owns and is the Party with respect to Parcel 6 of Parcel Map No. 22863 in the County of Riverside, State of California, according to the Map recorded in Book 150, Pages 51 through 57 inclusive of Parcel Maps, in the Office of the County Recorder of said County.

B. Albertson's owns and is the Party with respect to Parcel 7 of the Parcel Map described in Recital A.

C. Developer owns and is the Party with respect to Parcel 11 of the Parcel Map described in Recital A and the balance of the Shopping Center subject to the OEA.

D. Section 6.14 of the OEA provides that it may be amended by a written agreement signed by Parties holding at least seventy-five percent (75%) of the total voting power of the Parties, which 75% shall include the Party with respect to each of Parcels 6, 7 and 11.

E. Developer, Target and Albertson's have agreed to amend the OEA as set forth herein.

NOW, THEREFORE, for valuable consideration the receipt and sufficiency of which are hereby acknowledged, Developer, Target and Albertson's agree to amend the OEA as follows:



#25

Aug. 2,1989
Photographed By TICOR
259041

1. Incorporation of Terms. Capitalized terms used in this Amendment shall have the meanings set forth in the OEA, unless specifically defined herein.

2. Site Plan. The Site Plan attached to the OEA as Exhibit X, consisting of three labeled X-1, X-2 and X-3, is hereby deleted and Exhibit X attached to this Amendment, consisting of five pages labeled X-1, X-2, X-3, X-4 and X-5, is substituted therefor.

3. Definitions.

(a) The definition of "Outside Sales Area" in Section 1.8 is deleted in its entirety and the following is substituted therefor:

> "'Outside Sales Area' shall mean: (i) a permanently defined area immediately adjacent to a building which is used exclusively by an Occupant of such building for any of the following purposes: the sale or display of merchandise, the storage of merchandise, or the accommodation of customers (such as outdoor seating for a restaurant) and which is accessed primarily through the Occupant's portion of the building; and (ii) that portion of Parcel 2 which is located within the building location limit line, but excluding the Building Area and the common lighting facilities and landscaping, as long as such portion is used for a gasoline station sales and service area."

(b) Section 1.5 is modified to provide that the definition of "Floor Area" shall exclude the Outside Sales Area on Parcel 2 [described in Section 3(a) of this Amendment].

(c) The definition of "Parcel" in Section 1.12 is amended to delete Parcel 12, which is not a part of the Shopping Center. The references to Parcel 12 in Section 2.1(B)(iv) and Section 3.2(E) are deleted.

4. Construction; Common Area. Section 3.2(E)(ii) is deleted in its entirety and the following is substituted therefor:

> "(ii) if a business use contains a drive-up unit (such as a remote banking teller or food ordering/dispensing facility), then there shall also be created space for stacking not less than five (5) automobiles

for each drive-up unit, provided that such requirement shall not apply to the gasoline service islands on Parcel 2; and"

5. Building Improvement. The first paragraph of Section 3.3(A) is modified to add the following provision:

"Albertson's, or a successor Party with respect to Parcel 7, shall have the right to expand the initial Building Area and Floor Area on Parcel 7 (consisting of 42,630 square feet) to include all or a portion of the adjacent 'Expansion Area' which is indicated by cross-hatching on the Site Plan, provided the following conditions are satisfied: (i) Albertson's or such Party shall give written notice to the Operator prior to commencement of any construction work and shall obtain all governmental permits and approvals required for such expansion; (ii) Albertson's or such Party shall provide on Parcel 7 the parking spaces required for such expanded Floor Area pursuant to Section 3.2(E) of this Declaration and applicable governmental requirements; and (iii) Albertson's share of Common Area Maintenance Costs shall be modified, upon completion of construction of such expansion, to equal (A) for the period described in Section 4.2(D)(i), the percentage obtained by dividing the expanded Building Area of Parcel 7 by the total Building Area shown on the Site Plan then in effect pursuant to this Declaration for Parcels 1 through 11 and 13, and (B) for the period described in Section 4.2(D)(ii), the percentage obtained by dividing the expanded Building Area of Parcel 7 by the total Building Area shown on the Site Plan then in effect pursuant to this Declaration for the entire Shopping Center. If the percentage share of Common Area Maintenance Costs allocated to Parcel 7 is modified pursuant to the preceding sentence, the percentage share allocated to Parcel 6 shall not be adjusted, but the percentage share allocated to 'all other Parcels' shall be adjusted to equal 100% minus the percentage allocated to Parcel 6 and the revised percentage allocated to Parcel 7."



Aug. 2, 1989
Photographed By TICOR
259041

Aug. 2, 1989
Photographed By TICOR
259041

6. <u>Building Improvement; Height Restrictions</u>. Section 3.3(G) is amended to delete clause (iv) and to substitute the following therefor:

> "(iv) On Parcels 5 and 13 - 35 feet (not more than one story) for the Building Area described as Anchor 2 on Parcel 5 and 25 feet (not more than one story) for the balance of Parcels 5 and 13".

7. <u>Maintenance; Outside Sales Area</u>. Section 4.3(A) is amended to add the following provisions at the end of the first paragraph:

> "If the owner of Parcel 2 fails to maintain all or any portion of the Outside Sales Area on Parcel 2 (excluding the occupant's trade improvements, fixtures and equipment) in accordance with this Section and to the standards applied by the Operator to the Common Area, and if such failure is not corrected by such owner within thirty (30) days after written notice from the Operator, then the Operator shall have the right to enter Parcel 2 to perform repairs and maintenance for all or any portion of the Outside Sales Area (excluding the occupant's trade improvements, fixtures and equipment). The owner of Parcel 2 shall reimburse the Operator for reasonable expenses incurred by the Operator in performing such repairs and maintenance, plus fifteen percent (15%) of such amount for Operator's profit and administrative and overhead costs. Such costs shall be due and payable within ten (10) days after such owner receives a statement from Operator indicating in reasonable detail the amounts expended. All amounts not paid when due shall bear interest from the date due until the date paid at the rate specified in Section 6.2 of the OEA. In the event of failure to pay such sums, the Operator shall have a lien upon Parcel 2 and the other remedies provided in the event of default under Section 6.1 of the OEA. The owner of Parcel 2 hereby grants to the Operator a license to enter Parcel 2 for purposes of completing such repairs and maintenance. The Operator shall maintain the common

Aug. 2, 1989

Photographed By TICOR

259041

lighting facilities and landscaping on Parcel 2 as part of Common Area."

8. Uses.

(a) Section 5.1(C)(x) is deleted in its entirety and the following is substituted therefor:

"(x) No car wash shall be permitted unless located on Parcel 2, and such car wash may be a "customer activated" but not a "customer operated" service facility;"

(b) Section 5.1(C) is amended to add the following new sections:

"(xiii) Parcel 2 may be used for a gasoline service station, a convenience store not to exceed 924 square feet of Floor Area, and a car wash not to exceed 648 square feet of Floor Area;

(xiv) For so long as Parcel 2 is operated as a gasoline service station, no portion of the Shopping Center, other than Parcels 6 and 7 and Parcel 2, shall be developed or used, in whole or in part, for the retail sale of automotive fuels (which shall not include prepackaged fuel additives sold over the counter) and/or operated as a gasoline service station. This restriction shall automatically terminate if the use of Parcel 2 is changed, after its initial opening for business, from an automobile service station; and

(xv) A restaurant or drive-through shall not be permitted on Parcel 3, which shall be used for retail uses only."

(c) Section 5.1(D) of the OEA is amended to add the following provisions thereto, at the request and for the benefit of the occupant of Anchor 1 on Parcel 11:

"Unless the owner of Parcel 11 consents in writing, no portion of the Shopping Center, exclusive of Parcel 6, Parcel 7 and the space designated on the Site Plan as Anchor 1 on Parcel 11, shall be used or occupied for the operation of a drug store; provided,

Aug. 2, 1989
Photographed By TICOR
259041

however, that the foregoing restriction shall not preclude other Occupants of the Shopping Center from selling, as an incidental part of their business, sundry items customarily sold by drug stores which do not require the services of a registered pharmacist."

(d) Section 5.1(F) of the OEA is amended to delete clause (ii) and substitute the following therefor:

"(ii) the seasonal display and sale of bedding plants on the sidewalk in front of the buildings located on Parcels 6 and 7, on that portion of Parcel 11 in front of Anchor 1, and that portion of Parcel 13 in front of Major 2;"

(e) Section 5.1(F) of the OEA is further amended to add the following provisions:

"Notwithstanding the foregoing, sales of merchandise on the sidewalk adjacent to Anchor 1 on Parcel 11 are permitted, subject to compliance with the following conditions: (i) such sidewalk sales shall be conducted no more frequently than four (4) times per calendar year; (ii) each such sidewalk sale shall be no longer than three (3) days in duration; (iii) the Occupant of Anchor 1 shall promptly restore the sidewalks to their condition immediately prior to each sale, at no expense to other parties; (iv) all stands, displays, fixtures or other structures or equipment used in connection with such sales shall be maintained in a safe and attractive condition and shall be promptly removed by the Occupant of Anchor 1, at no expense to other parties, when each sale is terminated; (v) free movement of pedestrian traffic across said sidewalk shall be maintained; and (vi) this right shall be limited to Osco Drug as an Occupant of Anchor 1 and any sublessee or assignee who operates a drug store in Anchor 1."

9. <u>Signs</u>. Section 5.3(B) is amended to add the following provision:

"Notwithstanding any other provisions of the OEA to the contrary, the Occupant of

Aug. 2, 1989

Photographed By TICOR

259041

Parcel 2 shall be allowed to place (i) gasoline price signs as required by California law, (ii) one sign identifying the Occupant on the canopy, and (iii) one sign identifying the Occupant on the convenience store; provided, however, the Approving Parties shall have the right to approve an additional canopy sign and the location and design of such signs pursuant to Section 3.3(B)."

10. Miscellaneous. Article VI is revised to add the following new section:

"6.20 Common Interest Subdivision. The Shopping Center may constitute a common interest subdivision pursuant to the Davis-Stirling Common Interest Development Act [California Civil Code Section 1350 *et. seq.*] (the "Act"). It is intended that the Act have no application to this OEA or the Shopping Center, and all owners from time to time, to the fullest extent permitted by law, hereby waive the application of the Act and any similar laws, so that this OEA may be enforced as written. If, notwithstanding the foregoing declaration that the Act shall not apply to this OEA and the Shopping Center, the Act or any similar law does apply, then, to the extent required by law: (a) the owners shall constitute the association provided for therein; (b) membership in the association shall be mandatory for each owner during his period of ownership and shall be appurtenant to and pass with, and shall not be separated from, title to such owner's parcel; (c) the respective agreements, rights and obligations of the owners as set forth herein shall not be modified, except to the minimum extent required by law; and (d) the owners, as the members of the association, hereby delegate to the Operator the management and maintenance responsibilities with respect to the Common Area as set forth herein, including, but not limited to, the right to assess the owners for Common Area Maintenance Costs and the Administrative Fee and the right to file and enforce assessment liens.

11. No Other Changes. In all other respects, the OEA remains unchanged, in full force and effect.

12. Counterparts. This Amendment may be executed in one or more counterparts, and the signature pages of such counterparts may be attached to one original for recording.

IN WITNESS WHEREOF, the parties have executed this First Amendment as of the date first set forth above.

RADNOR/LANDGRANT RANCHO CALIFORNIA TOWN CENTER PARTNERSHIP, a California general partnership

By: RADNOR/LANDGRANT-RANCHO PARTNERSHIP, a California general Partnership, General Partner

By: RADNOR/RANCHO CALIFORNIA CORPORATION, a Delaware corporation, General Partner

By: ____________________

Title: SVP

By: RANCHO CALIFORNIA SHOPPING CENTER ASSOCIATES, A CALIFORNIA LIMITED PARTNERSHIP, General Partner

By: LGD-RANCHO CALIFORNIA, A CALIFORNIA LIMITED PARTNERSHIP, General Partner

By: LANDGRANT DEVELOPMENT, INC., a California corporation, General Partner

By: ____________________

Title: Vice President

By: ____________________

Title: Vice President

EBS:06/21/89
LDGRC.D01



Aug. 2,1989
Photographed By TICOR
259041

Aug. 2,1989

Photographed By TICOR

259041

DAYTON HUDSON CORPORATION, a Minnesota corporation

By: [signature]

WILLIAM E. HARDER

Title: VICE PRESIDENT

By: [signature]

William P. Hise
Assistant Secretary

STATE OF Minnesota )
) ss.
COUNTY OF Hennepin )

On July 5, 1989, before me, the undersigned, a Notary Public in and for said State, personally appeared William E. Harder and William P. Hise, personally known to me or proved to me on the basis of satisfactory evidence to be the persons who executed this instrument as the Vice President and Assistant Secretary, respectively, of the corporation that executed this instrument, and acknowledged to me that such corporation executed this instrument pursuant to its by-laws or a resolution of its board of directors.

WITNESS my hand and official seal.

LAURA R. MILLER
NOTARY PUBLIC—MINNESOTA
HENNEPIN COUNTY
My Comm. Expires Oct 16, 1994

[signature]
Notary Public in and for Said State

EBS:06/21/89
LDGRC.D01

ALBERTSON'S, INC., a Delaware corporation

By: Thomas R. Saldin

Title: Senior Vice President

STATE OF Idaho )
) ss.
COUNTY OF Ada )

On June 23, 1989, before me, the undersigned, a Notary Public in and for said State, personally appeared Thomas R. Saldin, personally known to me or proved to me on the basis of satisfactory evidence to be the persons who executed this instrument as the Sr. Vice Pres. ~~and~~ ---------------------, ~~respectively~~ of the corporation that executed this instrument, and acknowledged to me that such corporation executed this instrument pursuant to its by-laws or a resolution of its board of directors.

WITNESS my hand and official seal.

Notary Public in and for Said State
~~My commission expires:~~ 5/1/96

EBS:06/21/89
LDGRC.D01

Aug. 2, 1989

Photographed By TICOR

259041

Aug. 2,1989

Photographed By TICOR

259041

STATE OF CALIFORNIA )
) ss.
COUNTY OF SAN DIEGO )

On JULY 27, 1989, before me, the undersigned, a Notary Public in and for said State, personally appeared M.H.R. DINGUS, personally known to me ~~or proved to me on the basis of satisfactory evidence~~ to be the person who executed this instrument as the VICE PRESIDENT, or on behalf of RADNOR/RANCHO CALIFORNIA CORPORATION, the corporation that executed this instrument on behalf of RADNOR/LANDGRANT-RANCHO PARTNERSHIP, the partnership that executed this instrument on behalf of RADNOR/LANDGRANT RANCHO CALIFORNIA TOWN CENTER PARTNERSHIP, the partnership that executed this instrument and acknowledged to me that the corporation executed this instrument pursuant to its by-laws or a resolution of its board of directors as such partner of RADNOR/LANDGRANT-RANCHO PARTNERSHIP, that such partnership executed this instrument as such partner of RADNOR/LANDGRANT RANCHO CALIFORNIA TOWN CENTER PARTNERSHIP, and that such partnership executed it.

WITNESS my hand and official seal.

OFFICIAL SEAL
CAMILLA SUE JONES
NOTARY PUBLIC - CALIFORNIA
SAN DIEGO COUNTY
My comm. expires APR 30, 1993

Camilla Sue Jones
Notary Public in and for Said State

Aug. 2, 1989

STATE OF CALIFORNIA )
) ss.
COUNTY OF SAN DIEGO )

On July 12, 1989, before me, the undersigned, a Notary Public in and for said State, personally appeared G. J. [illegible] Jr. and Sam Hall, personally known to me or proved to me on the basis of satisfactory evidence to be the persons who executed this instrument as the Vice President and Vice President, respectively, or on behalf of LANDGRANT DEVELOPMENT, INC., the corporation that executed this instrument on behalf of LGD-RANCHO CALIFORNIA, A CALIFORNIA LIMITED PARTNERSHIP, the partnership that executed this instrument on behalf of RANCHO CALIFORNIA SHOPPING CENTER ASSOCIATES, A CALIFORNIA LIMITED PARTNERSHIP, the partnership that executed this instrument, on behalf of RADNOR/LANDGRANT RANCHO CALIFORNIA TOWN CENTER PARTNERSHIP, the partnership that executed this instrument and acknowledged to me that the corporation executed this instrument pursuant to its by-laws or a resolution of its board of directors as such partner of LGD-RANCHO CALIFORNIA, A CALIFORNIA LIMITED PARTNERSHIP, that such partnership executed this instrument as such partner of RANCHO CALIFORNIA SHOPPING CENTER ASSOCIATES, A CALIFORNIA LIMITED PARTNERSHIP, that such partnership executed this instrument as such partner of RADNOR/LANDGRANT RANCHO CALIFORNIA TOWN CENTER PARTNERSHIP, and that such partnership executed it.

WITNESS my hand and official seal.

OFFICIAL SEAL
MICHAEL A. DE TORO

[signature]
Notary Public in and for Said State

Photographed By TICOR

259041



X-1

EXHIBIT "X"




Aug. 2,1989

Photographed By TICOR

259041

Aug. 2,1989

Photographed By TICOR

259041



Aug. 2, 1989
Photographed By TICOR
259041



Aug. 2, 1989
Photographed By TICOR
259041




SITE PLAN DEVELOPMENT RESUME - PHASE 2

| | |
|---|---|
| 1. MAXIMUM BUILDING AREA | |
| A. DEVELOPER STORES | |
| (1) SHOPS A, B, C & D | [illegible] S.F. |
| B. MAJOR STORES | |
| (1) MAJOR BUILDINGS 4 & 5 | [illegible] S.F. |
| C. ANCHOR STORE | |
| (1) ANCHOR BUILDING 3 | [illegible] S.F. |
| TOTAL BUILDING AREA | 1[illegible]7,120 S.F. |
| PARKING RATIO REQUIRED | |
| 1 CAR PER 200 S.F. OF BUILDING AREA | |
| PARKING REQUIRED | [illegible] cars |
| PARKING PROVIDED | [illegible] cars |

**SITE PLAN** (PHASE 2) **EXHIBIT X-4**

**RANCHO CALIFORNIA TOWN CENTER**
**RIVERSIDE COUNTY, CALIFORNIA**

NORTH

NOTE

Aug. 2, 1989

Photographed By TICOR

259041




**SITE PLAN** (PHASE 2) EXHIBIT X-6

**RANCHO CALIFORNIA TOWN CENTER**
**RIVERSIDE COUNTY, CALIFORNIA**

RECORDING REQUESTED BY
TICOR TITLE INSURANCE

141301

REQUESTED RECORDING BY, AND
RETURN TO:

Brobeck, Phleger & Harrison
225 Broadway, Suite 2250
San Diego, California 92101
(619) 234-1966
Attn: Ellen B. Spallman, Esq.

RECEIVED FOR RECORD AT 2:00 O'CLOCK P.M. APR 18 1990 Recorded in Official Records of Riverside County, California. William E. Conerly, Recorder. Fees $ 37

(Space Above for Recorder's Use)

AB

Apr. 18, 1990.

## SECOND AMENDMENT TO OPERATION AND EASEMENT AGREEMENT

This SECOND AMENDMENT ("Amendment"), dated as of March 6, 1990, XXXX, amends the Operation and Easement Agreement dated April 29, 1988 and recorded on June 9, 1988 as Instrument No. 156782 of the Official Records of Riverside County, California, by and among DAYTON HUDSON CORPORATION, a Minnesota corporation ("Target"), ALBERTSON'S, Inc., a Delaware corporation ("Albertson's") and RADNOR/LANDGRANT RANCHO CALIFORNIA TOWN CENTER PARTNERSHIP, a California general partnership ("Developer"), as amended by the First Amendment thereto dated as of June 21, 1989 and recorded on August 2, 1989 as Instrument No. 259041 of said Official Records (collectively, "OEA"), with reference to the following facts:

### RECITALS

A. Target owns and is the Party with respect to Parcel 6 of Parcel Map No. 22863 in the County of Riverside, State of California, according to the Map recorded in Book 150, Pages 51 through 57 inclusive of Parcel Maps, in the Office of the County Recorder of said County.

B. Albertson's is the owner and the Party with respect to Parcel 7 of the Parcel Map described in Recital A.

C. Mobil Oil Corporation, a New York corporation, is the owner and the Party with respect to Parcel 2 of the Parcel Map described in Recital A.

D. Developer is the owner and the Party with respect to Parcel 11 described in Recital A and the balance of the Shopping Center subject to the OEA.

E. Section 6.14 of the OEA provides that it may be amended by a written agreement signed by Parties holding at least seventy-five percent (75%) of the total voting power of the Parties, which 75% shall include the Party with respect to each of Parcels 6, 7 and 11.

#25

F. Developer has recorded a Certificate of Parcel Merger on June 23, 1989, as Instrument No. 208854 of the Official Records, which has consolidated Parcels 16 and 17 of the Shopping Center into one Parcel which shall hereafter be identified as "Parcel 16."

G. Developer has recorded certain Grant Deeds on June 19, 1989 as Instruments Nos. 201434, 201435 and 201436 of the Official Records pursuant to Lot Line Adjustment No. 2886 approved by the Riverside County Planning Department on January 25, 1989 and recorded on June 19, 1989 as Instrument No. 204437, which effected minor adjustments among Parcels 9, 10 and 13.

H. Developer has recorded certain Grant Deeds on June 19, 1989 as Instruments Nos. 201431 and 201432 of the Official Records pursuant to Lot Line Adjustment No. 2885 approved by the Riverside Planning Department on January 25, 1989 and recorded on June 19, 1989 as Instrument No. 201433, which effected minor adjustments between Parcels 9 and 10.

I. Developer has recorded certain Grant Deeds on September 28, 1989 as Instruments Nos. 335273 and 335274 pursuant to Lot Line Adjustment No. 2883 approved by the Riverside County Planing Department on January 25, 1989 and recorded on September 28, 1989 as Instrument No. 335272, which effected minor adjustments between Parcels 4 and 6.

J. Developer has applied for approval of lot line Adjustments with the Riverside County Planning Department to affect adjustments among Parcels 6, 11 13, 14, 5 and 16 necessary for the construction of the Shopping Center in accordance with Exhibit X attached hereto.

K. Developer has recorded a Grant of Easement dated July 12, 1989 on July 14, 1989 as Instrument No. 235061 in favor of Linkletter R.C. Partners for the purpose of maintaining a 24-inch storm drain line across Parcel 14.

L. Developer, Target and Albertson's have agreed to amend the OEA as set forth herein.

NOW, THEREFORE, for valuable consideration the receipt and sufficiency of which are hereby acknowledged, Developer, Target and Albertson's agree to amend the OEA as follows:

1. Incorporation of Terms. Capitalized terms used in this Amendment shall have the meanings set forth in the OEA, unless specifically defined herein.



141701

Apr. 18, 1990

2. Site Plan. The Site Plan attached to the OEA as Exhibit X, consisting of five pages labeled X-1, X-2, X-3, X-4, and X-5, is hereby deleted and Exhibit X attached to this Amendment, consisting of five pages labeled X-1, X-2, X-3, X-4 and X-5, is substituted therefor. The attached Site Plan indicates the new configuration of Parcels 4, 6, 9, 10, 11, 13, 14, 15 and 16 as a result of the lot line adjustments described in Recitals F, G, H, I and J.

3. Definition of Floor Area.

(a) The definition of "Floor Area" in the first sentence of Section 1.5 is amended to exclude the following areas:

"(i) any mezzanine constructed as part of the building designated as 'Anchor 6' on the Site Plan, for so long as such building is utilized for a theatre facility, and provided such mezzanine is used for purposes which do not generate a need for additional parking (such as projection and mechanical equipment areas, restrooms and other amenities for theatre patrons); and (ii) the common and other areas constructed as part of the office building on Parcel 15 designated as '3-Story Building' on the Site Plan which are not leasable to tenants, up to a maximum of fifteen percent (15%) of the gross square footage of such office building."

(b) The definition of "Parcel" in Section 1.12 is amended to delete Parcel 17.

4. Ingress and Egress: Shared Access Areas. Section 2.1 (B)(i) is amended to delete Parcel 17 as a Parcel benefitted by Shared Access Area #1.

5. Common Area.

(a) The second sentence of Section 3.3 is deleted in its entirety and the following is substituted therefor:

"Developer agrees to cause the Common Area located on Parcels 1 through 10 and a portion of Parcel 11 to be substantially completed on or before January 16, 1989 in accordance with the provisions of that certain Site Development Agreement executed by the Approving Parties dated April 29, 1988. Developer agrees to cause the

Apr. 18, 1990

> Common Area located on Parcels 13 through 16 and the remainder of Parcel 11 to be substantially completed on or before April 30, 1990, in accordance with the provisions of said Site Development Agreement, as amended by an Amendment thereto dated concurrently with this Amendment."

(b) Section 3.2(E) is amended to add the following provision:

> "Notwithstanding the foregoing, the parking requirement applicable to any office building constructed on Parcel 15 in the area designated as '3-Story Building' shall be three (3) parking spaces for each one thousand (1,000) square feet of Floor Area included therein."

(c) Section 3.2(E)(iii) is amended to provide that the additional parking requirement set forth therein shall not apply to any restaurant having 1,300 square feet or less of Floor Area and fifteen (15) seats or less for use by customers.

6. <u>Building Improvement</u>.

(a) Section 3.3(D) is amended to delete Parcels 15 and 16 from the definition of "Restricted Parcels".

(b) Section 3.3(G)(x) is deleted in its entirety and the following is substituted therefor:

"(x) On Parcel 14 - 45 feet

(xi) On Parcel 15 - 65 feet

(xii) On Parcel 16 - 35 feet"

7. <u>Common Area.</u>

(a) The last sentence of Section 4.2(D)(i) is amended to delete the reference to Parcel 17.

(b) The percentages indicated in Section 4.2(D)(ii) for "All other Parcels" shall be allocated among such Parcels in accordance with the Declaration of Restrictions [Supplement to Operation and Easement Agreement] ("Supplement to OEA") dated August 7, 1989, executed by Developer pursuant to the OEA and recorded on August 14, 1989 as Instrument No. 274852 of the Official Records; provided, however, the share allocated to

Apr. 18, 1990

Parcels 14, 15, 16 and 17 shall be reallocated among revised Parcels 14, 15 and 16 (as modified by the lot line adjustments described in Recitals F, G, H, I and J) in accordance with the formula set forth in the Supplement to OEA.

8. Uses.

(a) Section 5.1(A) is amended to delete the reference to Parcel 17 and to add the following provision at the end of said Section:

"Notwithstanding the foregoing, the building on Parcel 15 designated as '3-Story Building' on the Site Plan may be used for general office purposes, but excluding training uses other than those which are incidental to the primary business of the office tenant."

(b) The proviso at the end of Section 5.1(B)(xiv) is deleted in its entirety and the following is substituted therefor:

"provided however, this prohibition shall not be applicable to any video tape sales or rental operation which offers products of the type typically sold or rented in neighborhood retail shopping centers in Riverside County, or to a theatre facility which shows feature films of the type typically shown in shopping center theatre facilities in Southern California;"

(c) The proviso at the end of Section 5.1(B)(xvii) is deleted in its entirety and the following is substituted therefor:

"provided however, this prohibition shall not be applicable to on-site employee training by an occupant incidental to the conduct of its business at the Shopping Center or to the building on Parcel 15 designated as '3-Story Building' on the Site Plan."

(d) Section 5.1(C) is amended to delete the reference to Parcel 17.

(e) Section 5.1(C)(iv) is amended to add the following provision at the end of said Section:



Apr. 18, 1990

> "provided however, the foregoing restriction shall not apply to the building on Parcel 15 designated as '3-Story Building' on the Site Plan;"

(f) Section 5.1(C)(viii) is deleted in its entirety and the following is substituted therefor:

> "Only one (1) theatre shall be permitted; provided however, it must be located only on Parcel 14;"

(g) Section 5.1(C)(xii) is amended to increase the square footage of the permitted video arcade from 2,000 to 2,500 square feet of Floor Area.

9. <u>Lighting</u>.

(a) The last sentence of Section 5.2(B) is deleted in its entirety and the following is substituted therefor:

> "Notwithstanding the foregoing, if the Requesting Party is a Major or the occupant of the building on Parcel 14 designated as 'Anchor 6' on the Site Plan, such Major or occupant shall pay only 100% of the cost of electrical power and its payment for such use shall be in arrears (but still monthly or shorter period, as the case may be), rather than in advance."

10. <u>Signs</u>.

(a) Section 5.3(A) is amended to add the following provision at the end of said Section:

> "Notwithstanding the foregoing provisions of this Section 5.3(A), the occupant of the building on Parcel 14 designated as 'Anchor 6' on the Site Plan shall have the right to utilize the Sign adjacent to Ynez Road designated as 'Theatre Sign' on the Site Plan, subject to the approval of the design and size of such Theatre Sign by the Approving Parties. The design, construction and maintenance of such sign shall be undertaken by such occupant, at its sole expense."



Apr. 18, 1990

(b) Section 5.3(B) is amended to add the following provision at the end of said Section:

> "Notwithstanding the foregoing provisions of this Section 5.3(B), the occupant of the building on Parcel 14 designated as "Anchor 6" on the Site Plan shall have the right to maintain, in addition to identification signs on the exterior of the building, a theatre marquee sign at the entrance, subject to the approval of the design and size of such marquee sign by the Approving Parties."

11. No Other Changes. In all other respects, the OEA remains unchanged, in full force and effect.

12. Counterparts. This Amendment may be executed in one or more counterparts, and the signature pages of such counterparts may be attached to one original for recording.

IN WITNESS WHEREOF, the parties have executed this Second Amendment as of the date first set forth above.

RADNOR/LANDGRANT RANCHO CALIFORNIA TOWN CENTER PARTNERSHIP, a California general partnership

By: RADNOR/LANDGRANT-RANCHO PARTNERSHIP, a California general partnership, General Partner

By: RADNOR/RANCHO CALIFORNIA CORPORATION, a Delaware corporation, General Partner

By: [signature]

Title: ASSISTANT VICE PRESIDENT

[SIGNATURES CONTINUED ON NEXT PAGE]



14170

Apr. 18, 1990

By: RANCHO CALIFORNIA SHOPPING CENTER ASSOCIATES, A CALIFORNIA LIMITED PARTNERSHIP, General Partner

By: LGD-RANCHO CALIFORNIA, A CALIFORNIA LIMITED PARTNERSHIP, General Partner

By: LANDGRANT DEVELOPMENT, INC., a California corporation, General Partner

By: [signature]

Title: Vice President

By: [signature]

Title: President

EBS:DKA:LGDRC.D02
01/03/90

Apr. 18, 1990

STATE OF CALIFORNIA )
) ss
COUNTY OF SAN DIEGO )

On March 6, 1990, before me, the undersigned, a Notary Public in and for said State, personally appeared Arthur G. Robertson, personally known to me or ~~proved to me on the basis of satisfactory evidence~~ to be the person who executed this instrument as the Asst. Vice President, or on behalf of RADNOR/RANCHO CALIFORNIA CORPORATION, the corporation that executed this instrument on behalf of RADNOR/LANDGRANT-RANCHO PARTNERSHIP, the partnership that executed this instrument on behalf of RADNOR/LANDGRANT RANCHO CALIFORNIA TOWN CENTER PARTNERSHIP, the partnership that executed this instrument and acknowledged to me that the corporation executed this instrument pursuant to its bylaws or a resolution of its board of directors as such partner of RADNOR/LANDGRANT-RANCHO PARTNERSHIP, that such partnership executed this instrument as such partner of RADNOR/LANDGRANT RANCHO CALIFORNIA TOWN CENTER PARTNERSHIP, and that such partnership executed it.

WITNESS my hand and official seal.

OFFICIAL SEAL
CAMILLA SUE JONES
NOTARY PUBLIC - CALIFORNIA
SAN DIEGO COUNTY
My comm. expires APR 30, 1993

Camilla Sue Jones
Notary Public in and for Said State

1441701

Apr. 18, 1990.

STATE OF CALIFORNIA )
) ss
COUNTY OF SAN DIEGO )

On MARCH 5, 1990, before me, the undersigned, a Notary Public in and for said State, personally appeared A.J. TARANTON, Jr. and C. SAMUEL MARASCO, personally known to me or proved to me on the basis of satisfactory evidence to be the persons who executed this instrument as the VICE PRESIDENT and PRESIDENT, respectively, or on behalf of LANDGRANT DEVELOPMENT, INC., the corporation that executed this instrument on behalf of LGD-RANCHO CALIFORNIA, A CALIFORNIA LIMITED PARTNERSHIP, the partnership that executed this instrument on behalf of RANCHO CALIFORNIA SHOPPING CENTER ASSOCIATES, A CALIFORNIA LIMITED PARTNERSHIP, the partnership that executed this instrument, on behalf of RADNOR/LANDGRANT RANCHO CALIFORNIA TOWN CENTER PARTNERSHIP, the partnership that executed this instrument and acknowledged to me that the corporation executed this instrument pursuant to its bylaws or a resolution of its board of directors as such partner of LGD-RANCHO CALIFORNIA, A CALIFORNIA LIMITED PARTNERSHIP, that such partnership executed this instrument as such partner of RANCHO CALIFORNIA SHOPPING CENTER ASSOCIATES, A CALIFORNIA LIMITED PARTNERSHIP, that such partnership executed this instrument as such partner of RADNOR/LANDGRANT RANCHO CALIFORNIA TOWN CENTER PARTNERSHIP, and that such partnership executed it."

WITNESS my hand and official seal.

OFFICIAL SEAL
LADONNA FLECK
NOTARY PUBLIC-CALIFORNIA
PRINCIPAL OFFICE IN
SAN DIEGO COUNTY

LaDonna Fleck
Notary Public in and for Said State

141170

Apr. 18, 1990

DAYTON HUDSON CORPORATION, a
Minnesota corporation

By: [signature]

Title: Jack D. Fontaine
Sr. Vice President
Target Stores

STATE OF Minnesota )
) ss.
COUNTY OF Hennepin )

On February 9, 1990, before me, the undersigned, a Notary Public in and for said State, personally appeared Jack D. Fontaine, personally known to me or proved to me on the basis of satisfactory evidence to be the person who executed this instrument as the Sr. Vice President, Target Stores of DAYTON HUDSON CORPORATION, the corporation that executed this instrument, and acknowledged to me that such corporation executed this instrument pursuant to its by-laws or a resolution of its board of directors.

WITNESS my hand and official seal.

LAURA R. MILLER
NOTARY PUBLIC—MINNESOTA
HENNEPIN COUNTY
My Comm. Expires Dec 18, 1994

[signature]
Notary Public in and for Said State

Apr. 18, 1990

ALBERTSON'S, INC., a
Delaware corporation

By: Thomas R. Saldin

Title: Senior Vice President

STATE OF Idaho )
) ss.
COUNTY OF Ada )

On January 26, 1990, before me, the undersigned, a Notary Public in and for said State, personally appeared Thomas R. Saldin, personally known to me or proved to me on the basis of satisfactory evidence to be the person who executed this instrument as the Senior Vice President of ALBERTSON'S INC., the corporation that executed this instrument, and acknowledged to me that such corporation executed this instrument pursuant to its by-laws or a resolution of its board of directors.

WITNESS my hand and official seal.

Tammy B. Gustke
Notary Public in and for Said State

1471701

Apr. 18, 1990

MOBIL OIL CORPORATION,
a New York corporation

By: [signature]

Title: Attorney-In-Fact

By: [signature]

Title: Assistant Secretary

STATE OF Virginia )
 ) ss
COUNTY OF Fairfax )

On April 10, 1990, before me, the undersigned, a Notary Public in and for said State, personally appeared D. R. Hayes and I. R. Heath, personally known to me or proved to me on the basis of satisfactory evidence to be the persons who executed this instrument as the Attorney-In-Fact and Assistant Secretary, of MOBIL OIL CORPORATION, and acknowledged to me that the corporation executed this instrument pursuant to its by-laws or a resolution of its board of directors.

WITNESS my hand and official seal.

Danielle D. Jones
Notary Public in and for Said State

DANIELLE D. JONES

My Commission Expires October 31, 1993

Apr. 18, 1990


Apr. 18, 1990
RANCHO CALIFORNIA ROAD
YNEZ ROAD
FOR THIS AREA SEE EXHIBIT X-2
SITE DEVELOPMENT PLAN SUMMARY
SITE PLAN
EXHIBIT X-1
RANCHO CALIFORNIA TOWN CENTER
RIVERSIDE COUNTY, CALIFORNIA

14-130-1

Apr. 18, 1990




NOTE
THE LOCATION OF THE BUILDINGS MAY BE ADJUSTED WITHIN THE BUILDING LOCATION LIMIT LINES TO ALLOW DEVELOPMENT OF MAXIMUM BUILDING AREA.

**SITE PLAN** (PHASE 1) EXHIBIT X-2
RANCHO CALIFORNIA TOWN CENTER
RIVERSIDE COUNTY, CALIFORNIA

NORTH

SITE PLAN
REVISIONS


PROPERTY LINE DETAIL (A)
PROPERTY LINE DETAIL (B)
PROPERTY LINE DETAIL (C)
SHARED ACCESS AREA 4
OUTSIDE SALES AREA
GARDEN CENTER
MAJOR 2
SERVICE PLUS
MAJOR 3
ALBERTSON'S
EXISTING GREAT AMERICAN FEDERAL BANK NOT A PART
SHOPS H
SHOPS M
SHOPS L
PAD 5
PAD 4
PAD 3
PAD 2
SHARED ACCESS AREA 3
RECYCLING CENTER
EXISTING RANCHO CALIFORNIA POPERTIES CORPORATE OFFICES NOT A PART
YNEZ ROAD
RANCHO CALIFORNIA ROAD
SITE PLAN
LEGEND
SITE PLAN [PHASE 1] EXHIBIT X-3
RANCHO CALIFORNIA TOWN CENTER
RIVERSIDE COUNTY, CALIFORNIA
NORTH

Apr. 18, 1990




Apr. 18, 1990.

**SITE PLAN** [PHASE 2] **EXHIBIT X-4**

**RANCHO CALIFORNIA TOWN CENTER**
**RIVERSIDE COUNTY, CALIFORNIA**

NORTH

SITE PLAN

REVISIONS




Apr. 18, 1990.

# SITE PLAN [PHASE 2] EXHIBIT X-5

RANCHO CALIFORNIA TOWN CENTER
RIVERSIDE COUNTY, CALIFORNIA

LEGEND

PROPERTY LINE

EASEMENT AREA

BUILDING LOCATION LIMIT LINE

MATCH LINE

NOTE:

NORTH

SITE PLAN

REVISIONS

DOC # 2002-410325
07/26/2002 08:00A Fee:190.00
Page 1 of 31
Recorded in Official Records
County of Riverside
Gary L. Orso
Assessor, County Clerk & Recorder

AB

REQUESTED RECORDING BY, AND RETURN TO:

Cimarron Properties, LLC
c/o Hilding Kipnis Lyon & Kelly
8910 University Center Lane
San Diego, CA 92122-1085

Attn: Judith T. Newman, Esq.

| M | S | U | PAGE | SIZE | DA | PCOR | NOCOR | SMF | MISC. |
|---|---|---|---|---|---|---|---|---|---|
| | 1 | | 31 | 31 | | | | | |
| | | | | | / | | | | LM |
| A | R | L | | | COPY | LONG | REFUND | NCHG | EXAM |

98

# THIRD AMENDMENT TO OPERATION AND EASEMENT AGREEMENT

C
LM

This THIRD AMENDMENT ("Amendment"), dated as of May 2, 2002, amends the Operation and Easement Agreement dated April 29, 1988 and recorded June 9, 1988 as Instrument No. 156782 of the Official Records of Riverside County, California, by and among TARGET CORPORATION (f/k/a DAYTON HUDSON CORPORATION), a Minnesota corporation ("Target"), THE VONS COMPANIES, INC., a Michigan corporation ("Vons"), successor in interest to Albertson's Inc., a Delaware corporation, and CIMARRON PROPERTIES, LLC, a Delaware limited liability company ("Cimarron"), successor in interest to RADNOR/LANDGRANT RANCHO CALIFORNIA TOWN CENTER PARTNERSHIP, a California general partnership ("Developer"), as amended by the First Amendment to Operation and Easement Agreement ("First Amendment"), dated June 21, 1989 and recorded on August 2, 1989 as Instrument No. 259041 of said Official Records, and by that certain Declaration of Restrictions (Supplement to Operation and Easement Agreement) dated as of August 7, 1989 and recorded on August 14, 1989 as Instrument No. 274852 of said Official Records and as further amended by the Second Amendment to Operation and Easement Agreement ("Second Amendment"), dated March 6, 1990 and recorded on April 18, 1990 as Instrument No. 141301 of said Official Records (collectively "OEA"), with reference to the following facts:

## RECITALS

A. Target owns and is the Party with respect to Parcel 6 of Parcel Map No. 22863 in the County of Riverside, State of California, according to the Map recorded in Book 150, pages 51 through 57 inclusive of Parcel Maps, in the office of the County Recorder in said County.

B. Vons is the owner and the successor Party with respect to Parcel 7 of the Parcel Map described in Recital A.



#25

REQUESTED RECORDING BY, AND RETURN TO:

Cimarron Properties, LLC
c/o Hilding Kipnis Lyon & Kelly
8910 University Center Lane
San Diego, CA 92122-1085

Attn: Judith T. Newman, Esq.

(Space Above For Recorder's Use)

# THIRD AMENDMENT TO OPERATION AND EASEMENT AGREEMENT

This THIRD AMENDMENT ("Amendment"), dated as of May 2, 2002, amends the Operation and Easement Agreement dated April 29, 1988 and recorded June 9, 1988 as Instrument No. 156782 of the Official Records of Riverside County, California, by and among TARGET CORPORATION (f/k/a DAYTON HUDSON CORPORATION), a Minnesota corporation ("Target"), THE VONS COMPANIES, INC., a Michigan corporation ("Vons"), successor in interest to Albertson's Inc., a Delaware corporation, and CIMARRON PROPERTIES, LLC, a Delaware limited liability company ("Cimarron"), successor in interest to RADNOR/LANDGRANT RANCHO CALIFORNIA TOWN CENTER PARTNERSHIP, a California general partnership ("Developer"), as amended by the First Amendment to Operation and Easement Agreement ("First Amendment"), dated June 21, 1989 and recorded on August 2, 1989 as Instrument No. 259041 of said Official Records, and by that certain Declaration of Restrictions (Supplement to Operation and Easement Agreement) dated as of August 7, 1989 and recorded on August 14, 1989 as Instrument No. 271852 of said Official Records and as further amended by the Second Amendment to Operation and Easement Agreement ("Second Amendment"), dated March 6, 1990 and recorded on April 18, 1990 as Instrument No. 141301 of said Official Records (collectively "OEA"), with reference to the following facts:

## RECITALS

A. Target owns and is the Party with respect to Parcel 6 of Parcel Map No. 22863 in the County of Riverside, State of California, according to the Map recorded in Book 150, pages 51 through 57 inclusive of Parcel Maps, in the office of the County Recorder in said County.

B. Vons is the owner and the successor Party with respect to Parcel 7 of the Parcel Map described in Recital A.



2002-410325
07/26/2002 08:00A
2 of 31

C. Mobil Oil Company, a New York corporation, is the owner and the Party with respect to Parcel 2 of the Parcel Map described in Recital A.

D. Temecula Corporate Plaza Center, LLC, a California limited liability company ("Temecula Corporate") is the owner with respect to Parcel 15 described in Recital A, and shall be added as an additional Party subject to the OEA.

E. Claim Jumper-Temecula, a California corporation ("Claim Jumper") is the owner with respect to Parcel 1 of the Parcel Map described in Recital A.

F. Cimarron is the owner and the successor Party with respect to Parcel 11 described in Recital A and the balance of the Shopping Center subject to the OEA.

G. Section 6.14 of the OEA provides that it may be amended by a written agreement signed by Parties holding at least seventy-five percent (75%) of the total voting power of the Parties, which 75% shall include the Parties with respect to Parcels 6, 7 and 11.

H. Together, Target, Vons and Cimarron hold more than seventy-five percent (75%) of the total voting power of the Parties and are the Approving Parties (as defined by Section 1.1 of the OEA), and as such, these Approving Parties desire to amend the OEA to revise the Site Plan to reflect the expanded Building Area on Parcel 6 and to make certain other changes as provided herein.

ACCORDINGLY, in consideration of the mutual covenants set forth herein and other good and valuable consideration, the receipt and sufficiency of which the Approving Parties hereby acknowledge, the Approving Parties agree as follows:

I. Definitions. Except as expressly provided herein, words and phrases in this Third Amendment have the same meanings as defined in the OEA.

II. Site Plan. The Site Plan attached to the OEA shall be deemed deleted, and the Amended Site Plan - 2001, attached hereto as Exhibit X-1 (the "Amended Site Plan - 2001") is hereby substituted in lieu thereof. From and after the Effective Date, all references in the OEA to the Site Plan or Exhibit X shall be deemed to mean the Amended Site Plan - 2001.

III. Target Plan Approval. In accordance with the provisions of the OEA, including but not limited to Sections 3.1 and 3.3, the Approving Parties have approved the Plans submitted by Target to Cimarron under letter dated February 9, 2001 and to Vons under letter dated March 2, 2001 ("Target's Plans") and the construction staging area

location for expanding and remodeling the building and other improvements on Parcel 6, all as detailed in Target's Plans. The Approving Parties acknowledge and agree that Parcel 6 and the improvements thereon are now in compliance with all applicable requirements of the OEA and that the expansion improvements described in Target's Plans are in compliance with all applicable requirements of the OEA. The Approving Parties hereby consent to the Target building expansion as depicted on the Amended Site Plan -2001. Target shall notify the Operator in writing of the date on which Target completes the expansion improvements in accordance with Target's Plans ("Target Completion Date") promptly following the Target Completion Date.

IV. Vons Plan Approval. In accordance with the provisions of the OEA, including but not limited to Sections 3.1 and 3.3, the Approving Parties have approved the Plans submitted by Vons to Target and Cimarron under letter dated March 27, 2001 and to GMS Realty, LLC (as agent for Cimarron) under letter dated May 9, 2001 (collectively, "Vons' Plans") and the construction staging area location for remodeling the building and the improvements on Parcel 7 all as detailed in Vons' Plans.

V. Parking Ratio. The first sentence of Subsection 3.2(E)(i) of the OEA is hereby deleted in its entirety and the following inserted in its place:

> "(i) with respect to Parcels 1, 2, 3, 7 and 8, five (5) parking spaces for each one thousand (1,000) square feet of Floor Area located thereon, and with respect to the remaining Parcels within the Shopping Center, four (4) parking spaces for each one thousand (1,000) square feet of Floor Area located thereon; provided however, that with respect to any theatre, the parking requirements applicable thereto shall be one (1) parking space for each four (4) seats."

VI. Common Area. Effective as of the Target Completion Date, section 1.5 shall be modified as provided hereunder and the allocations pursuant to Subsections 4.2(D)(i) and 4.2(D)(ii) of the OEA shall be changed as follows:

1. <u>Section 1.5</u>: Notwithstanding anything to the contrary, section 1.5, lines 11-12, is hereby amended by deletion of the following words:
"and the first 15,000 square feet of any Outside Sales Area located on Parcel 6,"

and substitution by the following:
"and 50% of the square footage of the Outside Sales Area located on Parcel 6 up to a maximum of 7,500 square feet,"

2. Section <u>4.2(D)(i)</u>: Notwithstanding anything to the contrary, because the period under Subsection 4.2(D)(ii) has commenced, Subsection 4.2(D)(i) is hereby deleted in its entirety.

3. <u>Section 4.2(D)(ii)</u>: The allocations pursuant to Subsection 4.2(D)(ii) shall be changed in accordance with the Amended Site Plan - 2001 as follows:

| Parcel | New Allocation % |
|---|---|
| Parcel 6 | 22.11% |
| Parcel 7 | 8.04% |
| All Others | 69.85% |
| Total | 100% |

2002-416325
07/26/2002 08:00A
4 of 31

location for expanding and remodeling the building and other improvements on Parcel 6, all as detailed in Target's Plans. The Approving Parties acknowledge and agree that Parcel 6 and the improvements thereon are now in compliance with all applicable requirements of the OEA and that the expansion improvements described in Target's Plans are in compliance with all applicable requirements of the OEA. The Approving Parties hereby consent to the Target building expansion as depicted on the Amended Site Plan -2001. Target shall notify the Operator in writing of the date on which Target completes the expansion improvements in accordance with Target's Plans ("Target Completion Date") promptly following the Target Completion Date.

IV. Vons Plan Approval. In accordance with the provisions of the OEA, including but not limited to Sections 3.1 and 3.3, the Approving Parties have approved the Plans submitted by Vons to Target and Cimarron under letter dated March 27, 2001 and to GMS Realty, LLC (as agent for Cimarron) under letter dated May 9, 2001 (collectively, "Vons' Plans") and the construction staging area location for remodeling the building and the improvements on Parcel 7 all as detailed in Vons' Plans.

V. Parking Ratio. The first sentence of Subsection 3.2(E)(i) of the OEA is hereby deleted in its entirety and the following inserted in its place:

> "(i) with respect to Parcels 1, 2, 3, 7 and 8, five (5) parking spaces for each one thousand (1,000) square feet of Floor Area located thereon, and with respect to the remaining Parcels within the Shopping Center, four (4) parking spaces for each one thousand (1,000) square feet of Floor Area located thereon; provided however, that with respect to any theatre, the parking requirements applicable thereto shall be one (1) parking space for each four (4) seats."

VI. Common Area. Effective as of the Target Completion Date, section 1.5 shall be modified as provided hereunder and the allocations pursuant to Subsections 4.2(D)(i) and 4.2(D)(ii) of the OEA shall be changed as follows:

1. Section 1.5: Notwithstanding anything to the contrary, section 1.5, lines 11-12, is hereby amended by deletion of the following words:

"and the first 15,000 square feet of any Outside Sales Area located on Parcel 6,"

and substitution by the following:

"and 50% of the square footage of the Outside Sales Area located on Parcel 6 up to a maximum of 7,500 square feet,"

2. Section 4.2(D)(i): Notwithstanding anything to the contrary, because the period under Subsection 4.2(D)(ii) has commenced, Subsection 4.2(D)(i) is hereby deleted in its entirety.

3. Section 4.2(D)(ii): The allocations pursuant to Subsection 4.2(D)(ii) shall be changed in accordance with the Amended Site Plan - 2001 as follows:

| Parcel | New Allocation % |
|---|---|
| Parcel 6 | 22.11% |
| Parcel 7 | 8.04% |
| All Others | 69.85% |
| Total | 100% |

2002-410325 07/26/2002 08:00A 5 of 31



INITIALS
INITIALS

location for expanding and remodeling the building and other improvements on Parcel 6, all as detailed in Target's Plans. The Approving Parties acknowledge and agree that Parcel 6 and the improvements thereon are now in compliance with all applicable requirements of the OEA and that the expansion improvements described in Target's Plans are in compliance with all applicable requirements of the OEA. The Approving Parties hereby consent to the Target building expansion as depicted on the Amended Site Plan -2001. Target shall notify the Operator in writing of the date on which Target completes the expansion improvements in accordance with Target's Plans ("Target Completion Date") promptly following the Target Completion Date.

IV. Vons Plan Approval. In accordance with the provisions of the OEA, including but not limited to Sections 3.1 and 3.3, the Approving Parties have approved the Plans submitted by Vons to Target and Cimarron under letter dated March 27, 2001 and to GMS Realty, LLC (as agent for Cimarron) under letter dated May 9, 2001 (collectively, "Vons' Plans") and the construction staging area location for remodeling the building and the improvements on Parcel 7 all as detailed in Vons' Plans.

V. Parking Ratio. The first sentence of Subsection 3.2(E)(i) of the OEA is hereby deleted in its entirety and the following inserted in its place:

"(i) with respect to Parcels 1, 2, 3, 7 and 8, five (5) parking spaces for each one thousand (1,000) square feet of Floor Area located thereon, and with respect to the remaining Parcels within the Shopping Center, four (4) parking spaces for each one thousand (1,000) square feet of Floor Area located thereon; provided however, that with respect to any theatre, the parking requirements applicable thereto shall be one (1) parking space for each four (4) seats."

VI. Common Area. Effective as of the Target Completion Date, section 1.5 shall be modified as provided hereunder and the allocations pursuant to Subsections 4.2(D)(i) and 4.2(D)(ii) of the OEA shall be changed as follows:

1. <u>Section 1.5</u>: Notwithstanding anything to the contrary, section 1.5, lines 11-12, is hereby amended by deletion of the following words:
"and the first 15,000 square feet of any Outside Sales Area located on Parcel 6,"

and substitution by the following:
"and 50% of the square footage of the Outside Sales Area located on Parcel 6 up to a maximum of 7,500 square feet,"

2. Section <u>4.2(D)(i)</u>: Notwithstanding anything to the contrary, because the period under Subsection 4.2(D)(ii) has commenced, Subsection 4.2(D)(i) is hereby deleted in its entirety.

3. <u>Section 4.2(D)(ii)</u>: The allocations pursuant to Subsection 4.2(D)(ii) shall be changed in accordance with the Amended Site Plan - 2001 as follows:

| Parcel | New Allocation % |
|---|---|
| Parcel 6 | 22.11% |
| Parcel 7 | 8.04% |
| All Others | 69.85% |
| Total | 100% |

Gms/temvoeq/3OEA17



Temecula, CA

APR 10 '02 10:50

2002-410325
07/26/2002 08:00A
6 of 31

VII. Existing Tenant Use Acceptance: Section 5.1 of the OEA is amended by adding Subsection 5.1(I) to the end of Section 5.1:

"(I) Cimarron and Operator represent and warrant to the parties that as of the Effective Date the following are the only tenants that have non-conforming uses: "Great Grains Bread Co." [Space K-13], "Hunan Gardens" [Space F-21], and "Round Table Pizza" [Space M-7] (hereinafter "Non-Conforming Tenants"). Notwithstanding anything to the contrary contained in this Section 5.1, the Approving Parties agree that the non-conforming uses under the existing leases of the Non-Conforming Tenants are deemed to be in compliance with the OEA, provided that the existing leases of these Non-Conforming Tenants shall not continue beyond the lease terms of said existing leases (or renewal extensions thereof). The Approving Parties further agree that Operator must seek the prior written approval from the other Approving Parties for the continuance of such non-conforming use in these specified spaces if (1) the Non-Conforming Tenant wants to physically expand its leased premises, or (2) following the vacation of a Non-Conforming Tenant, the prospective tenant for that space wants to continue the non-conforming use. It is agreed that an assignment, sublease, renewal or extension of the existing lease of a Non-Conforming Tenant shall not require the other Approving Parties' approval for the continuance of the non-conforming use. In the event Operator is required to seek the prior written approval for a tenant with non-conforming use from the other Approving Parties of the OEA, Operator agrees to provide a twenty (20) day prior written notice to the other Approving Parties and said tenant may only continue such non-conforming use if Operator receives the written approval of at least seventy-five percent (75%) of the total voting power of the Parties, which 75% shall include each of the Approving Parties. An Approving Party may arbitrarily withhold its consent to a proposed continuance of the non-conforming use. The failure of an Approving Party to respond within said twenty (20-) day period shall be deemed to be a disapproval of the request."

VIII. Office Use Exception:

1. Section 5.1(A): Section 5.1(A) of the OEA is amended by the addition of the following:

"Notwithstanding anything to the contrary contained in this subparagraph, general, professional or governmental office use, such as real estate, stock



2002-410325
07/26/2002 08:00A
7 of 31

brokerage, medical offices, dental offices and legal offices (but in no event to include any manufacturing or odor or noise producing entity) shall be permitted within the buildings located on Parcels 5 and/or 14, as shown on Exhibit X-1 (a copy of which is attached hereto)."

2. Subsection 5.1(C)(iv): Subsection 5.1(C)(iv) of the OEA is hereby deleted in its entirety and the following inserted in its place:

"(iv) Except as otherwise permitted under Subsection 5.1(A) above, no more than ten percent (10%) of the Floor Area of each building on the respective Parcel may be used for office purposes;"

IX. Training Facility Exception: The proviso at the end of Section 5.1(B)(xvii) of the OEA, as amended by the Second Amendment, is hereby deleted in its entirety and the following inserted in its place:

"provided, however, that this prohibition shall not be applicable to on-site employee training by an occupant incidental to the conduct of its business at the Shopping Center or to the building on Parcel 15 designated as '3-Story Building' or to the buildings on Parcel 14, all as shown on the Amended Site Plan – 2001."

X. Restaurant Use Exception:

1. Subsection 5.1(C)(i) of the OEA is amended by deleting the reference to "Anchor 2" therein.

2. Subsection 5.1(C)(xi) of the OEA is deleted in its entirety and the following inserted in its place:

"(xi) Restaurants including coffee houses (but exclusive of the "fast food" type) shall be permitted on Parcels 5, 8 and 9; provided, however, that such restaurant use shall not in the aggregate exceed eight thousand (8,000) square feet of Floor Area on Parcel 5, three thousand five hundred (3,500) square feet of Floor Area on Parcel 8, and five thousand (5,000) square feet of Floor Area on Parcel 9. Notwithstanding the foregoing, the Parties acknowledge that the current restaurant located in Space M7 on Parcel 9 is non-conforming, but approved as a Non-Conforming Tenant as specified in Paragraph VII of this Third Amendment to the OEA."



2002-410325
07/26/2002 08:00A
8 of 31

XI. Toy Store Exception: Subsection 5.1(C)(ii) of the OEA is hereby deleted and the following inserted in its place:

"(ii) No toy store exceeding five thousand (5,000) square feet of Floor Area shall be permitted; provided, however, that (a) one (1) toy store may be located on either Parcel 13 or Parcel 14 (but not both), (b) the Floor Area shall not exceed twenty-nine thousand eighty-two (29,082) square feet if it is located on Parcel 13, (c) the Floor Area shall not exceed forty-one thousand four hundred twenty-two (41,422) square feet if it is located on Parcel 14; (d) one (1) "learning concept" toy store of any size may be located on either Parcel 5 or Anchor 7 located on Parcel 11 (but not both), and (e) with respect to Shop spaces A through Q the following options (but not both) shall apply:

(x) no more than two (2) toy stores (each with Floor Area not to exceed two thousand five hundred (2,500) square feet) may be located in Shops H, I, J, K, L or M, provided that no more than one (1) toy store may be located within any one building, or

(y) one (1) toy store with Floor Area not to exceed five thousand (5,000) square feet may be located in Shops A, B, C, D, F, G, N, O, P or Q.

XII. Sidewalk Sales: The last sentence of Subsection 5.1(F), as was added pursuant to the First Amendment to OEA, shall be deleted in its entirety and the following inserted in its place:

"Notwithstanding the foregoing prohibition and in addition to the exceptions therefrom in this Subsection 5.1(F), all Anchors, Majors [excluding Parcels 6, 7 and 11 the rights of the owners and occupants of which to conduct sidewalk sales are dealt with in the preceding sentences of this Subsection 5.1(F)] and the tenant known as 'Little Professor' which is currently occupying Shops A1-A9 shall be allowed to conduct sidewalk sales provided that the following conditions are satisfied: (i) such sidewalk sales shall be conducted no more frequently than four (4) times per calendar year; (ii) each such sidewalk sale shall be no longer than three days in duration; (iii) promptly following each sale, the sidewalks shall be restored to their condition immediately prior to each sale, at no expense to any other party; (iv) all stands, displays, fixtures or other structures or equipment used in connection with such sales shall be maintained in a safe and attractive condition and shall be promptly removed by the Anchor, Major or tenants conducting the sale, at no expense to any other parties, when each sale is terminated; and (v) free movement of pedestrian traffic across said sidewalk



2002-410325
07/26/2002 08:00A
9 of 31

shall be maintained. Little Professor's right to conduct sidewalk sales in accordance with this Subsection 5.1(F) is specific to the existing permitted use of the lease for Little Professor."

XIII. Notice. Notice addresses for all purposes, including without limitation Section 6.4 of the OEA, is hereby changed to:

If to Party Cimarron:
Cimarron Properties, LLC
c/o GMS Realty, LLC
5973 Avenida Encinas, Suite 300
Carlsbad, CA 92008
Attn: Real Estate Leasing

If to Major and Party Target on Parcel 6:
Target Corporation
Property Development
1000 Nicollet Mall
Minneapolis, Minnesota 55403
Attn: Property Administration

If to Major and Party Vons on Parcel 7:
The Vons Companies, Inc.
618 Michillinda Avenue
Arcadia, CA 91007
Attn: Property Manager (#29-1962)

with a copy to:
Safeway Inc.
5918 Stoneridge Mall Road
Pleasanton, CA 94588
Attn: Real Estate Law Division (#29-1962)

And, the Approving Parties acknowledge that the following addresses for other parties to the OEA are current as of the Effective Date of this Third Amendment to the OEA:

If to Party "Temecula Corporate" on Parcel 15:
Temecula Corporate Plaza Center, LLC
1900 Main Street, Suite 350
Irvine, CA 92614



2002-418325
07/26/2002 08:00A
18 of 31

<u>If to Party "Mobil Oil Corporation" on Parcel 2:</u>
Mobil Oil Corporation
3225 Gallows Road
Fairfax, VA 22037

<u>If to Party "Claim Jumper" on Parcel 1:</u>
Claim Jumper
16721 Millikan Avenue
Irvine, CA 92606-5009

XIV. Conflicts/Ratification. If there is any conflict between the provisions of the OEA and this Third Amendment, the provisions of this Third Amendment shall control. Except as supplemented and amended by this Third Amendment, the OEA is ratified by the parties hereto and remains in full force and effect. Each of the parties hereto represent and warrant that it has the full capacity, right, power and authority to execute, deliver and perform this Third Amendment, and all required actions, consents and approvals therefore have been duly taken and obtained. Furthermore, each of the parties hereto represent and warrant that upon full execution of this Third Amendment, the OEA as amended by this Third Amendment shall be binding on all parties with any interest in their respective Tracts, including the holder of any mortgagee's interest.

XV. No Third Party Beneficiary. The provisions of this Third Amendment and the OEA are for the exclusive benefit of the parties hereto and not for the benefit of any third person; this Third Amendment to the OEA and the OEA do not confer any rights, express or implied, upon any such third person; and there are no third party beneficiaries to this Third Amendment or the OEA.

XVI. Counterparts. This Third Amendment may be executed in counterparts or with counterpart signature pages, which upon execution by all Parties shall constitute one integrated agreement.

XVII. Entire Agreement. The OEA, as amended by this Third Amendment, constitutes the entire agreement between the Parties with respect to the subject matters thereof and supersedes any prior written or oral agreements pertaining thereto.

BALANCE OF THIS PAGE INTENTIONALLY LEFT BLANK



2002-410325
07/26/2002 08:00A
11 of 31

IN WITNESS WHEREOF, the undersigned has executed this Third Amendment effective as of the day and year first above written.

THE VONS COMPANIES, INC., *llc*
a Michigan corporation

By: ____________________
Its: Assistant Vice President

By: ____________________
Its: Assistant Secretary

STATE OF California }
COUNTY OF Alameda } S.S.

On March 19, 2002 before me, Nicole Solovskoy, personally appeared Christianne C. Chen and Wendall Mitchell x——————x, personally known to me ~~(or proved to me on the basis of satisfactory evidence)~~ to be the person(s) whose name(s) ~~is~~/are subscribed to the within instrument and acknowledged to me that ~~he/she/~~they executed the same in ~~his/her/~~their authorized capacity(ies), and that by ~~his/her/~~their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature ____________________
(Seal)

NICOLE SOLOVSKOY
COMMISSION 1287142
NOTARY PUBLIC-CALIFORNIA
ALAMEDA COUNTY
My commission exps. Dec 14, 2004



2002-410325
07/26/2002 08:00A
12 of 31

IN WITNESS WHEREOF, the undersigned has executed this Third Amendment effective as of the day and year first above written.

TARGET CORPORATION,
a Minnesota corporation
(formerly known as DAYTON HUDSON CORPORATION)

By: [signature]

Its: Marc Steadman
Vice President
Target Stores

STATE OF Minnesota }
COUNTY OF Hennepin } S.S.

On March 22, 2002 before me, Darla D. King - Notary, personally appeared Marc Steadman Vice President, Target Stores, Target Corporation., personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(~~s~~) whose name(~~s~~) is/~~are~~ subscribed to the within instrument and acknowledged to me that he/~~she/they~~ executed the same in his/~~her/their~~ authorized capacity(ies), and that by his/~~her/their~~ signature(~~s~~) on the instrument the person(~~s~~), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

DARLA D. KING
NOTARY PUBLIC - MINNESOTA
MY COMMISSION
EXPIRES JAN. 31, 2006

Signature Darla D. King
(Seal)



2002-410325
07/26/2002 08:00A
13 of 31

IN WITNESS WHEREOF, the undersigned has executed this Third Amendment effective as of the day and year first above written.

CIMARRON PROPERTIES, LLC,
a Delaware limited liability company

By: ______________________

Its: President + CEO

STATE OF California }
COUNTY OF San Diego } S.S.

On May 2, 2002 before me, Kelly A. Johnson, Notary Public personally appeared William W. Burritt
_______________________________________,
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature ______________________
(Seal)

KELLY A. JOHNSON
Commission # 1274057
Notary Public - California
San Diego County
My Comm. Expires Sep 11, 2004

# EXHIBIT X-1

## AMENDED SITE PLAN - 2001

[See Attached]




2002-410325
07/26/2002 08:00A
16 of 31

EXHIBIT X-1




2002-410325
07/26/2002 08:00A
17 of 31

EXHIBIT X-1

INITIALS INITIALS




EXHIBIT X-1

2002-410325
07/26/2002 08:00A
18 of 31

APR 10 '02 10:54




NOTE
THE LOCATION OF THE BUILDINGS MAY BE ADJUSTED WITHIN THE BUILDING LOCATION LIMIT LINES TO ALLOW DEVELOPMENT OF MAXIMUM BUILDING AREA.

**SITE PLAN** (PHASE 1) EXHIBIT
**RANCHO CALIFORNIA TOWN CENTER**
**RIVERSIDE COUNTY, CALIFORNIA**

NORTH

SITE PLAN

REVISIONS

Revised 3/26/02

2002-410325
07/26/2002 08:00A
18 of 31




NOTE:
THE LOCATION OF THE BUILDINGS MAY BE ADJUSTED WITHIN THE BUILDING LOCATION LIMIT LINES TO ALLOW DEVELOPMENT OF MAXIMUM BUILDING AREA.

**SITE PLAN** [PHASE 1] EXHIBIT

**RANCHO CALIFORNIA TOWN CENTER**
**RIVERSIDE COUNTY, CALIFORNIA**

NORTH

SITE PLAN

REVISIONS

Revised 3/26/02

2002-410325
07/26/2002 08:00A
20 of 31

INITIALS

INITIALS


ANCHOR 1
MAJOR 1
TARGET
SHOPS G
SHARED ACCESS AREA 1
ANCHOR 3A
ANCHOR 3B
ANCHOR 2
PAD 1
SITE PLAN (PHASE 1)
RANCHO CALIFORNIA TOWN CENTER
RIVERSIDE COUNTY, CALIFORNIA
Revised 3/26/02




Revised 3/26/02

**SITE PLAN** [PHASE 1] EXHIBIT 3
RANCHO CALIFORNIA TOWN CENTER
RIVERSIDE COUNTY, CALIFORNIA

2002-410325
07/26/2002 08:00A
22 of 31




2002-410325
07/26/2002 08:00A
23 of 31

INITIALS INITIALS


ROAD
YNEZ
RANCHO CALIFORNIA ROAD
SHARED ACCESS AREA D
MAJOR 3 ALBERTSON'S
SHOPS L
PAD 4
Revised 3/26/02
SITE PLAN (PHASE 1) EXHIBIT
RANCHO CALIFORNIA TOWN CENTER
RIVERSIDE COUNTY, CALIFORNIA




**SITE PLAN** [PHASE 2] EXHIBIT -4

**RANCHO CALIFORNIA TOWN CENTER**
**RIVERSIDE COUNTY, CALIFORNIA**

NOTE:
THE LOCATION OF THE BUILDINGS MAY BE ADJUSTED WITHIN THE BUILDING LOCATION LIMIT LINES TO ALLOW DEVELOPMENT OF MAXIMUM BUILDING AREA.

NORTH

SITE PLAN

REVISIONS

Revised 3/26/02

2002-410325
07/26/2002 08:00A
25 of 31




SITE PLAN (PHASE 2) EXHIBIT -4
RANCHO CALIFORNIA TOWN CENTER
RIVERSIDE COUNTY, CALIFORNIA

NORTH

Revised 3/26/02

2002-410325
07/26/2002 08:00A
26 of 31

INITIALS INITIALS

APR 10 2002 2:01 PM FR 918586239114 P.08




2002-416325
07/26/2002 08:00A
27 of 31

**SITE PLAN** (PHASE 2) EXHIBIT
RANCHO CALIFORNIA TOWN CENTER
RIVERSIDE COUNTY, CALIFORNIA

Revised 3/26/(

APR 10 '02 10:55

** TOTAL PAGE.08 **




LEGEND

- LINE OF CURB
- MAXIMUM BUILDING AREA
- PROPERTY LINE
- DEPICTION OF PARCEL NO.
- EASEMENT AREA
- BUILDING LOCATION LIMIT LINE (SEE NOTE)
- MATCH LINE

NOTE:
THE LOCATION OF THE BUILDINGS MAY BE ADJUSTED WITHIN THE BUILDING LOCATION LIMIT LINES TO ALLOW DEVELOPMENT OF MAXIMUM BUILDING AREA.

**SITE PLAN [PHASE 2] EXHIBIT -5**

**RANCHO CALIFORNIA TOWN CENTER**
**RIVERSIDE COUNTY, CALIFORNIA**

NORTH

SITE PLAN
DATE FOR REFERENCE ONLY AS OF 6-11-99

REVISIONS
7-21-99

Revised 3/26/02

2002-410325
07/26/2002 08:00A
28 of 31




LEGEND

LINE OF CURB

MAXIMUM BUILDING AREA

PROPERTY LINE

DEPICTION OF PARCEL NO.

EASEMENT AREA

BUILDING LOCATION LIMIT LINE (SEE NOTE)

MATCH LINE

NOTE:
THE LOCATION OF THE BUILDINGS MAY BE ADJUSTED WITHIN THE BUILDING LOCATION LIMIT LINES TO ALLOW DEVELOPMENT OF MAXIMUM BUILDING AREA.

**SITE PLAN** [PHASE 2] EXHIBIT -8

**RANCHO CALIFORNIA TOWN CENTER**
**RIVERSIDE COUNTY, CALIFORNIA**

NORTH

SITE PLAN

DATE FOR REFERENCE ONLY AS OF

REVISIONS

Revised 3/26/02

INITIALS INITIALS

2002-410325
07/26/2002 08:00A
28 of 31




LEGEND

SITE PLAN (PHASE 3) EXHIBIT -B
RANCHO CALIFORNIA TOWN CENTER
RIVERSIDE COUNTY, CALIFORNIA

Revised 3/26



2002-410325
07/26/2002 08:00A
30 of 31

Exhibit

**CONSENT AND SUBORDINATION TO THIRD AMENDMENT TO OPERATION AND EASEMENT AGREEMENT**

Wells Fargo Bank, a national association ~~corporation,~~ (**"Trustee"**) as beneficial holder of that certain [Deed of Trust and Security Agreement] dated ____________, and recorded in the Official Records of Riverside County, California as Instrument No. _______ (the **"Deed of Trust"**), which Deed of Trust is subordinate to the OEA, hereby consents to the attached Third Amendment to Operation and Easement Agreement (the **"Third Amendment"**) and agrees to be bound by it and accordingly agrees that the Deed of Trust is and shall be subordinate to the OEA as amended by the Third Agreement.

Trustee represents and warrants that it has the full capacity, right, power and authority to execute and deliver this Consent and Subordination, and all required actions, consents and approvals therefore have been duly taken and obtained.

Wells Fargo Bank, N.A.
a national association ~~corporation~~

By: [signature]
Its: Managing Director

STATE OF CALIFORNIA )
) ss.
COUNTY OF SAN FRANCISCO )

On this 15TH day of MAY, 2002, before me, the undersigned Notary Public, personally appeared SEAN FLANNERY, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), to the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

PC01
NELLIE JOSE
COMM. #1234022
NOTARY PUBLIC-CALIFORNIA
SAN FRANCISCO COUNTY
My Comm. Expires Sept. 5, 2003
PC01

[signature]
Notary Public

2002-410325
07/26/2002 08:00A
31 of 31

In The County of Riverside

SHEET 1 OF 6 SHEETS

FILED July 8 1965 No. 78004 At 2:20 P.M.
W.D. BALOEH County Recorder
By [signature] Deputy
Fee $15.00
Filed By County Clerk
Subdivision Guarantee Ti.I.& Tr. G.

# TRACT No. 3334

Being a subdivision of a portion of the Rancho Temecula in the County of Riverside, as shown in Book 1 of Patents at Page 37, recorded in the Office of the County Recorder of San Diego County, State of California. Being also shown as Lots 7 through 11 inclusive, and portions of Lots 1 through 6, inclusive, and a portion of Lot 12, of Block 3; Lots 1, 4, 5, and 6, and portions of Lots 2, 3, and 8 through 13, inclusive of Block 4; Lot 1 and portions of Lots 2, 4, 5, 13, 14, 16 and 17 of Block 5; portion of Lot 1, of Block 6; portions of Lots 1, 2, 7, 8 and 9 of Block 16; and portions of Lots 3 through 6, inclusive, of Block 18 all of the Pauba Land and Water Company as shown by map on file in Book 11, Page 507, of Maps, Records of San Diego County, California.

## OWNERS CERTIFICATE

WE HEREBY CERTIFY THAT WE ARE THE OWNERS OF THE LAND INCLUDED WITHIN THE SUBDIVISION SHOWN UPON THIS MAP CONSISTING OF 6 SHEETS; WE ARE THE ONLY PERSONS WHOSE CONSENT IS NECESSARY TO PASS A CLEAR TITLE TO SAID LAND AND HEREBY CONSENT TO THE MAKING AND FILING OF THE MAP AND SUBDIVISION AS SHOWN WITHIN THE COLORED BORDER LINES AND WE HEREBY OFFER FOR DEDICATION TO PUBLIC USE FOR STREET PURPOSES THE AREAS DESIGNATED AS LOTS "A", "B", "C", "D", "E", "F", "G", AND "H" AND FOR CONSTRUCTION AND MAINTENANCE OF ALL PUBLIC UTILITIES THE 6', 10' & 15' PUBLIC UTILITIES EASEMENTS. LOTS "I", "J", "K", "L", "M", "N", AND "O" BARRIER STRIPS ARE DEDICATED TO THE COUNTY OF RIVERSIDE. PURSUANT TO THE PROVISIONS OF SECTION 11587 OF THE BUSINESS AND PROFESSIONS CODE, THE SIGNATURES OF THE FOLLOWING EASEMENT AND/OR RIGHT OF WAY HOLDERS WERE OMITTED.

SOUTHERN SIERRAS POWER COMPANY AND NEVADA-CALIFORNIA ELECTRIC CORPORATION NOW CALIFORNIA ELECTRIC POWER COMPANY BY DEED RECORDED IN BOOK 398, PAGE 387, OFFICIAL RECORDS; CASSIE SWANHUSEN DEWAND BY DEED RECORDED IN BOOK 560, PAGE 157, OF DEEDS, BECAUSE THEY CANNOT RIPEN INTO FEE TITLE.

RANCHO CALIFORNIA
A PARTNERSHIP (OWNER)

BY: TEMECULA INVESTMENT COMPANY
By [signature] President
By [signature] Asst. Secretary

BY: TEMECULA PROPERTIES, INC.
By [signature] Vice-President
By [signature] Asst. Secretary

BY: KAISER RANCHO CALIFORNIA, INC.
By [signature] Vice-President
By [signature] Asst. Secretary

## SURVEYOR'S CERTIFICATE

I, J.W. McINTIRE, DO HEREBY CERTIFY THAT I AM A LICENSED LAND SURVEYOR OF THE STATE OF CALIFORNIA AND THAT THIS MAP CONSISTING OF 6 SHEETS CORRECTLY REPRESENTS A SURVEY MADE UNDER MY SUPERVISION IN JAN. 1965; THAT THE MONUMENTS SHOWN HEREON ACTUALLY EXIST AND ARE OF THE CHARACTER AND OCCUPY THE POSITION INDICATED, OR WILL BE IN PLACE WITHIN ONE YEAR AFTER RECORDATION OF THIS MAP, THAT SAID MONUMENTS ARE SUFFICIENT TO ENABLE THE SURVEY TO BE RETRACED AND THAT THE SURVEY IS TRUE AND COMPLETE AS SHOWN.

DATED: APRIL 21, 1965

SIGNED [signature]
J.W. McINTIRE L.S. 2602

## COUNTY SURVEYOR'S CERTIFICATE

I, HEREBY CERTIFY THAT I HAVE EXAMINED THE WITHIN ANNEXED MAP; THAT THE SUBDIVISION SHOWN THEREON IS SUBSTANTIALLY THE SAME AS IT APPEARED ON THE TENTATIVE MAP AS FILED, AMENDED AND APPROVED BY THE COUNTY PLANNING COMMISSION; THAT ALL PROVISIONS OF THE STATE LAWS AND COUNTY SUBDIVISION REGULATIONS HAVE BEEN COMPLIED WITH, AND THAT I AM SATISFIED THAT THIS MAP IS TECHNICALLY CORRECT.

DATED: July 8, 1965

A.C. KEITH
COUNTY SURVEYOR

BY: A. C. Keith

## ACKNOWLEDGMENT

State of California }
County of ORANGE } s.s.
On this 22nd day of JUNE 1965, before me JUNE P. HUFF a Notary Public in and for said County and State, personally appeared JOHN TRACER known to me to be the PRESIDENT, and HERBERT W. KAINBACH known to me to be the ASSISTANT SECRETARY of TEMECULA INVESTMENT COMPANY the corporation that executed the within instrument as partner of RANCHO CALIFORNIA a ________ partnership, and known to me to be the persons who executed the within instrument on behalf of the corporation therein named and acknowledged to me that such corporation executed the within instrument pursuant to its by-laws or a resolution of its Board of Directors as such partner and acknowledged to me that such partnership executed the same.

My Commission Expires August 24, 1968

[signature] Notary Public

## ACKNOWLEDGMENT

State of California }
County of ALAMEDA } s.s.
On this 29th day of June 1965, before me, E.A. Richards a Notary Public in and for said County and State, personally appeared [illegible] known to me to be the VICE PRESIDENT and [illegible] known to me to be the ASSISTANT SECRETARY of TEMECULA PROPERTIES INC. the corporation that executed the within instrument as partner of RANCHO CALIFORNIA a ________ partnership, and known to me to be the persons who executed the within instrument on behalf of the corporation therein named and acknowledged to me that such corporation executed the within instrument pursuant to its by-laws or a resolution of its Board of Directors as such partner and acknowledged to me that such partnership executed the same.

My Commission Expires October 4, 1968

[signature] Notary Public

## ACKNOWLEDGMENT

State of California }
County of ALAMEDA } s.s.
On this 29th day of June 1965, before me Dagmar E. Hanby a Notary Public in and for said County and State, personally appeared William Marks known to me to be the VICE PRESIDENT and Roy E. Hughes known to me to be the ASSISTANT SECRETARY of KAISER RANCHO CALIFORNIA, INC. the corporation that executed the within instrument as partner of RANCHO CALIFORNIA a ________ partnership, and known to me to be the persons who executed the within instrument on behalf of the corporation therein named and acknowledged to me that such corporation executed the within instrument pursuant to its by-laws or a resolution of its Board of Directors as such partner and acknowledged to me that such partnership executed the same.

My Commission Expires January 9, 1968

[signature] Notary Public

## TAX COLLECTOR'S CERTIFICATE

I HEREBY CERTIFY THAT ACCORDING TO THE RECORDS OF THIS OFFICE AS OF THIS DATE THERE ARE NO LIENS AGAINST THE PROPERTY SHOWN UPON THE ANNEXED MAP FOR UNPAID STATE, COUNTY, MUNICIPAL OR LOCAL TAXES OR SPECIAL ASSESSMENTS COLLECTED AS TAXES EXCEPT TAXES OR SPECIAL ASSESSMENTS COLLECTED AS TAXES NOW A LIEN BUT NOT YET PAYABLE, WHICH ARE ESTIMATED TO BE $[illegible]

DATED: July 1 1965

DONNA M. BOWER
COUNTY TAX COLLECTOR

by [signature] DEPUTY

## PLANNING COMMISSION CERTIFICATE

TRACT No 3334 BEING A PORTION OF THE ORIGINAL APPROVED TENTATIVE MAP OF TRACT No 2990 HAS BEEN DESIGNATED AS A UNIT OF TRACT No 2990 PURSUANT TO THE PROVISIONS OF SECTION 6.18 OF ORDINANCE 460 OF THE COUNTY OF RIVERSIDE. THE TENTATIVE MAP OF TRACT No 2990 WAS APPROVED BY THE PLANNING COMMISSION OF THE COUNTY OF RIVERSIDE IN ACCORDANCE WITH REQUIREMENTS OF LAW IN DULY AUTHORIZED MEETING HELD ON THE 30th DAY OF MARCH 1965

[signature: Hazel I. Evenson]
SECRETARY
RIVERSIDE COUNTY PLANNING COMMISSION

## COUNTY ACCEPTANCE

THE COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, BY AND THROUGH ITS DULY AUTHORIZED OFFICERS, HEREBY ACCEPTS THE FOREGOING DEDICATIONS AND APPROVES THIS FINAL MAP, EXCEPT LOTS "I" TO "O" INCLUSIVE, (1' BARRIER STRIPS) ARE ACCEPTED CONTINGENT UPON THE EXTENSION AND IMPROVEMENT OF THE STREETS.

DATED: JULY 6th, 1965

[signature]
CHAIRMAN OF THE BOARD OF SUPERVISORS
COUNTY OF RIVERSIDE, STATE OF CALIFORNIA

ATTEST
DONALD D. SULLIVAN
COUNTY CLERK AND EX-OFFICIO
CLERK OF THE BOARD OF SUPERVISORS

BY: [signature] DEPUTY

## GENERAL NOTES

1. SET 2X2 REDWOOD STAKES PAINTED WHITE AND TAGGED L.S. 2602 AT ALL LOT CORNERS UNLESS OTHER WISE NOTED.
2. BUILDING SET BACK TO CONFORM TO EXISTING ZONING.
3. ALL MONUMENTS SET ACCORDING TO COUNTY ORDINANCE No 461, STANDARD No 42
4. ◉ INDICATES MONUMENTS FOUND, SIZE AND DESCRIPTION AS NOTED.
5. o INDICATES 1/4 IRON PIPE SET AND TAGGED L.S. 2602.
6. THIS TRACT HAS 40 LOTS, PLUS LOTS "A" TO "O" INCLUSIVE.
7. P.U.E. = PUBLIC UTILITY EASEMENT

## BASIS OF BEARINGS

Bearings used on this map are based on U.S.C. & G.S. California Co-ordinate System zone 6 co-ordinates shown are grid. Grid factor = 0.9998706
Average Latitude = North 33°21'20"
Average Elevation = 2000'
All bearings are grid. All distances are actual except as noted.

## TAX BOND CERTIFICATE

I hereby certify that a bond in the sum of $4,000.00 has been executed and filed with the Board of Supervisors of the County of Riverside, California, conditioned upon the payment of all taxes, State, County, Municipal or local, and all special assessments collected as taxes, which at the time of filing of this map with the County Recorder are a lien against said property but not yet payable, and said bond has been duly approved by said Board of Supervisors.

Dated JULY 6th, 1965

DONALD D. SULLIVAN
County Clerk and ex-officio
Clerk of the Board of Supervisors

By [signature] Deputy




SCALE: 1"=300'
In The County of Riverside
SHEET 2 OF 6 SHEETS
TRACT No. 3334
NOTE:
GENERAL NOTES:
1. SET 2x2 REDWOOD STAKES PAINTED WHITE AND TAGGED L.S. 2602 AT ALL LOT CORNERS UNLESS OTHERWISE NOTED.
2. BUILDING SET BACK TO CONFORM TO EXISTING ZONING.
3. ALL MONUMENTS SET ACCORDING TO COUNTY ORDINANCE Nº 461, STANDARD Nº 42
4. ● INDICATES MONUMENTS FOUND, SIZE AND DESCRIPTION AS NOTED.
5. • INDICATES 1¼ IRON PIPE SET AND TAGGED L.S. 2602.
6. THIS TRACT HAS 40 LOTS, PLUS LOTS "A" TO "O", INCLUSIVE.
7. P.U.E. = PUBLIC UTILITY EASEMENT
BASIS OF BEARINGS
BEARINGS USED ON THIS MAP ARE BASED ON U.S.C.&G.S. CALIFORNIA CO-ORDINATE SYSTEM-ZONE 6. CO-ORDINATES SHOWN ARE GRID.
ALL BEARINGS ARE GRID. ALL DISTANCES ARE ACTUAL EXCEPT AS NOTED.
KEARNY
ROAD
NORTH GENERAL
LA SERENA WAY
PUBLIC UTILITIES EASEMENTS
NATURAL WATERCOURSE
AREA OF POSSIBLE INUNDATION
1
2
3
4
5
37
38
39
40
SEE SHEET


SCALE: 1"=300'
In The County of Riverside
SHEET 3 OF 6 SHEETS
TRACT No. 3334
NOTE:
ALL WATERCOURSES MUST BE KEPT FREE OF BUILDINGS, OBSTRUCTIONS, AND ENCROACHMENT BY LAND FILLS.
MURRIETTA POR. OF TEMECULA RANCHO
PUBLIC UTILITIES EASEMENTS
PUBLIC UTILITY EASEMENT
NORTH GENERAL KEARNY ROAD
SOUTH GENERAL KEARNY ROAD
LA SERENA WAY
MACLEOD ROAD
U.S. HIGHWAY 395
EAST LINE
THIS SUBDIVISION
NOT A PART OF
AREA OF POSSIBLE INUNDATION
NATURAL WATERCOURSE
SEE SHEET 2
SEE SHEET 4
SEE SHEET 6
5
6
23.36 Ac.
7
20.90 Ac.
8
20.54 Ac.
9
20.74 Ac.
10
11
33
35
36
20.77 Ac.
37
38


SCALE: 1"=300'
In The County of Riverside
SHEET 4 OF 6 SHEETS
TRACT No. 3334
NOTE:
SEE SHEET 3 SEE SHEET
SOUTH GENERAL KEARNY ROAD
MACLEOD ROAD
LONG VALLEY ROAD
U.S. HIGHWAY 395
EAST LINE OF PART OF THIS SUBDIVISION
A NOT PART
PUBLIC UTILITIES EASEMENTS
NATURAL WATERCOURSE
AREA OF POSSIBLE INUNDATION
10
11
22.66 Ac.
12
13
14
16
17
18
19
21
35
SEE SHEET 6
SEE SHEET

SCALE: 1"=300'

In The County of Riverside

SHEET 5 OF 6 SHEETS

# TRACT No 3334



NOTE:
ALL WATERCOURSES MUST BE KEPT FREE OF BUILDINGS, OBSTRUCTIONS, AND ENCROACHMENT BY LAND FILLS.




GENERAL NOTES:

1. SET 2x2 REDWOOD STAKES PAINTED WHITE AND TAGGED L.S. 2602 AT ALL LOT CORNERS UNLESS OTHERWISE NOTED.
2. BUILDING SET BACK TO CONFORM TO EXISTING ZONING.
3. ALL MONUMENTS SET ACCORDING TO COUNTY ORDINANCE No 461, STANDARD No 12
4. ⊕ INDICATES MONUMENTS FOUND, SIZE AND DESCRIPTION AS NOTED.
5. ○ INDICATES 1¼" IRON PIPE SET AND TAGGED L.S. 2602.
6. THIS TRACT HAS 40 LOTS, PLUS LOTS "A" TO "O", INCLUSIVE.
7. P.U.E. = PUBLIC UTILITY EASEMENT

BASIS OF BEARINGS

BEARINGS USED ON THIS MAP ARE BASED ON U.S.C.& G.S. CALIFORNIA CO-ORDINATE SYSTEM - ZONE 6. CO-ORDINATES SHOWN ARE GRID. GRID FACTOR = 0.9998736.
AVERAGE LATITUDE - N33°21'20"
AVERAGE ELEVATION - 2000'
ALL BEARINGS ARE GRID. ALL DISTANCES ARE ACTUAL EXCEPT AS NOTED.


SCALE: 1"=300'
In The County of Riverside
SHEET 6 OF 6 SHEETS
TRACT No. 3334
NOTE: ALL WATERCOURSES MUST BE KEPT FREE OF BUILDINGS, OBSTRUCTIONS, AND ENCROACHMENT BY LAND FILLS.
LA SERENA WAY
SOUTH GENERAL KEARNY ROAD
MORAGA ROAD
LONG VALLEY ROAD
PUBLIC UTILITIES EASEMENTS
NATURAL WATERCOURSE
30
23.78 Ac.
34
27.65 Ac.
31
28.34 Ac.
29
28.06 Ac.
35
22.16 Ac.
33
24.51 Ac.
32
23.73 Ac.
28
20.83 Ac.
27
21.11 Ac.
14
20.23 Ac.
15
20.08 A
26
20.76 Ac.
25
20.95 Ac.
16
21.51 Ac.
23
20.68 Ac.
24
22.97 Ac.
22
22.89 Ac.




| DATE | OLD NO | NEW NO |
|---|---|---|
| 12-99 | 49 | 58, 59 |
| " | 50, 59 | 60 |

| DATE | OLD NO. | NEW NO. |
|---|---|---|
| 8/89 | 40 | 41 |
| " | 29 | 42 |
| " | 35 | 43 |
| " | 20, 43 | 44 |
| 11/89 | 19, 22 | 45, 46 |
| 4/91 | 35,25,42, | — |
| " | 36,25,32, | |
| " | 45, 44 | 47 |
| " | 47 | 48-55 |
| 3-93 | 7 | 54, 51 |
| 7-95 | 27 | 56, 51 |
| 9-96 | 51 | 56, 57 |
| " | 57 | PG 76 |

| DATE | OLD NO | NEW NO |
|---|---|---|
| 1/82 | 1 | 5, 4 |
| 1/82 | 2 | 5, 6 |
| 4-82 | 4, 6 | 7 |
| 7/85 | 3, 5 | 8 |
| " | 8 | 9-11 |
| 6/88 | 10 | 12-26 |
| " | 11 | 27-35 |
| 8/89 | [illegible] | 36 |
| " | 17, 34 | 37 |
| " | 13 | 38 |
| " | 14 | 39 |
| " | 35, 39 | 40 |

DOC # 2003-705441
09/11/2003
Conformed Copy
Has not been compared with original
Gary L Orso
County of Riverside
Assessor, County Clerk & Recorder

REQUESTED RECORDING BY, AND RETURN TO:

Cimarron Temecula, LLC
c/o Hilding Kipnis Lyon & Kelly
11975 El Camino Real, Suite 200
San Diego, CA 92130

Attn: Judith T. Newman, Esq.

(Space Above For Recorder's Use)

## FOURTH AMENDMENT TO OPERATION AND EASEMENT AGREEMENT

This FOURTH AMENDMENT ("Amendment"), dated as of 9/9, 2003, amends the Operation and Easement Agreement dated April 29, 1988 and recorded June 9, 1988 as Instrument No. 156782 of the Official Records of Riverside County, California, by and among TARGET CORPORATION (f/k/a DAYTON HUDSON CORPORATION), a Minnesota corporation ("Target"), THE VONS COMPANIES, INC., a Michigan corporation ("Vons"), successor in interest to Albertson's Inc., a Delaware corporation, and CIMARRON TEMECULA, LLC, a Delaware limited liability company ("Cimarron"), successor in interest to RADNOR/LANDGRANT RANCHO CALIFORNIA TOWN CENTER PARTNERSHIP, a California general partnership ("Developer"), as amended by the First Amendment to Operation and Easement Agreement ("First Amendment"), dated June 21, 1989 and recorded on August 2, 1989 as Instrument No. 259041 of said Official Records, and by that certain Declaration of Restrictions (Supplement to Operation and Easement Agreement) dated as of August 7, 1989 and recorded on August 14, 1989 as Instrument No. 274852 of said Official Records, as further amended by the Second Amendment to Operation and Easement Agreement ("Second Amendment"), dated March 6, 1990 and recorded on April 18, 1990 as Instrument No. 141301 of said Official Records, and as further amended by the Third Amendment To Operation and Easement Agreement ("Third Amendment"), dated May 2, 2002 and recorded on July 26, 2002 as Instrument No. 2002-410325 of said Official Records (collectively "OEA"), with reference to the following facts:

## RECITALS

A. Target owns and is the Party with respect to Parcel 6 of Parcel Map No. 22863 in the County of Riverside, State of California, according to the Map recorded in Book 150, pages 51 through 57 inclusive of Parcel Maps, in the office of the County Recorder in said County.

B. Vons is the owner and the successor Party with respect to Parcel 7 of the Parcel Map described in Recital A.

C. Mobil Oil Company, a New York corporation, is the owner and the Party with respect to Parcel 2 of the Parcel Map described in Recital A.

D. Temecula Corporate Plaza Center, LLC, a California limited liability company ("Temecula Corporate") is the owner with respect to Parcel 15 described in Recital A, and shall be added as an additional Party subject to the OEA.

E. Claim Jumper-Temecula, a California corporation ("Claim Jumper") is the owner with respect to Parcel 1 of the Parcel Map described in Recital A.

F. Cimarron is the owner and the successor Party with respect to Parcel 11 described in Recital A and the balance of the Shopping Center subject to the OEA.

G. Section 6.14 of the OEA provides that it may be amended by a written agreement signed by Parties holding at least seventy-five percent (75%) of the total voting power of the Parties, which 75% shall include the Parties with respect to Parcels 6, 7 and 11.

H. Together, Target, Vons and Cimarron hold more than seventy-five percent (75%) of the total voting power of the Parties and are the Approving Parties (as defined by Section 1.1 of the OEA), and as such, these Approving Parties desire to amend the OEA as provided herein.

ACCORDINGLY, in consideration of the mutual covenants set forth herein and other good and valuable consideration, the receipt and sufficiency of which the Approving Parties hereby acknowledge, the Approving Parties agree as follows:

**I. Definitions.** Except as expressly provided herein, words and phrases in this Fourth Amendment have the same meanings as defined in the OEA.

**II. Use Restrictions:** Section 5.1 (B)(iii) of the OEA shall be deleted in its entirety and the following substituted therefore:

"(iii) Any "second hand" store or "surplus" store, it being understood and agreed that, subject to Section 5.1(C)(v), the provisions of this Section 5.1(B)(iii) shall not be deemed to prohibit the operation of a typical T.J. Maxx, Marshalls, HomeGoods or A.J. Wright Store;"

**III. Conflicts/Ratification.** If there is any conflict between the provisions of the OEA and this Fourth Amendment, the provisions of this Fourth Amendment shall control. Except as supplemented and amended by this Fourth Amendment, the OEA is ratified by the parties hereto and remains in full force and effect. Each of the parties hereto represent and warrant that it has the full capacity, right, power and authority to execute, deliver and perform this Fourth Amendment, and all required actions, consents and approvals therefore have been duly taken and obtained. Furthermore, each of the parties hereto represent and warrant that upon full execution of this Fourth Amendment, the OEA as amended by this Fourth Amendment shall be binding on all parties with any interest in their respective Tracts, including the holder of any mortgagee's interest.

**IV. No Third Party Beneficiary.** The provisions of this Fourth Amendment and the OEA are for the exclusive benefit of the parties hereto and not for the benefit of any third person; this Fourth Amendment to the OEA and the OEA do not confer any rights, express or implied, upon any such third person; and there are no third party beneficiaries to this Fourth Amendment or the OEA.

**V. Counterparts.** This Fourth Amendment may be executed in counterparts or with counterpart signature pages, which upon execution by all Parties shall constitute one integrated agreement.

**VI. Entire Agreement.** The OEA, as amended by this Fourth Amendment, constitutes the entire agreement between the Parties with respect to the subject matters thereof and supersedes any prior written or oral agreements pertaining thereto.

BALANCE OF THIS PAGE INTENTIONALLY LEFT BLANK

IN WITNESS WHEREOF, the undersigned has executed this Fourth Amendment effective as of the day and year first above written.

THE VONS COMPANIES, INC.,
a Michigan corporation

By: [signature]
Its: Asst. Vice President
Rogelio M. Ruiz

By: [signature]
Its: Assistant Secretary
Steven J. Gaug

See attached certificate

STATE OF ________________}
COUNTY OF ______________} S.S.

On ____________________ before me, ________________________________,
personally appeared ________________________________________________
________________________________________________________________,
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature ________________________________
(Seal)



4OEAfinal.doc

**ACKNOWLEDGMENT**

STATE OF CALIFORNIA )
) ss.
COUNTY OF ALAMEDA )

On August 13, 2003, before me, Nicole Solovskoy, Notary Public, personally appeared Rogelio M. Ruíz and Steven J. Gouig personally known to me to be the persons whose names are subscribed to the within instrument and acknowledged to me that they executed the same in their authorized capacities, and that by their signatures on the instrument, the persons or the entity upon behalf of which the persons acted, executed the instrument.

WITNESS my hand and official seal.

NICOLE SOLOVSKOY
COMMISSION 1287142
NOTARY PUBLIC-CALIFORNIA
ALAMEDA COUNTY
My commission exps. Dec. 14, 2004

Signature Nicole Solovskoy (Seal)

IN WITNESS WHEREOF, the undersigned has executed this Fourth Amendment effective as of the day and year first above written.

TARGET CORPORATION,
a Minnesota corporation
(formerly known as DAYTON HUDSON CORPORATION)

By: [signature]

Its: Scott A. Nelson
Vice President
Target Stores

STATE OF Minnesota }
COUNTY OF Hennepin } S.S.

On September 4, 2003 before me, Tom Dawson, Notary Public, personally appeared Scott A. Nelson, V.P., Target Corporation

personally known to me (~~or proved to me on the basis of satisfactory evidence~~) to be the person~~(s)~~ whose name~~(s)~~ is/~~are~~ subscribed to the within instrument and acknowledged to me that he/~~she/they~~ executed the same in his/~~her/their~~ authorized capacity~~(ies)~~, and that by his/~~her/their~~ signature~~(s)~~ on the instrument the person~~(s)~~, or the entity upon behalf of which the person~~(s)~~ acted, executed the instrument.

WITNESS my hand and official seal.

Signature [signature]
(Seal)

THOMAS FRANCIS DAWSON
Notary Public
Minnesota
My Commission Expires Jan. 31, 2007



4OEAfinal.doc

IN WITNESS WHEREOF, the undersigned has executed this Fourth Amendment effective as of the day and year first above written.

CIMARRON TEMECULA, LLC,
a Delaware limited liability company

By: William W. Gerrity

Its: President & CEO

STATE OF California }
COUNTY OF San Diego } S.S.

On 9/9/03 before me, Carly Harrington,
personally appeared William W. Gerrity,

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

CARLY HARRINGTON
Commission # 1315695
Notary Public - California
San Diego County
My Comm. Expires Aug 2, 2005

Signature _______________
(Seal)



4OEAfinal.doc

DOC #2014-0194857
05/28/2014 02:13 PM Fees: $90.00
Page 1 of 26
Recorded in Official Records
County of Riverside
Larry W. Ward
Assessor, County Clerk & Recorder

**This document was electronically submitted to the County of Riverside for recording**
Receipted by: MCASTRO

THIS INSTRUMENT FILED FOR RECORD BY FIRST AMERICAN TITLE AS AN ACCOMMODATION ONLY IT HAS NOT BEEN EXAMINED AS TO ITS EXECUTION OR TO ITS EFFECT UPON THE TITLE
ACCMDB - 010

RECORDING REQUESTED BY
AND WHEN RECORDING MAIL
THIS DOCUMENT TO:

BACM 2006-5 Rancho California Limited Partnership
c/o LNR Partners California Manager, LLC
1601 Washington Ave., Suite 700
Miami Beach, FL 33139

---

**(Above Space for Recorder's Use Only)**

# FIFTH AMENDMENT TO OPERATION AND EASEMENT AGREEMENT

THIS FIFTH AMENDMENT TO OPERATION AND EASEMENT AGREEMENT (this "**Fifth Amendment**") is made as of April 1, 2014, by and among BACM 2006-5 RANCHO CALIFORNIA LIMITED PARTNERSHIP, a Delaware limited partnership ("**BACM**"), TARGET CORPORATION, a Minnesota corporation ("**Target**") and THE VONS COMPANIES, INC., a Michigan corporation ("**Vons**").

## RECITALS:

A. BACM, Target and Vons, among others, are parties to that certain Operation and Easement Agreement recorded in the Official Records of Riverside County ("**Official Records**") on June 9, 1988 as Instrument No. 156782 ("**Original OEA**"), as amended by that certain First Amendment to Operation and Easement Agreement recorded in the Official Records on August 2, 1989 as Instrument No. 259041, that certain Declaration of Restrictions [Supplement to the Operation and Easement Agreement] recorded in the Official Records on August 14, 1989 as Instrument No. 274852 ("**Supplement**"), that certain Second Amendment to Operation and Easement Agreement recorded in the Official Records on April 18, 1990 as Instrument No. 141301, that certain Third Amendment to Operation and Easement Agreement recorded in the Official Records on July 26, 2002 as Instrument No. 2002-410325 ("**Third Amendment**"), and that certain Fourth Amendment to Operation and Easement Agreement recorded in the Official Records on September 11, 2003 as Instrument No. 2003-705441 (collectively, "**OEA**"), relating to the development and operation of that certain shopping center located in Temecula, California, commonly known as the Temecula Town Center, more particularly described in **Exhibit A** attached hereto and made a part hereof.

B. Target is the owner of Parcel 6 described in **Exhibit A**.

C. Vons is the owner of Parcel 7 described in **Exhibit A**.

D. BACM is the owner of Parcels 3, 4, 5, 8, 9, 10, 11, 13, 14, and 16 described in **Exhibit A**.

E. Section 6.14 of the OEA provides that it may be amended by a written agreement signed by Parties holding at least seventy-five percent (75%) of the total voting power of the Parties, which 75% shall include the Parties with respect to Parcels 6, 7 and 11 described in **Exhibit A**.

F. Together, Target, Vons, and BACM hold more than seventy-five percent (75%) of the total voting power of the Parties and are the Approving Parties (as defined in Section 1.1 of the OEA), and as such, these Approving Parties desire to amend the OEA to designate BACM as the Operator under the OEA and to otherwise amend the OEA as otherwise set forth herein.

AGREEMENT:

ACCORDINGLY, in consideration of the mutual covenants set forth herein and other good and valuable consideration, receipt and sufficiency of which are hereby acknowledged, the OEA is amended as follows:

1. Defined Terms and Recitals. Except as otherwise defined herein, all capitalized terms used herein but not otherwise defined herein shall have the meanings set forth in the OEA. The recitals set forth above and all exhibits attached hereto are hereby incorporated into this Fifth Amendment.

2. Designation of BACM as Operator Under the OEA. Effective as of the date hereof and pursuant to Section 4.2(B) of the OEA, the Parties hereto hereby designate BACM as the Operator under the OEA, and BACM hereby accepts such designation. Target has taken over and assumed maintenance of the Common Area on its Parcel pursuant to Section 4.2(G) of the OEA and will continue to maintain such Common Area pursuant to the terms of the OEA.

3. Height Limitation. Effective upon the date of the completion of the Redeveloped Truck Turn Around Area (defined below) ("**RDTTAA Date**"), the height limitation table in Section 3.3(G) of the OEA is hereby deleted in its entirety and the following inserted in its place:

| | |
|---|---|
| (i) On Parcel 1 | - 24 feet<br>(not more than one story) |
| (ii) On Parcels 2, 3 and 8 | - 22 feet<br>(not more than one story) |
| (iii) On Parcel 4 | - 27 feet<br>(not more than one story, plus mezzanine) |
| (iv) On Parcel 5 | - 35 feet (not more than one story) for the Builder Area described as Anchor 2 on Parcel 5<br><br>- 25 feet (not more than one story) for the balance of Parcel 5 |

| | |
|---|---|
| (v) On Parcel 6 | - 35 feet |
| (vi) On Parcel 7 | - 35 feet |
| (vii) On Parcel 9 | - 28 feet |
| (viii) On Parcel 10 | - 26 feet<br>(not more than one story) |
| (ix) On Parcel 11 | - 30 feet<br>(not more than one story, plus mezzanine) |
| (x) On Parcel 13 | - 60 feet |
| (xi) On Parcels 14 | - 45 feet |
| (xii) On Parcels 15 | - 65 feet |
| (xiii) On Parcels 16 | - 60 feet |
| (xiv) On Common Area<br>- Tower<br>- Cross Road Cover<br>- Center Pylon Signs/Ynez Road<br>- Center Pylon Signs/Ranch California Road<br>- Monument Signs<br>- All Other Structures | <br>- 50 feet<br>- 30 feet<br>- 20 feet<br>- 20 feet<br>- 8 feet<br>- 12 feet |

4. Residential Use Exception. Effective upon the RDTTAA Date, Section 5.1(A) of the OEA is amended by the addition of the following:

> "Notwithstanding anything to the contrary contained in this subparagraph, multi-family and senior residential uses shall be permitted on Parcels 13, 14, and 16 described in **Exhibit A** to the Fifth Amendment."

5. Section 5.1(B)(xi). Effective upon the RDTTAA Date, Subsection 5.1(B)(xi) of the OEA is hereby deleted in its entirety and the following inserted in its place:

> "(xi) Any living quarters, residential apartments, or lodging rooms; except for multi-family and senior residential uses on Parcels 13, 14, and 16 described in **Exhibit A** to the Fifth Amendment."

6. Parking. Effective upon the RDTTAA Date, Section 3.2(E) of the OEA is hereby amended to include subparts (v) and (vi) as follows:

"(v) for multi-family residential, 1.5 parking spaces for 1 bedroom units, 2 parking spaces for 2 bedroom units, 2.5 parking spaces for 3 or more bedroom units, and 1 guest parking space for every 6 units."

"(vi) for senior housing, 0.5 parking spaces for each unit and 1 guest parking space for every 5 units."

7. Waiver of Claims. Without in any way implying that BACM has or may have any claim, right or remedy, BACM, on behalf of itself and its successors and assigns, hereby waives all claims in respect of, and waives any right or remedy to object to, the retail or other commercial use of the Target Parcel and/or the Vons Parcel from time to time permitted under the OEA (as amended by this Fifth Amendment) that could potentially be inconsistent with or conflict in any manner with residential use. Such waiver includes, without limitation, claims, rights and remedies under the zoning ordinance of the City of Temecula, California and on the basis of public or private nuisance or trespass. Further, BACM, on behalf of itself and its successors and assigns, acknowledges and agrees that any residential use is intentionally and knowingly locating immediately adjacent to retail and commercial operations that will vary in intensity from time to time and may include lighting, noise and other activities that may be heard or viewed within such residential use at any time of day or night.

THIS RELEASE INCLUDES CLAIMS OF WHICH BACM IS PRESENTLY UNAWARE OR WHICH BACM DOES NOT PRESENTLY SUSPECT TO EXIST, WHICH, IF KNOWN BY BACM, WOULD MATERIALLY AFFECT BACM'S RELEASE. BACM SPECIFICALLY WAIVES THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542, WHICH PROVIDES AS FOLLOWS:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR EXPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN TO HIM OR HER MUST HAVE MATERIALLY AFFECTED THE SETTLEMENT WITH THE DEBTOR."

8. Indemnity. If any person residing in or owning residential property within Parcels 13, 14, and 16 described in Exhibit A, or any association of residential property owners that has a member residing within or owning property within Parcels 13, 14, and 16 described in Exhibit A, makes a claim that attempts to limit or terminate the operation of the retail or other commercial uses operating on the Target Parcel or the Vons Parcel on the grounds that the retail or other commercial use is a nuisance or similar claim (including without limitation, claims in connection with lighting, signage, truck traffic, trash collection, maintenance activities, delivery vehicles and/or dock access), and as a result (i) the city, county, state or federal government, or any agency or department thereof (collectively, "**Governmental Authority**") shall make any claim, or (ii) any order, directive, judgment or other legal process shall issue against Target, Vons, the Target Parcel or the Vons Parcel or (iii) any permit, license, zoning, platting or other authorization from any Governmental Authority shall not be issued after proper request or application by Target or Vons, or (iv) any such authorization is, or is threatened to be, modified, suspended, limited, conditioned, revoked or terminated, or as part of the issuance of any such authorization is limited or conditioned (each, an "**Adverse Residential Action**"), then, and in any such case, the Party with respect to the Parcel upon which the claimant is located (or from or as to which such claim is derived) shall indemnify, protect, defend, and hold harmless Target, Vons, the Target Parcel and the Vons Parcel from and against all

claims, liabilities, actions, proceedings and costs (including reasonable attorneys' fees) arising out of any Adverse Residential Action.

9. Residential Use. If any part of Parcels 13, 14, and 16 described in Exhibit A is developed into a condominium, co-operative, townhouse, common interest community, or similar regime, then (A) the provisions of the OEA, as amended by this Fifth Amendment, shall also be binding upon and may be enforced jointly and severally against each owner of a residential unit and/or the owners' association for such community and (B) the owners association for such community shall be the "Party" to the OEA with respect to such residential property, shall represent and act for and on behalf of all owners within such residential development, and shall be deemed the Person authorized to give consents and/or approvals, and to join in the execution of amendments, to the extent applicable as set forth in Section 6.14, for the entirety of such residential property. Notice of transfer of any individual residential unit(s) within the residential development shall not be required under Section 1.9 of the OEA. Prior to the conveyance of any property within the Shopping Center for residential use, the Party conveying such property shall provide the buyer with a notice containing a copy of Sections 7, 8 and 9 of this Fifth Amendment. If a Party elects to develop a residential use on Parcels 13, 14 or 16, then, effective upon the date of commencement of construction of such residential use, such Parcel may only be used for residential purposes for the remainder of the term of the OEA.

10. Signage. Section 5.3(A) of the OEA is hereby amended to provide that (i) Center Pylon Signs #2, #3, and #4 include four (4) spaces for Occupants instead of three (3), (ii) the spacing thereon shall be 25% instead of 33-1/3%, and (iii) the Parcel 11 Party shall have the right to designate not more than three (3) Occupants thereon instead of two (2) Occupants.

11. Site Plan. Effective upon the RDTTAA Date, if residential uses are implemented pursuant to this Fifth Amendment, the Site Plan attached to the OEA, as most recently amended by the Third Amendment, shall be deemed deleted and the Alternative Site Plan attached hereto as **Exhibit X-2** ("**Alternative Site Plan**") is hereby substituted in lieu thereof. From and after such date, all references in the OEA to the Site Plan, Exhibit X, Amended Site Plan - 2001 or Exhibit X-1 shall be deemed to mean the Alternative Site Plan.

12. Redeveloped Truck Turn Around Area. The right to commence any development of any residential use within the Shopping Center is contingent upon the prior completion of new truck turn around improvements by BACM substantially consistent with the Truck Turnaround Demolition Plan and Truck Turnaround Construction Plan attached hereto as **Exhibit T** (collectively, "**Redeveloped Truck Turn Around Area**"). The final plans, specifications and schedule relating to the Redeveloped Truck Turn Around Area shall be provided to Target at least ninety (90) days prior to commencement of any work relating to the Redeveloped Truck Turn Around Area and shall be subject to the approval of Target, not to be unreasonably withheld. No work relating to the Redeveloped Truck Turn Around Area may occur during the months of November, December or January and such work shall be performed in a manner to minimize any interference with business operations on the Target Parcel. For purposes of OEA Section 3.1(C), BACM shall be the indemnifying Party with respect to all work and activities relating to the Redeveloped Truck Turn Around Area.

13. Authority. As required by Section 4.2(B) of the OEA, the Parties hereto have the authority to designate the Operator under the OEA as they represent a majority of the voting power of the Parties to the OEA and at least two of three Approving Parties. As required by Section 6.14 of

the OEA, the Parties hereto have the authority to amend the OEA as they represent at least 75% of the voting power of the Parties to the OEA and all three Approving Parties.

14. Notice. The notice address for BACM for all purposes, including without limitation Sections 6.1 and 6.4 of the OEA, is as follows:

BACM 2006-5 Rancho California Limited Partnership
c/o LNR Partners California Manager, LLC
1601 Washington Ave., Suite 700
Miami Beach, FL 33139

15. Conflicts/Ratification. If there is any conflict between the provisions of the OEA and this Fifth Amendment, the provisions of this Fifth Amendment shall control. Except as supplemented and amended by this Fifth Amendment, the OEA is ratified by the Parties hereto and remains in full force and effect. Each of the Parties hereto represent and warrant that it has the full capacity, right, power and authority to execute, deliver and perform this Fifth Amendment, and all required actions, consents, and approvals therefore have been duly taken and obtained. Furthermore, each of the Parties hereto represent and warrant that upon full execution of this Fifth Amendment, the OEA as amended by this Fifth Amendment shall be binding on all Parties with any interest in the respective Tracts, including the holder of any mortgagee's interest.

16. Counterparts. This Fifth Amendment may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

17. No Third Party Beneficiary. The provisions of this Fifth Amendment and the OEA are for the exclusive benefit of the Parties and not for the benefit of any third person. This Fifth Amendment and the OEA do not confer any rights, express or implied, upon any third person and there are no third party beneficiaries to this Fifth Amendment or the OEA.

18. Entire Agreement. The OEA, as amended by this Fifth Amendment, constitutes the entire agreement between the Parties with respect to the subject matters thereof and supersedes any prior written or oral agreements pertaining thereto.

19. Residential Parties. Notwithstanding anything to the contrary contained in the OEA, including, without limitation, Sections 6.14 and 3.3(B), (i) no consent or approval shall be required from any Party (or Approving Party) with residential use on its Parcel (each a "**Residential Party**") for any matter relating to changes on a Parcel that does not have any residential use (each a "**Commercial Parcel**"), and (ii) the agreement of any Residential Party shall not be required for any amendment to the OEA for any matter relating to changes on a Commercial Parcel. Accordingly, an amendment to the OEA for any matter(s) relating to changes on a Commercial Parcel may be made by a written agreement signed by all of the Approving Parties that are not Residential Parties. For the avoidance of doubt, residential use is only permitted on Parcels 13, 14, and 16 and only following the RDTTAA Date.

[SIGNATURES APPEAR ON THE FOLLOWING PAGES]

IN WITNESS WHEREOF, the Parties hereto have executed this Fifth Amendment as of the date and year hereinabove written.

"**BACM**"

BACM 2006-5 RANCHO CALIFORNIA LIMITED PARTNERSHIP,
a Delaware limited partnership

By: BACM 2006-5 Rancho California GP, LLC,
a Delaware limited liability company,
its general partner

By: LNR Partners California Manager, LLC,
a California limited liability company,
its manager

By: ______________________
Name: Steven D. Ferreira
Title: Vice President

State of ~~California~~ Florida )
County of Miami-Dade )

On May 22, 2014, before me, Yamilia Colmenero,
(insert name of notary)
Notary Public, personally appeared Steven D. Ferreira,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature______________________ (Seal)

YAMILIA COLMENERO
Notary Public - State of Florida
My Comm. Expires Sep 19, 2016
Commission # EE 836568
Bonded Through National Notary Assn.

[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]

**"TARGET"**

TARGET CORPORATION,
a Minnesota corporation

By: [signature]
Name: Scott Nelson
Title: Sr. Vice President
Target Corporation

State of Minnesota )
County of Hennepin )

On May 7, 2014, before me, Natalie Rose Gigler, (insert name of notary)
Notary Public, personally appeared Scott Nelson,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of ~~California~~ Minnesota that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

NATALIE ROSE GIGLER
NOTARY PUBLIC - MINNESOTA
MY COMMISSION
EXPIRES 01/31/18

Signature [signature] (Seal)

[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]

953082.10/OC
371879-00002/3-31-14//mrf

"**VONS**"

THE VONS COMPANIES, INC.,
a Michigan corporation

By: ______________________
Assistant Vice President, Denise M. Roman

By: ______________________
Assistant Secretary Wendall Mitchell

State of CA )
County of Alameda )

On April 2, 2014, before me, Angela Parliament,
(insert name of notary)
Notary Public, personally appeared Denise M. Roman & Wendall Mitchell
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature ______________________ (Seal)

ANGELA PARLIAMENT
Commission # 1935729
Notary Public - California
Alameda County
My Comm. Expires Jun 5, 2015

953082.10/OC
371879-00002/3-31-14//mrf

## EXHIBIT A

## LEGAL DESCRIPTION

Real property in the City of Temecula, County of Riverside, State of California, described as follows:

**PARCEL 1**: (APN: 921-320-061; PROPERTY ADDRESS: 29540 RANCHO CALIFORNIA ROAD, TEMECULA, CALIFORNIA)

PARCEL 1 OF PARCEL MAP 22863, IN THE CITY OF TEMECULA, COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 150, PAGES 51 THROUGH 57, INCLUSIVE OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT A PORTION OF SAID PARCEL 1 OF MAP 22863 DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST SOUTHERLY CORNER OF SAID PARCEL 1, SAID POINT BEING ON THE NORTHERLY RIGHT OF WAY OF RANCHO CALIFORNIA ROAD, LOCATED 55.00 FEET NORTHERLY OF AND PARALLEL WITH THE CENTERLINE OF RANCHO CALIFORNIA ROAD;

THENCE NORTH 38° 51' 26" WEST, 12.00 FEET ALONG THE SOUTHWESTERLY LINE OF SAID PARCEL;

THENCE NORTH 51° 08' 34" EAST, 165.00 FEET PARALLEL WITH AND 67.00 FEET NORTHERLY OF SAID CENTERLINE OF RANCHO CALIFORNIA ROAD;

THENCE SOUTH 38° 51' 26" EAST, 12.00 FEET TO THE NORTHERLY RIGHT OF WAY OF RANCHO CALIFORNIA ROAD;

THENCE SOUTH 51° 08' 34" WEST, 165.00 FEET ALONG SAID NORTHERLY RIGHT OF WAY RANCHO CALIFORNIA ROAD TO THE POINT OF BEGINNING.

**PARCEL 2**: (APN: 921-320-016-6; PROPERTY ADDRESS: 29500 RANCHO CALIFORNIA ROAD, TEMECULA, CA)

PARCEL 1 OF PARCEL MAP NO. 22225 AS SHOWN BY MAP ON FILE IN BOOK 150 OF PARCEL MAPS, PAGES 1 THROUGH 18, INCLUSIVE, RECORDS OF RIVERSIDE COUNTY.

EXCEPTING THEREFROM THOSE PORTIONS OF PARCELS 6 AND 9 AS DESCRIBED IN THE DEED TO ALBERTSON'S, INC., A DELAWARE CORPORATION RECORDED MAY 2, 1989 AS INSTRUMENT NO. 140159, OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM 25% OF ALL OIL, GAS MINERALS AND OTHER HYDROCARBON SUBSTANCES LYING BELOW A DEPTH OF 500.00 FEET FROM THE SURFACE OF SAID LAND, BUT WITHOUT THE RIGHT OF SURFACE ENTRY UPON ANY PORTION OF THE SURFACE ABOVE A DEPTH OF 500.00 FEET, TO TAKE, MARKET, MINE, EXPLORE OR DRILL FOR SAME, AS RESERVED BY KAZUKO TAKENAGE, A WIDOW, IN DEED RECORDED NOVEMBER 1, 1979 AS INSTRUMENT NO. 233777 OF OFFICIAL RECORDS OF RIVERSIDE COUNTY, CALIFORNIA.

**PARCEL 3**: (APN: 921-320-018-8; PROPERTY ADDRESS: 25776 YNEZ ROAD, TEMECULA, CALIFORNIA)

PARCEL 3 OF PARCEL MAP NO. 22863, IN THE CITY OF TEMECULA, COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 150, PAGES 51 THROUGH 57, INCLUSIVE OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

**PARCEL 4**: (APN: 921-320-45-2; PROPERTY ADDRESS: 29640 RANCHO CALIFORNIA ROAD, TEMECULA, CALIFORNIA)

PARCEL 4 OF PARCEL MAP 22863, IN THE CITY OF TEMECULA, COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 150, PAGES 51 THROUGH 57, INCLUSIVE OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, TOGETHER WITH A PORTION OF PARCEL 6 OF SAID PARCEL MAP 22863 DESCRIBED AS FOLLOWS:

COMMENCING AT THE MOST WESTERLY CORNER OF SAID PARCEL 4;

THENCE NORTH 51° 08' 34" EAST ALONG THE BOUNDARY LINE OF SAID PARCEL 4 A DISTANCE OF 125.00 FEET TO ANGLE POINT IN SAID BOUNDARY LINE, THE TRUE POINT OF BEGINNING;

THENCE CONTINUING NORTH 51° 08' 34" EAST A DISTANCE OF 27.79 FEET;

THENCE SOUTH 69° 18' 35" EAST A DISTANCE OF 132.24 FEET TO SAID BOUNDARY LINE OF PARCEL 4;

THENCE SOUTH 51° 08' 34" WEST ALONG SAID BOUNDARY LINE A DISTANCE OF 27.79 FEET TO AN ANGLE POINT IN SAID BOUNDARY LINE;
THENCE NORTH 69° 18' 35" WEST ALONG SAID BOUNDARY LINE A DISTANCE OF 132.24 FEET TO THE TRUE POINT OF BEGINNING.
EXCEPTING THEREFROM THAT PORTION OF SAID PARCEL 4 DESCRIBED AS FOLLOWS:
BEGINNING AT THE MOST EASTERLY CORNER OF SAID PARCEL 4, SAID MOST EASTERLY CORNER ALSO BEING A POINT ON THE NORTHWESTERLY LINE OF RANCHO CALIFORNIA ROAD;
THENCE SOUTH 51° 08' 34" WEST ALONG SAID NORTHWESTERLY LINE OF RANCHO CALIFORNIA ROAD A DISTANCE OF 83.85 FEET;
THENCE NORTH 38° 51' 26" WEST A DISTANCE OF 13.00 FEET;
THENCE NORTH 51° 08' 34" EAST A DISTANCE OF 5.00 FEET;
THENCE NORTH 33° 41' 44" EAST A DISTANCE OF 36.69 FEET;
THENCE NORTH 38° 51' 26" WEST A DISTANCE OF 32.00 FEET TO THE NORTHWESTERLY LINE OF SAID PARCEL 4;
THENCE NORTH 51° 08' 34" EAST ALONG SAID NORTHWESTERLY LINE A DISTANCE OF 43.85 FEET TO THE MOST NORTHERLY CORNER OF SAID PARCEL 4;
THENCE SOUTH 38° 51' 26" EAST ALONG THE NORTHEASTERLY LINE OF SAID PARCEL 4 A DISTANCE OF 56.00 FEET TO THE POINT OF BEGINNING.

**PARCEL 5**: (APN: 921-320-021-0; PROPERTY ADDRESS: 29720 RANCHO CALIFORNIA ROAD, TEMECULA, CALIFORNIA)

PARCEL 5 OF PARCEL MAP NO. 22863, IN THE CITY OF TEMECULA, COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 150, PAGES 51 THROUGH 57, INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

**PARCEL 6**: (APN: 921-320-053; PROPERTY ADDRESS: 29676 RANCHO CALIFORNIA ROAD, TEMECULA, CALIFORNIA)

PARCEL "D" AS SHOWN ON LOT LINE ADJUSTMENT NO. 3128, AS EVIDENCED BY DOCUMENT RECORDED JULY 24, 1990 AS INSTRUMENT NO. 272427 OF OFFICIAL RECORDS, OF RIVERSIDE COUNTY, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

THOSE PORTIONS OF PARCELS 6 AND 4 OF PARCEL MAP 22863 ON FILE IN BOOK 150 OF PARCEL MAPS, PAGES 51 THROUGH 57 INCLUSIVE, RECORDS OF RIVERSIDE COUNTY, CALIFORNIA, BEING DESCRIBED AS PARCEL "B" OF LOT LINE ADJUSTMENT NO. 2883 APPROVED BY THE RIVERSIDE COUNTY PLANNING DEPARTMENT ON JANUARY 30, 1989 AND RECORDED SEPTEMBER 28, 1989 AS INSTRUMENT NO. 335272, OFFICIAL RECORDS OF RIVERSIDE COUNTY, CALIFORNIA;

TOGETHER WITH A PORTION OF THAT CERTAIN PARCEL "B" OF LOT LINE ADJUSTMENT NO. 2886 APPROVED BY RIVERSIDE COUNTY PLANNING DEPARTMENT ON JANUARY 25, 1989 AND RECORDED JUNE 19, 1989 AS INSTRUMENT NO. 201437, OFFICIAL RECORDS OF SAID COUNTY, BEING A PORTION OF PARCEL 11 OF SAID PARCEL MAP 22863 DESCRIBED AS FOLLOWS:

COMMENCING AT THE MOST NORTHERLY CORNER OF PARCEL 6 OF SAID PARCEL MAP 22863; THENCE SOUTH 37° 57' 44" WEST A DISTANCE OF 47.32 FEET TO THE TRUE POINT OF BEGINNING;

THENCE CONTINUING SOUTH 37° 57' 44" WEST A DISTANCE OF 50.99 FEET;

THENCE NORTH 52° 02' 16" WEST A DISTANCE OF 20.00 FEET;

THENCE SOUTH 37° 57' 44" WEST A DISTANCE OF 9.00 FEET;

THENCE NORTH 52° 02' 16" WEST A DISTANCE OF 27.96 FEET;

THENCE NORTH 02° 00' 00" WEST A DISTANCE OF 33.88 FEET;

THENCE NORTH 88° 00' 00" EAST A DISTANCE OF 42.15 FEET;

THENCE SOUTH 52° 02' 16" EAST A DISTANCE OF 30.47 FEET;

THENCE NORTH 82° 57' 44" EAST A DISTANCE OF 9.83 FEET TO THE TRUE POINT OF BEGINNING.

EXCEPTING THEREFROM A PORTION OF THAT CERTAIN PARCEL "B" OF SAID LOT LINE ADJUSTMENT NO. 2883 BEING A PORTION OF SAID PARCEL 6 DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST NORTHERLY CORNER OF SAID PARCEL 6;

THENCE SOUTH 52° 06' 16" EAST A DISTANCE OF 47.32 FEET;

THENCE SOUTH 82° 57' 44" WEST A DISTANCE OF 66.92 FEET;

THENCE SOUTH 37° 57' 44" EAST A DISTANCE OF 47.32 FEET TO THE TRUE POINT OF BEGINNING.

AND ALSO EXCEPTING THEREFROM A PORTION OF THAT CERTAIN PARCEL "B" OF SAID LOT LINE ADJUSTMENT NO. 2883 BEING A PORTION OF SAID PARCEL 6 DESCRIBED AS FOLLOWS:

COMMENCING AT THE MOST NORTHERLY CORNER OF SAID PARCEL 6 OF SAID PARCEL MAP 22863; THENCE SOUTH 37° 57' 44" WEST ALONG THE NORTHWESTERLY LINE OF SAID PARCEL 6 A DISTANCE OF 98.31 FEET;

THENCE NORTH 52° 02' 16" WEST A DISTANCE OF 20.00 FEET;

THENCE SOUTH 37° 57' 44" WEST A DISTANCE OF 9.00 FEET;

THENCE NORTH 52° 02' 16" WEST A DISTANCE OF 27.96 FEET TO THE TRUE POINT OF BEGINNING;

THENCE SOUTH 02° 00' 00" EAST A DISTANCE OF 86.05 FEET;

THENCE SOUTH 88° 00' 00" WEST A DISTANCE OF 31.28 FEET;

THENCE NORTH 02° 00' 00" WEST A DISTANCE OF 50.33 FEET;

THENCE NORTH 37° 57' 44" EAST A DISTANCE OF 47.47 FEET;

THENCE SOUTH 52° 02' 16" EAST A DISTANCE OF 1.04 FEET TO THE TRUE POINT OF BEGINNING.

**PARCEL 7**: (APN: 921-320-037; PROPERTY ADDRESS: 29530 RANCHO CALIFORNIA ROAD, TEMECULA, CALIFORNIA)

PARCEL 7 OF PARCEL MAP NO. 22863 IN THE COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, ACCORDING TO THE MAP RECORDED IN BOOK 150, PAGE(S) 51 THROUGH 57 INCLUSIVE OF PARCEL MAPS, RECORDS OF RIVERSIDE COUNTY, CALIFORNIA.

**PARCEL 8**: (APN: 921-320-012-2; PROPERTY ADDRESS: 27648 YNEZ ROAD, TEMECULA, CALIFORNIA)

PARCEL 8 OF PARCEL MAP NO. 22863, IN THE CITY OF TEMECULA, COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 150, PAGES 51

THROUGH 57, INCLUSIVE OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

**PARCEL 9**: (APN: 921-320-038-6; PROPERTY ADDRESS: 27644 YNEZ ROAD, TEMECULA, CALIFORNIA)

PARCEL 9 OF PARCEL MAP 22863, IN THE CITY OF TEMECULA, COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, AS SHOWN BY MAP ON FILE IN BOOK 150 OF PARCEL MAPS, PAGES 51 THROUGH 57, INCLUSIVE, RECORDS OF RIVERSIDE COUNTY, CALIFORNIA AND THAT PORTION OF PARCEL 10 OF SAID PARCEL MAP 22863 DESCRIBED AS ALL THAT PORTION OF SAID PARCEL 10 LYING SOUTHWESTERLY OF A LINE DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST NORTHERLY CORNER OF SAID PARCEL 9;
THENCE NORTH 51° 08' 34" EAST ALONG THE NORTHEASTERLY PROLONGATION OF THE NORTHWESTERLY LINE OF SAID PARCEL 9 A DISTANCE OF 13 FEET;
THENCE SOUTH 38° 51' 26" EAST, A DISTANCE OF 123.57 FEET TO THE SOUTHEASTERLY LINE OF SAID PARCEL 10.
EXCEPTING FROM SAID PARCEL 9 THAT PORTION DESCRIBED AS FOLLOWS:
BEGINNING AT THE MOST WESTERLY CORNER OF SAID PARCEL 9, SAID MOST WESTERLY CORNER ALSO BEING A POINT ON THE EASTERLY LINE OF YNEZ ROAD;
THENCE NORTH 51° 08' 34" EAST, ALONG THE NORTHWESTERLY LINE OF SAID PARCEL 9 A DISTANCE OF 12.43 FEET;
THENCE SOUTH 23° 30' 42" EAST A DISTANCE OF 9.41 FEET;
THENCE SOUTH 66° 29' 18" WEST A DISTANCE OF 12.00 FEET TO AN INTERSECTION WITH SAID EASTERLY LINE OF YNEZ ROAD, SAID INTERSECTION ALSO BEING A POINT ON A CURVE CONCAVE NORTHEASTERLY AND HAVING A RADIUS OF 1950.00 FEET, A RADIAL LINE TO SAID POINT BEARS SOUTH 66° 29' 18" WEST;
THENCE NORTHWESTERLY ALONG SAID CURVE AND EASTERLY LINE OF YNEZ ROAD THROUGH AN ANGLE OF 0°10'48" A DISTANCE OF 6.13 FEET TO THE POINT OF BEGINNING.

**PARCEL 10**: (APN: 921-320-041-8; PROPERTY ADDRESS: 27576 YNEZ ROAD, TEMECULA, CALIFORNIA)

PARCEL 10 OF PARCEL MAP 22863 AS SHOWN BY MAP ON FILE IN BOOK 150 OF PARCEL MAPS, PAGES 51 THROUGH 57, INCLUSIVE, RECORDS OF RIVERSIDE COUNTY, CALIFORNIA, AND THAT PORTION OF PARCEL 9 OF SAID PARCEL MAP 22863 DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST WESTERLY CORNER OF SAID PARCEL 9, SAID MOST WESTERLY CORNER ALSO BEING A POINT ON THE EASTERLY LINE OF YNEZ ROAD;
THENCE NORTH 51° 08' 34" EAST ALONG THE NORTHWESTERLY LINE OF SAID PARCEL 9 A DISTANCE OF 12.43 FEET;
THENCE SOUTH 23° 30' 42" EAST, A DISTANCE OF 9.41 FEET
THENCE SOUTH 66° 29' 18" WEST A DISTANCE OF 12.00 FEET TO AN INTERSECTION WITH SAID EASTERLY LINE OF YNEZ ROAD, SAID INTERSECTION ALSO BEING A POINT ON A CURVE CONCAVE NORTHEASTERLY AND HAVING A RADIUS OF 1950.00 FEET, A RADIAL LINE TO SAID POINT BEARS SOUTH 66° 29' 18" WEST;
THENCE NORTHWESTERLY ALONG SAID CURVE AND EASTERLY LINE OF YNEZ ROAD THROUGH AN ANGLE OF 0° 10' 48" A DISTANCE OF 6.13 FEET TO THE POINT OF

BEGINNING; AND THAT PORTION OF PARCEL 13 OF SAID PARCEL MAP 22863 DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST SOUTHERLY CORNER OF SAID PARCEL 13;
THENCE NORTH 38° 51' 26" WEST ALONG THE SOUTHWESTERLY LINE OF SAID PARCEL 13, 211.63 FEET TO AN ANGLE POINT THEREIN;
THENCE NORTH 80° 59' 21" EAST 4.02 FEET;
THENCE SOUTH 51° 08' 34" EAST 14.22 FEET;
THENCE SOUTH 38° 51' 26" EAST 53.33 FEET;
THENCE SOUTH 51° 08' 34" WEST 5.75 FEET;
THENCE SOUTH 38° 51' 26" EAST 16.00 FEET;
THENCE NORTH 51° 08' 34" EAST 5.75 FEET;
THENCE SOUTH 38° 51' 26" EAST 140.30 FEET TO THE SOUTHEASTERLY LINE OF SAID PARCEL 13;
THENCE SOUTH 51° 08' 34" WEST ALONG SAID SOUTHEASTERLY LINE 17.71 FEET TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM THAT PORTION OF SAID PARCEL 10 LYING SOUTHWESTERLY OF A LINE DESCRIBED AS FOLLOWS:
BEGINNING AT THE MOST NORTHERLY CORNER OF SAID PARCEL 9;
THENCE NORTH 51° 08' 34" EAST ALONG THE NORTHEASTERLY PROLONGATION OF THE NORTHWESTERLY LINE OF SAID PARCEL 9, A DISTANCE OF 13.00 FEET;
THENCE SOUTH 38° 51' 26" EAST A DISTANCE OF 123.57 FEET TO THE SOUTHEASTERLY LINE OF SAID PARCEL 10.

**<u>PARCEL 11</u>**: (APN: 921-320-052-8; PROPERTY ADDRESS: 27536 YNEZ ROAD, TEMECULA, CALIFORNIA)

THOSE PORTIONS OF PARCELS 11 AND 13 OF PARCEL MAP 22863 ON FILE IN BOOK 150 OF PARCEL MAPS, PAGES 51 THROUGH 57, INCLUSIVE, RECORDS OF RIVERSIDE COUNTY, CALIFORNIA, BEING DESCRIBED AS PARCEL "B" OF LOT LINE ADJUSTMENT NO. 2886 APPROVED BY THE RIVERSIDE COUNTY PLANNING DEPARTMENT ON JANUARY 25, 1989 AND RECORDED JUNE 19, 1989 AS INSTRUMENT NO. 201437, OFFICIAL RECORDS OF SAID COUNTY;

TOGETHER WITH THAT PORTION OF PARCEL 14 OF SAID PARCEL MAP 22863 DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST NORTHERLY CORNER OF PARCEL 11 OF SAID PARCEL MAP 22863, ALSO BEING AN ANGLE POINT IN THE SOUTHERLY LINE OF SAID PARCEL 14;
THENCE SOUTHWESTERLY ALONG THE LINE BETWEEN SAID PARCELS 14 AND 11 THE FOLLOWING SIX (6) COURSES:

1. SOUTH 37° 57' 44" WEST A DISTANCE OF 101.78 FEET;
2. NORTH 52° 02' 16" WEST A DISTANCE OF 45.00 FEET;
3. SOUTH 37° 57' 44" WEST, A DISTANCE OF 235.53 FEET;
4. SOUTH 52° 02' 16" EAST A DISTANCE OF 58.28 FEET;
5. SOUTH 02° 00' 00" EAST A DISTANCE OF 81.70 FEET;
6. SOUTH 69° 12' 59" WEST A DISTANCE OF 373.05 FEET TO A POINT ON THE EASTERLY LINE OF PARCEL 13 OF SAID PARCEL MAP 22863;

THENCE NORTH 20° 47'01" WEST ALONG SAID EASTERLY LINE A DISTANCE OF 4.70 FEET;

THENCE NORTH 46° 24' 58" EAST A DISTANCE OF 290.94 FEET;
THENCE SOUTH 43° 35' 02" EAST A DISTANCE OF 16.00 FEET;
THENCE NORTH 46° 24' 58" EAST A DISTANCE OF 116.10 FEET;
THENCE NORTH 29° 57' 49" EAST A DISTANCE OF 36.05 FEET;
THENCE NORTH 37° 57' 44" EAST A DISTANCE OF 206.18 FEET;
THENCE SOUTH 52° 02' 16" EAST A DISTANCE OF 33.20 FEET;
THENCE NORTH 37° 57' 44" EAST A DISTANCE OF 74.27 FEET;
THENCE SOUTH 52° 02' 16" EAST A DISTANCE OF 27.97 FEET TO THE POINT OF BEGINNING.

AND ALSO TOGETHER WITH A PORTION OF THAT CERTAIN PARCEL "B" OF LOT LINE ADJUSTMENT NO. 2883 APPROVED BY THE RIVERSIDE COUNTY PLANNING DEPARTMENT ON JANUARY 30, 1989 AND RECORDED SEPTEMBER 28, 1989 AS INSTRUMENT NO. 335272, OFFICIAL RECORDS OF SAID COUNTY, BEING A PORTION OF PARCEL 6 OF SAID PARCEL MAP 22863 DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST NORTHERLY CORNER OF SAID PARCEL 6;
THENCE SOUTH 52° 02' 16" EAST DISTANCE OF 47.32 FEET;
THENCE SOUTH 82° 57' 44" WEST A DISTANCE OF 66.92 FEET;
THENCE NORTH 37° 57' 44" EAST A DISTANCE OF 47.32 FEET TO THE POINT OF BEGINNING.

AND ALSO TOGETHER WITH A PORTION OF THAT CERTAIN PARCEL "B" OF SAID LOT LINE ADJUSTMENT NO. 2883 BEING A PORTION OF SAID PARCEL 6 DESCRIBED AS FOLLOWS:

COMMENCING AT THE MOST NORTHERLY CORNER OF SAID PARCEL 6 OF SAID PARCEL MAP 22863;
THENCE SOUTH 37° 57' 44" WEST ALONG THE NORTHWESTERLY LINE OF SAID PARCEL 6 A DISTANCE OF 98.31 FEET;
THENCE NORTH 52° 02' 16" WEST A DISTANCE OF 20.00 FEET;
THENCE SOUTH 37° 57' 44" WEST A DISTANCE OF 9.00 FEET;
THENCE NORTH 52° 02' 16" WEST A DISTANCE OF 27.96 FEET TO THE TRUE POINT OF BEGINNING;
THENCE SOUTH 02° 00' 00" EAST A DISTANCE OF 86.05 FEET;
THENCE SOUTH 88° 00' 00" WEST A DISTANCE OF 31.28 FEET;
THENCE NORTH 02° 00' 00" WEST A DISTANCE OF 50.33 FEET;
THENCE NORTH 37° 57' 44" EAST A DISTANCE OF 47.47 FEET;
THENCE SOUTH 52° 02' 16" EAST A DISTANCE OF 1.04 FEET TO THE TRUE POINT OF BEGINNING.

AND EXCEPTING THEREFROM A PORTION OF THAT CERTAIN PARCEL "B" OF LOT LINE ADJUSTMENT NO. 2886 APPROVED BY THE RIVERSIDE COUNTY PLANNING DEPARTMENT ON JANUARY 25, 1989 AND RECORDED JUNE 19, 1989 AS INSTRUMENT NO. 201437, OFFICIAL RECORDS OF SAID COUNTY, BEING A PORTION OF PARCEL 11 OF SAID PARCEL MAP 22863 DESCRIBED AS FOLLOWS:

COMMENCING AT THE MOST NORTHERLY CORNER OF PARCEL 6 OF SAID PARCEL MAP 22863;
THENCE SOUTH 37° 57' 44" WEST A DISTANCE OF 47.32 FEET TO THE TRUE POINT OF BEGINNING;
THENCE CONTINUING SOUTH 37° 57' 44" WEST A DISTANCE OF 50.99 FEET;
THENCE NORTH 52° 02' 16" WEST A DISTANCE OF 20.00 FEET;

THENCE SOUTH 37° 57' 44" WEST A DISTANCE OF 9.00 FEET;
THENCE NORTH 52° 02' 16" WEST A DISTANCE OF 27.96 FEET;
THENCE NORTH 02° 00' 00" WEST A DISTANCE OF 33.88 FEET;
THENCE NORTH 88° 00' 00" EAST, A DISTANCE OF 42.15 FEET;
THENCE SOUTH 52° 02' 16" EAST A DISTANCE OF 30.47 FEET;
THENCE NORTH 82° 57' 44" EAST A DISTANCE OF 9.83 FEET TO THE TRUE POINT OF BEGINNING.

**PARCEL 13**: (APN: 921-320-048-5; PROPERTY ADDRESS: 27560 YNEZ ROAD, TEMECULA, CALIFORNIA)

THAT PORTION OF PARCEL 13 OF PARCEL MAP 22863 IN THE CITY OF TEMECULA, COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, AS SHOWN BY MAP ON FILE IN BOOK 150 OF PARCEL MAPS, PAGES 51 THROUGH 57, INCLUSIVE, RECORDS OF RIVERSIDE COUNTY, CALIFORNIA, BEING DESCRIBED AS PARCEL "C" OF LOT LINE ADJUSTMENT NO. 2886 APPROVED BY THE RIVERSIDE COUNTY PLANNING DEPARTMENT ON JANUARY 25, 1989 AND RECORDED JUNE 19, 1989 AS INSTRUMENT NO. 201437, OFFICIAL RECORDS OF RIVERSIDE COUNTY, CALIFORNIA.

TOGETHER WITH THAT PORTION OF PARCEL "A" OF LOT LINE ADJUSTMENT NO. 3128, OFFICIAL RECORDS OF RIVERSIDE COUNTY, CALIFORNIA, BEING A PORTION OF CERTIFICATE OF PARCEL MERGER NO. 593 APPROVED BY THE RIVERSIDE COUNTY PLANNING DEPARTMENT ON JUNE 12, 1989 AND RECORDED JUNE 23, 1989 AS INSTRUMENT NO. 208854, OFFICIAL RECORDS OF SAID COUNTY, DESCRIBED AS FOLLOWS:

COMMENCING AT THE MOST SOUTHEASTERLY CORNER OF PARCEL 16 OF SAID PARCEL MAP 22863, SAID POINT BEING THE MOST NORTHERLY CORNER OF SAID PARCEL 13;
THENCE SOUTH 69° 12' 59" WEST ALONG A LINE BETWEEN SAID PARCELS 16 AND 13 A DISTANCE OF 143.13 FEET TO THE POINT OF BEGINNING;
THENCE CONTINUING SOUTH 69° 12' 59" WEST ALONG A LINE BETWEEN SAID PARCELS 16 AND 13 A DISTANCE OF 185.36 FEET TO A POINT ON A CURVE;
THENCE NORTHEASTERLY ALONG A CURVE TO THE LEFT WHOSE CENTER BEARS NORTH 88° 16' 59" WEST HAVING A CENTRAL ANGLE OF 05°22'29", A RADIUS OF 407.32 FEET, A DISTANCE OF 38.21 FEET AS MEASURED ALONG THE ARC;
THENCE NORTH 80° 59' 21" EAST A DISTANCE OF 176.12 FEET TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM A PORTION OF THAT CERTAIN PARCEL "C" OF SAID LOT LINE ADJUSTMENT NO. 2886, DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST SOUTHEASTERLY CORNER OF SAID PARCEL 16 AND THE MOST NORTHERLY CORNER OF SAID PARCEL 13;
THENCE SOUTH 20° 47' 01" EAST A DISTANCE OF 29.83 FEET;
THENCE SOUTH 80° 59' 21" WEST A DISTANCE OF 146.20 FEET TO A POINT ON THE NORTHWESTERLY LINE OF SAID PARCEL 13;
THENCE NORTH 69° 12' 59" EAST ALONG SAID NORTHWESTERLY LINE A DISTANCE OF 143.13 FEET TO THE POINT OF BEGINNING.
AND ALSO EXCEPTING THEREFROM A PORTION OF THAT CERTAIN PARCEL "C" OF SAID LOT LINE ADJUSTMENT NO. 2886 DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST SOUTHWESTERLY CORNER OF PARCEL 15 OF SAID PARCEL MAP 22863;
THENCE NORTHEASTERLY AND NORTHWESTERLY ALONG THE SOUTHERLY AND EASTERLY BOUNDARY OF SAID PARCEL 15, THE FOLLOWING TWO COURSES:
1. NORTH 80° 59' 21" EAST A DISTANCE OF 140.00 FEET;
2. NORTH 09°00'39" WEST A DISTANCE OF 155.00 FEET TO THE MOST SOUTHERLY CORNER OF SAID PARCEL 16 BEING A POINT ON THE WESTERLY LINE OF SAID PARCEL 13;
THENCE NORTH 69° 12' 59" EAST A DISTANCE OF 118.37 FEET TO A POINT ON CURVE;
THENCE SOUTHWESTERLY ALONG A CURVE TO THE RIGHT WHOSE CENTER BEARS NORTH 88° 16' 59" WEST HAVING A CENTRAL ANGLE OF 11° 56' 30", A RADIUS OF 407.32 FEET, A DISTANCE OF 84.89 FEET, AS MEASURED ALONG THE ARC TO A POINT OF REVERSE CURVE;
THENCE SOUTHWESTERLY ALONG A CURVE TO THE LEFT HAVING A CENTRAL ANGLE OF 16° 19' 35", A RADIUS OF 407.32 FEET, A DISTANCE OF 116.06 FEET AS MEASURED ALONG THE ARC;
THENCE SOUTH 80° 59' 21" WEST A DISTANCE OF 164.56 FEET;
THENCE NORTH 78° 47' 10" WEST A DISTANCE OF 40.50 FEET TO THE POINT OF BEGINNING.

**PARCEL 14**: (APN: 921-320-056-2; PROPERTY ADDRESS: 27520 YNEZ ROAD, TEMECULA, CALIFORNIA)

PARCEL 14 OF PARCEL MAP 22863 AS SHOWN BY MAP ON FILE IN BOOK 150 OF PARCEL MAPS, PAGES 51 THROUGH 57, INCLUSIVE, RECORDS OF RIVERSIDE COUNTY, CALIFORNIA;

TOGETHER WITH THAT PORTION OF CERTIFICATE OF PARCEL MERGER NO. 593 APPROVED BY THE RIVERSIDE COUNTY PLANNING DEPARTMENT ON JUNE 12, 1989 AND RECORDED JUNE 23, 1989 AS INSTRUMENT NO. 208854, OFFICIAL RECORDS OF SAID COUNTY, BEING A PORTION OF PARCEL 17 OF SAID PARCEL MAP 22863 DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST NORTHERLY CORNER OF SAID PARCEL 17;
THENCE SOUTHERLY ALONG THE LINE BETWEEN PARCEL 17 AND PARCEL 14 OF SAID PARCEL MAP 22863 THE FOLLOWING SIX (6) COURSES:
1. SOUTH 52° 02' 16" EAST A DISTANCE OF 150.41 FEET;
2. SOUTH 37° 57' 44" WEST A DISTANCE OF 180.00 FEET;
3. SOUTH 52° 02' 16" EAST A DISTANCE OF 45.00 FEET;
4. SOUTH 37° 57' 44" WEST A DISTANCE OF 40.00 FEET;
5. SOUTH 20° 47' 01" EAST A DISTANCE OF 55.00 FEET;
6. SOUTH 69° 12' 59" WEST A DISTANCE OF 131.37 FEET TO A POINT ON THE SOUTHERLY LINE OF PARCEL 17 OF SAID PARCEL MAP 22863;
THENCE NORTH 00° 30' 00" WEST A DISTANCE OF 28.61 FEET TO A POINT ON A CURVE;
THENCE NORTHEASTERLY ALONG A CURVE TO THE LEFT WHOSE CENTER BEARS NORTH 20° 51' 00" WEST HAVING A CENTRAL ANGLE OF 8° 06' 19" A RADIUS OF 150.00 FEET, A DISTANCE OF 21.22 FEET MEASURED ALONG THE ARC TO A POINT OF REVERSE CURVE;
THENCE NORTHEASTERLY ALONG A CURVE TO THE RIGHT HAVING A CENTRAL ANGLE OF 22° 27' 19" A RADIUS OF 150.00 FEET A DISTANCE OF 58.79 FEET MEASURED ALONG THE ARC TO A POINT OF TANGENCY;

THENCE NORTH 83° 30' 00" EAST A DISTANCE OF 20.97 FEET;
THENCE NORTH 1° 44' 11" WEST, A DISTANCE OF 298.94 FEET;
THENCE NORTH 20° 47' 01" WEST A DISTANCE OF 33.55 FEET TO A POINT ON THE NORTH LINE OF SAID PARCEL 17;
THENCE NORTH 69° 12' 59" EAST ALONG SAID NORTH LINE A DISTANCE OF 10.79 FEET TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM THAT PORTION OF PARCEL 14 OF SAID PARCEL MAP 22863 DESCRIBED AS FOLLOWS:

COMMENCING AT THE MOST EASTERLY CORNER OF SAID PARCEL 16 OF SAID PARCEL MAP 22863;
THENCE NORTH 20° 47' 01" WEST A DISTANCE OF 2.83 FEET TO THE TRUE POINT OF BEGINNING;
THENCE CONTINUING NORTH 20° 47' 01" WEST A DISTANCE OF 172.17 FEET;
THENCE NORTH 69° 12' 59" EAST, A DISTANCE OF 63.63 FEET;
THENCE SOUTH 00° 30' 00" EAST A DISTANCE OF 183.55 FEET TO THE TRUE POINT OF BEGINNING;

AND ALSO EXCEPTING THEREFROM THAT PORTION OF SAID PARCEL 14 DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST NORTHERLY CORNER OF PARCEL 11 OF SAID PARCEL MAP 22863 ALSO BEING AN ANGLE POINT IN THE SOUTHERLY LINE OF SAID PARCEL 14;
THENCE SOUTHWESTERLY ALONG THE LINE BETWEEN SAID PARCELS 14 AND 11 THE FOLLOWING SIX (6) COURSES:

1. SOUTH 37° 57' 44" WEST A DISTANCE OF 101.78 FEET;
2. NORTH 52° 02' 16" WEST A DISTANCE OF 45.00 FEET;
3. SOUTH 37° 57' 44" WEST A DISTANCE OF 235.53 FEET;
4. SOUTH 52° 02' 16" EAST A DISTANCE OF 58.28 FEET;
5. SOUTH 02° 00' 00" EAST A DISTANCE OF 81.70 FEET;
6. SOUTH 69° 12' 59" WEST A DISTANCE OF 373.05 FEET TO A POINT ON THE EASTERLY LINE OF PARCEL 13 OF SAID PARCEL MAP 22863;

THENCE NORTH 20° 47' 01" WEST ALONG SAID EASTERLY LINE A DISTANCE OF 4.70 FEET;
THENCE NORTH 46° 24' 58" EAST A DISTANCE OF 290.94 FEET;
THENCE SOUTH 43° 35' 02" EAST A DISTANCE OF 16.00 FEET;
THENCE NORTH 46° 24' 58" EAST A DISTANCE OF 116.10 FEET;
THENCE NORTH 29° 57' 49" EAST A DISTANCE OF 36.05 FEET;
THENCE NORTH 37° 57' 44" EAST, A DISTANCE OF 206.18 FEET;
THENCE SOUTH 52° 02' 16" EAST A DISTANCE OF 33.20 FEET;
THENCE NORTH 37° 57' 44" EAST A DISTANCE OF 74.27 FEET;
THENCE SOUTH 52° 02' 16" EAST A DISTANCE OF 27.97 FEET TO THE POINT OF BEGINNING.

ALSO EXCEPTING THEREFROM THAT PORTION OF PARCEL B OF LOT LINE ADJUSTMENT NO. 3128 RECORDED JULY 24, 1990, AS INSTRUMENT NO. 272427 OF OFFICIAL RECORDS OF RIVERSIDE COUNTY, CALIFORNIA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST NORTHERLY CORNER OF SAID PARCEL B OF LOT LINE ADJUSTMENT NO. 3128, ALSO BEING THE MOST NORTHERLY CORNER OF PARCEL 14 OF

PARCEL MAP 22863 AS SHOWN BY MAP ON FILE IN BOOK 150, PAGES 51 THROUGH 57 OF PARCEL MAPS, RIVERSIDE COUNTY RECORDS;
THENCE SOUTH 52° 04' 31" EAST ALONG THE EASTERLY LINE OF SAID PARCEL B SHOWN ON LOT LINE ADJUSTMENT NO. 3128 AND PARCEL 14 OF PARCEL MAP 22863 AS SOUTH 52° 02' 16" EAST A DISTANCE OF 1,006.94 FEET TO THE TRUE POINT OF BEGINNING.
THENCE SOUTH 52° 04' 31" EAST ALONG THE EASTERLY LINE OF SAID PARCEL 14 OF PARCEL MAP 22863 A DISTANCE OF 366.64 FEET TO THE BEGINNING OF A NON-TANGENT CURVE, CONCAVE SOUTHERLY, HAVING A RADIUS OF 4,055.00 FEET AND A RADIAL BEARING OF SOUTH 33° 04' 38" EAST, SAID POINT ALSO BEING ON THE NORTHERLY RIGHT-OF-WAY LINE OF RANCHO CALIFORNIA ROAD;
THENCE SOUTHWESTERLY ALONG SAID NON-TANGENT CURVE AND RIGHT-OF-WAY LINE THROUGH A CENTRAL ANGLE OF 01° 46' 18" AN ARC LENGTH OF 125.40 FEET;
THENCE LEAVING SAID RIGHT-OF-WAY LINE NORTH 34° 52' 00" WEST A DISTANCE OF 158.63 FEET;
THENCE NORTH 29° 46' 17" WEST A DISTANCE OF 190.36 FEET TO THE TRUE POINT OF BEGINNING.

**<u>PARCEL 15</u>**: (APN: 921-320-060-5; PROPERTY ADDRESS: 27450 YNEZ ROAD, TEMECULA, CALIFORNIA)

PARCEL A, AS SHOWN AND DESCRIBED IN THE NOTICE OF LOT LINE ADJUSTMENT AS EVIDENCED BY DOCUMENT RECORDED JULY 16, 1999 AS INSTRUMENT NO. 1999-319192 OF OFFICIAL RECORDS, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEING THAT CERTAIN PARCEL OF LAND DESCRIBED IN GRANT DEED RECORDED MAY 15, 1998 AS INSTRUMENT NO. 197157, TOGETHER WITH A PORTION OF THAT CERTAIN PARCEL OF LAND DESCRIBED AS PARCEL "1" IN GRANT DEED RECORDED DECEMBER 18, 1997 AS INSTRUMENT NO. 464346 ALL IN THE OFFICE OF THE RIVERSIDE COUNTY RECORDER, RIVERSIDE, CALIFORNIA, DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST WESTERLY CORNER OF THAT PARCEL OF LAND DESCRIBED IN SAID INSTRUMENT NO. 197157, SAID POINT ALSO BEING THE MOST WESTERLY CORNER OF PARCEL 15 AND ON THE EASTERLY RIGHT OF WAY LINE OF YNEZ ROAD AS SHOWN ON PARCEL MAP NO. 22863 RECORDED IN PARCEL MAP BOOK 150, PAGES 51 THROUGH 57 INCLUSIVE RECORDS OF RIVERSIDE COUNTY, CALIFORNIA; THENCE, ON THE EASTERLY RIGHT OF WAY LINE OF YNEZ ROAD, SOUTH 09° 00' 39" EAST, 487.36 FEET; THENCE LEAVING SAID RIGHT OF WAY LINE, SOUTH 78° 47' 10" EAST, 40.50 FEET; THENCE NORTH 80° 59' 21" EAST, 164.58 FEET TO THE BEGINNING OF A NON TANGENT CURVE CONCAVE EASTERLY AND HAVING A RADIUS OF 407.32 FEET, A RADIAL LINE TO SAID POINT BEARS NORTH 87° 19' 56" EAST; THENCE NORTHERLY ON SAID CURVE THROUGH A CENTRAL ANGLE OF 16° 19' 35", 116.07 FEET TO A POINT OF REVERSE CURVATURE TO WHICH A RADIAL LINE BEARS NORTH 76° 20' 29" WEST; THENCE, NORTHERLY ON SAID CURVE THROUGH A CENTRAL ANGLE OF 22° 40' 10", 161.16 FEET; THENCE NORTH 10° 12' 18" WEST, 143.93 FEET, TO THE BEGINNING OF A CURVE CONCAVE EASTERLY HAVING A RADIUS OF 95.00 FEET; THENCE, NORTHEASTERLY ON SAID CURVE THROUGH A CENTRAL ANGLE OF 09° 45' 47" 16.19 FEET TO A POINT ON A NON-TANGENT LINE TO WHICH A RADIAL LINE BEARS NORTH 89° 14' 52" WEST;
THENCE, NORTH 53° 44' 11" WEST, 91.76 FEET;
THENCE, NORTH 36° 15' 49" EAST, 29.00 FEET;
THENCE, NORTH 53° 44' 11" WEST, 42.76 FEET;

THENCE, NORTH 57° 46' 44" WEST, 25.24 FEET;
THENCE, SOUTH 72° 21' 20" WEST, 61.11 FEET;
THENCE, NORTH 01° 04' 16" WEST, 55.54 FEET;
THENCE, NORTH 77° 56' 08" EAST, 12.22 FEET;
THENCE, NORTH 30° 36' 41" EAST, 27.84 FEET;
THENCE, NORTH 59° 22' 04" WEST, 42.34 FEET;
THENCE, NORTH 28° 20' 07" WEST, 42.25 FEET;
THENCE, SOUTH 54° 08' 29" EAST, 12.70 FEET;
THENCE, SOUTH 01° 04' 16" EAST, 65.32 FEET;
THENCE, SOUTH 72° 21' 20" WEST, 35.13 FEET;
THENCE, SOUTH 35° 50' 34" WEST, 60.16 FEET;
THENCE, SOUTH 80° 59' 21" WEST, 10.00 FEET TO THE TRUE POINT OF BEGINNING.

**PARCEL 16**: (APN: 921-320-058-4; PROPERTY ADDRESS: 27468 YNEZ ROAD, TEMECULA, CALIFORNIA)

THOSE PORTIONS OF PARCELS 13, 14, 16 AND 17 OF PARCEL MAP 22863 ON FILE IN BOOK 150 OF PARCEL MAPS, PAGES 51 THROUGH 57, INCLUSIVE, RECORDS OF RIVERSIDE COUNTY, CALIFORNIA, DESCRIBED AS PARCEL "B" IN NOTICE OF LOT LINE ADJUSTMENT NO. PA99-0183, BY THE CITY OF TEMECULA, RECORDED JULY 16, 1999 AS INSTRUMENT NO. 1999-319192, OFFICIAL RECORDS, BEING A PORTION OF THAT CERTAIN PARCEL OF LAND DESCRIBED AS PARCEL "I" IN GRANT DEED RECORDED DECEMBER 18, 1997 AS INSTRUMENT NO. 464346 IN THE OFFICE OF THE RIVERSIDE COUNTY RECORDER, RIVERSIDE CALIFORNIA, DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST WESTERLY CORNER OF THAT PARCEL OF LAND DESCRIBED IN SAID INSTRUMENT NO. 464346, SAID POINT ALSO BEING THE MOST WESTERLY CORNER OF PARCEL 15 AND ON THE EASTERLY RIGHT OF WAY LINE OF YNEZ ROAD AS SHOWN ON PARCEL MAP NO. 22863 RECORDED IN PARCEL MAP BOOK 150 PAGES 51 THROUGH 57, INCLUSIVE, RECORDS OF RIVERSIDE COUNTY, CALIFORNIA;
THENCE, ON THE EASTERLY RIGHT OF WAY LINE OF YNEZ ROAD, NORTH 09° 00' 39" WEST, 160.63 FEET TO THE NORTH LINE OF SAID PARCEL MAP NO. 22863;
THENCE, ON THE NORTH LINE OF SAID PARCEL MAP, NORTH 69° 12' 56" EAST, 754.23 FEET;
THENCE, LEAVING SAID LINE, SOUTH 20° 47' 01" EAST, 33.55 FEET;
THENCE, SOUTH 01° 44' 11" EAST, 298.94 FEET;
THENCE, SOUTH 83° 30' 00" WEST, 20.97 FEET TO THE BEGINNING OF A CURVE CONCAVE SOUTHEASTERLY AND HAVING A RADIUS OF 150.00 FEET;
THENCE, SOUTHWESTERLY ON SAID CURVE THROUGH A CENTRAL ANGLE OF 22° 27' 19", 58.79 FEET TO THE BEGINNING OF A REVERSE CURVE CONCAVE NORTHWESTERLY AND HAVING A RADIUS OF 150.00 FEET, A RADIAL LINE TO SAID POINT BEARS NORTH 28° 57' 19" WEST;
THENCE, SOUTHWESTERLY ON SAID CURVE THROUGH A CENTRAL ANGLE OF 08° 06' 19", 21.22 FEET TO A POINT ON A NON-TANGENT LINE, TO WHICH A RADIAL LINE BEARS NORTH 20° 51' 00" WEST;
THENCE, SOUTH 00° 30' 00" EAST, 212.16 FEET;
THENCE, SOUTH 20° 47' 01" EAST, 2.83 FEET; (USE RECORD DATA)
THENCE, SOUTH 20° 47' 01" EAST, 29.83 FEET;
THENCE, SOUTH 80° 59' 21" WEST, 322.32 FEET TO A POINT ON A NON-TANGENT CURVE CONCAVE WESTERLY AND HAVING A RADIUS OF 407.32 FEET, A RADIAL LINE TO SAID POINT BEARS NORTH 86° 20' 35" EAST;

THENCE, NORTHERLY ON SAID CURVE THROUGH A CENTRAL ANGLE OF 05° 21' 14", 38.06 FEET;
THENCE, NORTH 10° 12' 18" WEST, 143.93 FEET TO THE BEGINNING OF A CURVE CONCAVE EASTERLY AND HAVING A RADIUS OF 95.00 FEET;
THENCE, NORTHERLY ON SAID CURVE THROUGH A CENTRAL ANGLE OF 09° 45' 47", 16.19 FEET;
THENCE, NORTH 53° 44' 11" WEST, 91.76 FEET;
THENCE, NORTH 36° 15' 49" EAST, 29.00 FEET;
THENCE, NORTH 53° 44' 11" WEST, 42.76 FEET;
THENCE, NORTH 57° 46' 44" WEST, 25.24 FEET;
THENCE, SOUTH 72° 21' 20" WEST, 61.11 FEET;
THENCE, NORTH 01° 04' 16" WEST, 55.54 FEET;
THENCE, NORTH 77° 56' 08" EAST, 12.22 FEET;
THENCE, NORTH 30° 36' 41" EAST, 27.84 FEET;
THENCE, NORTH 59° 22' 04" WEST, 42.34 FEET;
THENCE, SOUTH 28° 20' 07" WEST, 42.25 FEET;
THENCE, SOUTH 54° 08' 29" EAST, 12.70 FEET;
THENCE, SOUTH 01° 04' 16" EAST, 65.32 FEET;
THENCE, SOUTH 72° 21' 20" WEST, 35.13 FEET;
THENCE, SOUTH 35° 50' 34" WEST, 60.16 FEET;
THENCE, SOUTH 80° 59' 21" WEST, 10.00 FEET TO THE POINT OF BEGINNING.

# EXHIBIT T

## Redeveloped Truck Turn Around Area






953082.10/OC
371879-00002/3-31-14//mrf

EXHIBIT T

**EXHIBIT X-2**

**ALTERNATIVE SITE PLAN**

[See Attached]




| | | | | |
|---|---|---|---|---|
| SHEET 1 OF 1 | SCALE: 1" = 60' | TEMECULA TOWN CENTER EXHIBIT | JRN CIVIL ENGINEERS | REVISIONS: |
| | DATE: 11/20/12 | ADDRESS: 29720 RANCHO CALIFORNIA ROAD TEMECULA, CA | 232 AVENIDA FABRICANTE, SUITE 107 SAN CLEMENTE, CALIFORNIA 92672 | |
| FILE NO. 12274 | DRAWN BY: ACM | | TEL.: (949) 248-4685 FAX: (949) 248-4687 | |
| | CHKD. BY: JLM | CLIENT: LNR PARTNERS, LLC | | |

# EXHIBIT C

Statement of Operations
11/30/2010

| | CURRENT PERIOD | PERCENT | YEAR TO DATE | PERCENT |
|---|---|---|---|---|
| INCOME | | | | |
| RENTAL OPERATIONS | | | | |
| BASE RENTAL REVENUE | $ 103,562 | 100 | $ 1,076,274 | 98 |
| OPERATING EXP RECOVERIES | (486) | 0 | 1,700 | 0 |
| MAINTENANCE REIMBURSEMENT | 505 | 0 | 861 | 0 |
| SUBTOTAL | 103,581 | 100 | 1,078,835 | 99 |
| OTHER INCOME | | | | |
| INTEREST INCOME | 0 | 0 | 5 | 0 |
| LATE CHARGE INCOME | 0 | 0 | 14,937 | 1 |
| SUBTOTAL | 0 | 0 | 14,942 | 1 |
| TOTAL REVENUE | $ 103,581 | 100 | $ 1,093,777 | 100 |

Statement of Operations
11/30/2010

| | CURRENT PERIOD | PERCENT | YEAR TO DATE | PERCENT |
|---|---|---|---|---|
| OPERATING EXPENSES | | | | |
| REPAIRS & MAINTENANCE | | | | |
| HVAC REPAIRS | $ 3,799 | 4 | $ 22,835 | 2 |
| HVAC CONTRACT SERVICES | 168 | 0 | 12,415 | 1 |
| ASSOCIATION DUES | 9,237 | 9 | 134,288 | 12 |
| REPAIRS & MAINTENANCE | 2,323 | 2 | 22,165 | 2 |
| R&M SUPPLIES | 4 | 0 | 348 | 0 |
| PLUMBING REPAIRS | 50 | 0 | 1,682 | 0 |
| LOCKS & KEYS | 659 | 1 | 4,978 | 0 |
| ELEVATOR MAINTENANCE | 1,034 | 1 | 7,152 | 1 |
| ROOF REPAIRS | 0 | 0 | 1,595 | 0 |
| TOTAL REPAIRS & MAINT | 17,274 | 17 | 207,458 | 19 |
| JANITORIAL | | | | |
| JANITORIAL CONTRACT | 3,125 | 3 | 34,139 | 3 |
| JANITORIAL SUPPLIES | 549 | 1 | 6,979 | 1 |
| DAY PORTER | 1,256 | 1 | 16,730 | 2 |
| WINDOW CLEANING | 2,290 | 2 | 4,540 | 0 |
| TOTAL JANITORIAL | 7,220 | 7 | 62,388 | 6 |
| LOT, LANDSCAPE & TRASH | | | | |
| LOT SWEEPING | 0 | 0 | 180 | 0 |
| PEST CONTROL | 501 | 0 | 5,811 | 1 |
| LANDSCAPING CONTRACT | 175 | 0 | 1,925 | 0 |
| LANDSCAPE - OTHER | 566 | 1 | 1,256 | 0 |
| TRASH | 845 | 1 | 9,441 | 1 |
| FOUNTAIN MAINTENANCE | 80 | 0 | 880 | 0 |
| TOTAL LOT, LANDSC & TRASH | 2,167 | 2 | 19,493 | 2 |
| UTILITIES | | | | |
| ELECTRICITY | 8,831 | 9 | 55,427 | 5 |
| WATER/SEWER | 1,284 | 1 | 6,781 | 1 |
| GAS | 3 | 0 | 2,769 | 0 |
| TOTAL UTILITIES | 10,118 | 10 | 64,977 | 6 |
| SECURITY & LIFE SAFETY | | | | |
| FIRE ALARM MONITORING | 320 | 0 | 4,044 | 0 |
| FIRE SAFETY CONTRACT | 0 | 0 | 622 | 0 |
| TOTAL SECURITY LIFE SAFE | 320 | 0 | 4,666 | 0 |

TE[illegible]ORAT[illegible]TER

Statement of Operations
11/30/2010

| | CURRENT PERIOD | PERCENT | YEAR TO DATE | PERCENT |
|---|---|---|---|---|
| ADMINISTRATIVE EXPENSES | | | | |
| OFFICE POSTAGE & DELIVERY | $ 200 | 0 | $ 498 | 0 |
| OFFICE SUPPLIES | 0 | 0 | 258 | 0 |
| TOTAL ADMINISTRATIVE | 200 | 0 | 756 | 0 |
| MANAGEMENT FEES | | | | |
| BASE MANAGEMENT FEES | 3,901 | 4 | 39,467 | 4 |
| TOTAL MANAGEMENT FEES | 3,901 | 4 | 39,467 | 4 |
| PROPERTY TAXES | | | | |
| PROPERTY TAXES | 0 | 0 | 46,308 | 4 |
| TOTAL PROPERTY TAXES | 0 | 0 | 46,308 | 4 |
| SUBTOTAL | 0 | 0 | 46,308 | 4 |
| INSURANCE | | | | |
| TOTAL DIRECT EXPENSES | 41,200 | 40 | 445,513 | 41 |
| INDIRECT EXPENSES | | | | |
| GENERAL & ADMINISTRATIVE | | | | |
| TENANT MAINTENANCE EXP | 143 | 0 | (1,690) | 0 |
| LEGAL | 0 | 0 | 4,669 | 0 |
| TENANT IMPROVEMENT EXP | 1,163 | 1 | 4,835 | 0 |
| MARKETING | 923 | 1 | 2,905 | 0 |
| BANK SERVICE CHARGES | 0 | 0 | 679 | 0 |
| FTB - FEES | 0 | 0 | 1,600 | 0 |
| PROFESSIONAL FEES | 0 | 0 | 18,050 | 2 |
| SUBTOTAL | 2,229 | 2 | 31,048 | 3 |
| TOTAL INDIRECT EXPENSES | 2,229 | 2 | 31,048 | 3 |
| TOTAL EXPENSES | 43,429 | 42 | 476,561 | 44 |
| NET OPERATING INCOME | 60,152 | 58 | 617,216 | 56 |

TEMECULA CORPORATE PLAZA CENTER

Statement of Operations
11/30/2010

| | CURRENT PERIOD | PERCENT | YEAR TO DATE | PERCENT |
|---|---|---|---|---|
| DEBT SERVICE | | | | |
| INTEREST | $ 0 | 0 | $ 134,519 | 12 |
| SUBTOTAL | 0 | 0 | 134,519 | 12 |
| TOTAL CASH FLOW | $ 60,152 | 58 | $ 482,697 | 44 |

Database: CBRE
ENTITY: EEY001

Cash

**Comparative Income Statement**
**LNR Partners**
**CBRE**
**Temecula Corporate Plaza**

Page: 1
Date: 1/10/2012
Time: 12:13 PM

| | Current Period | | | | Year-To-Date | | | |
|---|---|---|---|---|---|---|---|---|
| Thru: | Actual Dec 2011 | Budget Dec 2011 | Variance | | Actual Dec 2011 | Budget Dec 2011 | Variance | |
| REVENUE | | | | | | | | |
| RENTAL OPERATIONS | | | | | | | | |
| TENANT RENTS | 99,522.31 | 91,769.00 | 7,753.31 | 8.45% | 578,075.48 | 553,593.00 | 24,482.48 | 4.42% |
| OTHER RENTAL OPERATIONS | 0.00 | 0.00 | 0.00 | 0.00% | 201.55 | 0.00 | 201.55 | 0.00% |
| TOTAL RENTAL OPERATIONS | 99,522.31 | 91,769.00 | 7,753.31 | 8.45% | 578,277.03 | 553,593.00 | 24,684.03 | 4.46% |
| EXPENSE RECOVERIES | | | | | | | | |
| REIMB-UTILITIES | 1,035.48 | 0.00 | 1,035.48 | 0.00% | 5,731.25 | 0.00 | 5,731.25 | 0.00% |
| TOTAL EXPENSE RECOVERIES | 1,035.48 | 0.00 | 1,035.48 | | 5,731.25 | 0.00 | 5,731.25 | |
| TOTAL REVENUES | 100,557.79 | 91,769.00 | 8,788.79 | 9.58% | 584,008.28 | 553,593.00 | 30,415.28 | 5.49% |
| OPERATING EXPENSES | | | | | | | | |
| UTILITIES | | | | | | | | |
| ELECTRIC | 6,855.25 | 4,500.00 | (2,355.25) | -52.34% | 32,180.00 | 34,000.00 | 1,820.00 | 5.35% |
| GAS | 31.27 | 550.00 | 518.73 | 94.31% | 81.31 | 1,200.00 | 1,118.69 | 93.22% |
| WATER AND SEWER | 694.58 | 600.00 | (94.58) | -15.76% | 3,822.16 | 3,975.00 | 152.84 | 3.85% |
| TRASH REMOVAL | 1,038.21 | 845.00 | (193.21) | -22.87% | 5,385.18 | 5,070.00 | (315.18) | -6.22% |
| TOTAL UTILITIES | 8,619.31 | 6,495.00 | (2,124.31) | -32.71% | 41,468.65 | 44,245.00 | 2,776.35 | 6.27% |
| JANITORIAL | | | | | | | | |
| CONTRACT SERV-JANITORIAL | 5,085.87 | 5,600.00 | 514.13 | 9.18% | 30,209.82 | 34,000.00 | 3,790.18 | 11.15% |
| SUPPLIES-JANITORIAL | 740.45 | 700.00 | (40.45) | -5.78% | 5,515.00 | 4,200.00 | (1,315.00) | -31.31% |
| JANITORIAL-OTHER | 6,850.00 | 0.00 | (6,850.00) | 0.00% | 7,430.00 | 11,200.00 | 3,770.00 | 33.66% |
| TOTAL JANITORIAL | 12,676.32 | 6,300.00 | (6,376.32) | -101.21% | 43,154.82 | 49,400.00 | 6,245.18 | 12.64% |
| ELEVATOR | | | | | | | | |
| CONTRACT SERV - ELEVATOR | 2,621.75 | 650.00 | (1,971.75) | -303.35% | 2,786.37 | 4,125.00 | 1,338.63 | 32.45% |
| TOTAL ELEVATOR | 2,621.75 | 650.00 | (1,971.75) | -303.35% | 2,786.37 | 4,125.00 | 1,338.63 | 32.45% |

Database: CBRE
ENTITY: EEY001

Cash

**Comparative Income Statement**
**LNR Partners**
**CBRE**
**Temecula Corporate Plaza**

Page: 2
Date: 1/10/2012
Time: 12:13 PM

| Thru: | Current Period Actual Dec 2011 | Current Period Budget Dec 2011 | Current Period Variance | | Year-To-Date Actual Dec 2011 | Year-To-Date Budget Dec 2011 | Year-To-Date Variance | |
|---|---|---|---|---|---|---|---|---|
| HVAC | | | | | | | | |
| CONTRACT SERVICES-HVAC | 3,241.25 | 3,725.00 | 483.75 | 12.99% | 13,228.70 | 23,100.00 | 9,871.30 | 42.73% |
| TOTAL HVAC | 3,241.25 | 3,725.00 | 483.75 | 12.99% | 13,228.70 | 23,100.00 | 9,871.30 | 42.73% |
| REPAIRS AND MAINTENANCE | | | | | | | | |
| ROOF REPAIRS | 3,200.00 | 0.00 | (3,200.00) | 0.00% | 3,830.00 | 4,400.00 | 570.00 | 12.95% |
| ELECTRICAL REPAIRS | 0.00 | 400.00 | 400.00 | 100.00% | 289.60 | 2,400.00 | 2,110.40 | 87.93% |
| PLUMBING REPAIRS | 65.00 | 200.00 | 135.00 | 67.50% | 392.86 | 1,850.00 | 1,457.14 | 78.76% |
| INT. REPAIR AND MAINT | 0.00 | 0.00 | 0.00 | 0.00% | 38.34 | 0.00 | (38.34) | 0.00% |
| FIRE AND SAFETY | 605.48 | 1,925.00 | 1,319.52 | 68.55% | 2,557.48 | 4,120.00 | 1,562.52 | 37.93% |
| PAINTING | 11,000.00 | 0.00 | (11,000.00) | 0.00% | 11,842.77 | 7,250.00 | (4,592.77) | -63.35% |
| REPAIR AND MAINT-OTHER | 2,400.00 | 750.00 | (1,650.00) | -220.00% | 11,825.83 | 10,340.00 | (1,485.83) | -14.37% |
| KEYS & LOCKS | 65.00 | 150.00 | 85.00 | 56.67% | 1,628.05 | 900.00 | (728.05) | -80.89% |
| TOTAL REPAIRS AND MAINTENANCE | 17,335.48 | 3,425.00 | (13,910.48) | -406.15% | 32,404.93 | 31,260.00 | (1,144.93) | -3.66% |
| LOT AND LANDSCAPE | | | | | | | | |
| CONTRACT SERV-LOT SWEEP | 180.00 | 180.00 | 0.00 | 0.00% | 1,080.00 | 1,080.00 | 0.00 | 0.00% |
| PEST CONTROL | 1,512.00 | 501.00 | (1,011.00) | -201.80% | 3,399.45 | 3,006.00 | (393.45) | -13.09% |
| CONTRACT SERV-LANDSCAPE | 13,457.55 | 875.00 | (12,582.55) | -1438.01% | 17,668.30 | 10,300.00 | (7,368.30) | -71.54% |
| REPAIRS & MAINT-LNSCPNG | 0.00 | 0.00 | 0.00 | 0.00% | 612.00 | 0.00 | (612.00) | 0.00% |
| LOT AND LANDSCAPE-OTHER | 0.00 | 180.00 | 180.00 | 100.00% | 1,426.51 | 1,080.00 | (346.51) | -32.08% |
| TOTAL LOT AND LANDSCAPE | 15,149.55 | 1,736.00 | (13,413.55) | -772.67% | 24,186.26 | 15,466.00 | (8,720.26) | -56.38% |
| PROPERTY MANAGEMENT EXPENSE | | | | | | | | |
| MANAGEMENT FEE | 3,500.00 | 3,441.00 | (59.00) | -1.71% | 20,435.78 | 20,760.00 | 324.22 | 1.56% |
| OTHER-BANK SVC CHRG | 15.55 | 0.00 | (15.55) | 0.00% | 157.66 | 0.00 | (157.66) | 0.00% |
| TOTAL PROPERTY MANAGEMENT EXPENSE | 3,515.55 | 3,441.00 | (74.55) | -2.17% | 20,593.44 | 20,760.00 | 166.56 | 0.80% |
| PROPERTY TAXES | | | | | | | | |
| PROPERTY TAXES | 0.00 | 47,003.00 | 47,003.00 | 100.00% | 46,658.89 | 47,003.00 | 344.11 | 0.73% |
| TOTAL PROPERTY TAXES | 0.00 | 47,003.00 | 47,003.00 | 100.00% | 46,658.89 | 47,003.00 | 344.11 | 0.73% |

Database: CBRE
ENTITY: EEY001

Cash

**Comparative Income Statement**
**LNR Partners**
**CBRE**
**Temecula Corporate Plaza**

Page: 3
Date: 1/10/2012
Time: 12:13 PM

| Thru: | Current Period Actual Dec 2011 | Current Period Budget Dec 2011 | Current Period Variance | | Year-To-Date Actual Dec 2011 | Year-To-Date Budget Dec 2011 | Year-To-Date Variance | |
|---|---|---|---|---|---|---|---|---|
| INSURANCE | | | | | | | | |
| PROP DAMAGE AND LIAB | 0.00 | 0.00 | 0.00 | 0.00% | 0.00 | 44,119.00 | 44,119.00 | 100.00% |
| EARTHQUAKE AND FLOOD | 0.00 | 0.00 | 0.00 | 0.00% | 6,652.00 | 0.00 | (6,652.00) | 0.00% |
| TOTAL INSURANCE | 0.00 | 0.00 | 0.00 | | 6,652.00 | 44,119.00 | 37,467.00 | 84.92% |
| PARKING | | | | | | | | |
| PARKING REPAIRS | 0.00 | 150.00 | 150.00 | 100.00% | 3,025.00 | 3,775.00 | 750.00 | 19.87% |
| TOTAL PARKING EXPENSE | 0.00 | 150.00 | 150.00 | 100.00% | 3,025.00 | 3,775.00 | 750.00 | 19.87% |
| TOTAL OPERATING EXPENSE | 63,159.21 | 72,925.00 | 9,765.79 | 13.39% | 234,159.06 | 283,253.00 | 49,093.94 | 17.33% |
| NET OPERATING INCOME | 37,398.58 | 18,844.00 | 18,554.58 | 98.46% | 349,849.22 | 270,340.00 | 79,509.22 | 29.41% |
| GENERAL AND ADMINISTRATIVE | | | | | | | | |
| GENERAL & ADMINISTRATIVE | 0.00 | 50.00 | 50.00 | 100.00% | 30.72 | 150.00 | 119.28 | 79.52% |
| LEGAL FEES | 1,251.50 | 0.00 | (1,251.50) | 0.00% | 1,251.50 | 0.00 | (1,251.50) | 0.00% |
| PROFESSIONAL FEES-OTHER | 3,077.00 | 0.00 | (3,077.00) | 0.00% | 5,597.00 | 5,350.00 | (247.00) | -4.62% |
| GEN & ADMIN-OTHER | 65.71 | 35.00 | (30.71) | -87.74% | 390.14 | 210.00 | (180.14) | -85.78% |
| TOTAL GENERAL AND ADMINISTRATIVE | 4,394.21 | 85.00 | (4,309.21) | -5069.66% | 7,269.36 | 5,710.00 | (1,559.36) | -27.31% |
| OTHER INCOME AND EXPENSES | | | | | | | | |
| TENANT SPACE REFURB. | 0.00 | 99,190.00 | 99,190.00 | 100.00% | 0.00 | 139,190.00 | 139,190.00 | 100.00% |
| BUILDING IMPRV EXPENSE | 0.00 | 0.00 | 0.00 | 0.00% | 36,850.00 | 44,500.00 | 7,650.00 | 17.19% |
| COMMISSION EXPENSE | 0.00 | 0.00 | 0.00 | 0.00% | 18,214.20 | 61,514.00 | 43,299.80 | 70.39% |
| TOTAL OTHER INCOME AND EXPENSES | 0.00 | 99,190.00 | 99,190.00 | 100.00% | 55,064.20 | 245,204.00 | 190,139.80 | 77.54% |
| NET INCOME | 33,004.37 | (80,431.00) | 113,435.37 | 141.03% | 287,515.66 | 19,426.00 | 268,089.66 | 1380.06% |

# EXHIBIT D

Hilco Global
AN ORIX COMPANY

ONYX
ASSET ADVISORS

**BANKRUPTCY SALE**



BID DEADLINE **OCTOBER 1**

# Pro Temecula Town Center & Ynez Shops

## Premier Retail Investment Opportunity | 84% Leased

27520, 27576, 27644, 27648 Ynez Rd. & 29640 Rancho California Rd., Temecula, CA







## HIGHLIGHTS

- 84% occupancy with near-term cash-flow upside
- High-traffic intersection at Ynez & Rancho California Roads
- Surrounded by major retailers, restaurants & financial institutions, including AMC Temecula, Chase Bank, CVS, HomeGoods, Target & more
- Convenient access to I-15, near Promenade Temecula, Temecula Valley Wine Country & growing residential communities

| | |
|---|---|
| **Building Size** | 241,536± SF Total |
| **Land Size** | 25.47± AC |
| **Year Built** | 1989 |
| **Parking** | 1,800 Spaces |
| **Zoning** | CC (Community Commercial) |
| **Taxes (2024)** | 131293 |
| **Tax ID#** | 921-320-056 |

## DETAILS

**U.S. Bankruptcy Court, Central District of California (Santa Ana Division)**
**Case No.: 8:26-bk-10694-SC**
***In re:* Pro Temecula Town Center, LLC**
**Case No. 8:26-bk-10693-SC**
***In re:* Ynez Shops, LLC**

Temecula Town Center and Ynez Shops offer the opportunity to acquire an established neighborhood retail asset in Temecula's primary commercial corridor. The property features a diverse tenant mix with approximately 84% occupancy, providing in-place income with upside through lease-up, renewals and market rent growth. Its prominent location near Ynez Road & Rancho California Road offers strong visibility, convenient access and proximity to Interstate 15, while surrounding retail, dining and residential uses provide an established customer base.

The investment is supported by strong local demographics and visitor demand, with approximately 165,000 residents and average household income of roughly $139,000 within five miles. Temecula Valley generated approximately $1.2 billion in direct visitor spending in 2025, including $106.5 million in retail expenditures. Combined with planned improvements along Ynez Road, the property offers multiple avenues for value creation through occupancy growth, rent increases and active asset management.

855.755.2300
**HilcoRealEstateSales.com**

Hilco Global
AN ORIX COMPANY

ONYX ASSET ADVISORS

## SITE BOUNDARIES



Hilco Global
AN ORIX COMPANY

ONYX ASSET ADVISORS

# TEMECULA TOWN CENTER
## RENT ROLL SUMMARY 7/16/26

| Unit | Sq. Ft. | Residents | Status | Market Rent | Rent | Other Charges | Credits | Total | Move In | Lease Start | Lease End | Move Out | Deposits |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Current Tenants** | | | | | | | | | | | | | |
| I9 | 1600 | Vacant Unit | | 4,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | | 0.00 |
| Q1 | 2794 | Vacant Unit | | 6,985.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | | 0.00 |
| Q2 | 1766 | Vacant Unit | | 4,415.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | | 0.00 |
| F01 | 3562 | Spectrum Store (Spectru | | 8,905.00 | 11,609.15 | 3,553.28 | 0.00 | 15,162.43 | 11/01/18 | 11/01/18 | 01/31/29 | | 0.00 |
| F07 | 1158 | Doodlebugs Art Studio | C | 2,895.00 | 3,992.70 | 949.56 | 0.00 | 4,942.26 | 05/17/24 | 05/17/24 | 05/31/29 | | 0.00 |
| F09 | 1200 | Kumon Learning Center | C | 3,000.00 | 3,220.81 | 1,210.40 | 0.00 | 4,431.21 | 04/01/11 | 04/01/11 | 03/31/29 | | 0.00 |
| F11 | 1100 | Eyeglass Express | C | 2,750.00 | 3,115.75 | 1,109.24 | 0.00 | 4,224.99 | 03/01/14 | 07/01/24 | 06/30/29 | | 2,643.70 |
| F13 | 1100 | Lost & Found Barb | C | 2,750.00 | 3,500.97 | 1,100.00 | 0.00 | 4,600.97 | 02/21/23 | 02/20/23 | 06/30/28 | | 4,202.00 |
| F15 | 2300 | Anasa Hair Studio | C | 5,750.00 | 5,740.49 | 0.00 | 0.00 | 5,740.49 | 07/01/08 | 09/22/23 | 06/30/29 | | 4,530.00 |
| F19 | 1200 | Massage by Sunny LLC D | C | 3,000.00 | 3,182.70 | 1,200.00 | 0.00 | 4,382.70 | 07/06/23 | 10/01/23 | 09/30/28 | | 4,068.00 |
| F21 | 2930 | Pho Ha | C | 7,325.00 | 4,833.47 | 2,364.94 | 0.00 | 7,198.41 | 07/23/09 | 07/01/25 | 06/30/30 | | 4,000.00 |
| F25 | 1167 | Vacant Unit | | 2,917.50 | 0.00 | 0.00 | 0.00 | 0.00 | | | | | 0.00 |
| F27 | 2372 | Vacant Unit | | 5,930.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | | 0.00 |
| G01 | 4267 | Town Center Laundrom | C | 10,667.50 | 8,910.70 | 4,256.55 | 0.00 | 13,167.25 | 02/02/16 | 02/02/16 | 02/28/31 | | 4,465.59 |
| G03 | 1300 | Little Caesar's Pizza, So | C | 3,250.00 | 4,925.07 | 1,296.82 | 0.00 | 6,221.89 | 01/31/95 | 09/01/14 | 08/31/26 | | 2,600.00 |
| G05 | 1300 | Temecula Center Denta | C | 3,250.00 | 4,686.50 | 1,310.16 | 0.00 | 5,996.66 | 02/06/04 | 10/01/24 | 09/30/35 | | 3,665.00 |
| G07 | 1300 | Lucky Feet Shoes, Inc. | C | 3,250.00 | 3,481.40 | 1,296.82 | 0.00 | 4,778.22 | 03/01/14 | 09/01/24 | 08/31/29 | | 2,717.00 |
| G09 | 1196 | Charlene LLC (Musicolog | C | 2,990.00 | 3,136.37 | 1,193.07 | 0.00 | 4,329.44 | 05/01/13 | 04/01/25 | 03/31/30 | | 2,463.76 |
| G11 | 1404 | Temecula Pool & S | C | 3,510.00 | 3,759.91 | 1,400.56 | 0.00 | 5,160.47 | 09/23/96 | 06/01/25 | 05/31/30 | | 4,071.60 |
| I01 | 3454 | Vacant Unit | | 8,635.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | | 0.00 |
| I03 | 1845 | Vacant Unit | | 4,612.50 | 0.00 | 0.00 | 0.00 | 0.00 | | | | | 0.00 |
| I05 | 3206 | Vacant Unit | | 8,015.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | | 0.00 |
| I11 | 1600 | Edible Arrangements #1 | C | 4,000.00 | 3,200.00 | 1,600.00 | 0.00 | 4,800.00 | 11/01/21 | 11/01/21 | 10/31/31 | | 2,480.00 |
| I13 | 1600 | Juan Pollo | C | 4,000.00 | 4,455.78 | 1,538.92 | 0.00 | 5,994.70 | 12/01/04 | 12/01/13 | 12/01/26 | | 4,051.83 |
| J01 | 2050 | Nothing Bundt Cakes | C | 5,125.00 | 7,179.33 | 2,071.66 | 0.00 | 9,250.99 | 03/22/10 | 05/01/25 | 04/30/30 | | 4,612.50 |
| J05 | 1000 | Vivian Spa & Nails | C | 2,500.00 | 2,100.58 | 1,010.89 | 0.00 | 3,111.47 | 12/01/13 | 01/01/24 | 12/31/28 | | 0.00 |
| J07 | 1000 | Bill & Dallas Dedic | C | 2,500.00 | 1,273.08 | 0.00 | 0.00 | 1,273.08 | 06/01/24 | 06/01/24 | 05/31/27 | | 2,090.00 |
| J09 | 1000 | uBreak iFix | C | 2,500.00 | 2,519.97 | 997.55 | 0.00 | 3,517.52 | 11/12/18 | 01/01/24 | 12/31/28 | | 5,433.34 |
| J11 | 972 | Ghasem Separ And . | C | 2,430.00 | 2,165.51 | 982.96 | 0.00 | 3,148.47 | 02/01/14 | 01/01/24 | 12/31/28 | | 2,050.92 |
| J13 | 977 | Kitt Kathy Bowles | C | 2,442.50 | 2,369.00 | 0.00 | 0.00 | 2,369.00 | 02/01/25 | 02/01/25 | 01/31/28 | | 0.00 |
| J15 | 1949 | Love Optometry, Inc. | C | 4,872.50 | 6,032.45 | 1,970.91 | 0.00 | 8,003.36 | 01/10/22 | 02/01/22 | 01/31/28 | | 5,359.75 |
| K01 | 1400 | Vacant Unit | | 3,500.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | | 0.00 |
| K03 | 1400 | Rancho Donuts | C | 3,500.00 | 5,768.00 | 1,423.26 | 0.00 | 7,191.26 | 06/01/15 | 06/01/15 | 05/31/30 | | 2,590.00 |
| K05 | 2800 | Vacant Unit | | 7,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | | 0.00 |
| K07 | 1400 | European Wax Center (N | C | 3,500.00 | 5,250.00 | 1,400.00 | 0.00 | 6,650.00 | 08/11/22 | 08/11/22 | 07/31/32 | | 6,412.00 |
| K11 | 1350 | Dragon Express | C | 3,375.00 | 4,083.75 | 1,360.03 | 0.00 | 5,443.78 | 06/30/95 | 09/01/25 | 08/31/30 | | 4,050.00 |
| K13 | 1540 | Starbucks #7927 | C | 3,850.00 | 5,776.73 | 1,536.23 | 0.00 | 7,312.96 | 03/01/25 | 03/01/25 | 02/28/30 | | 0.00 |
| MAJ2 | 29082 | Homegoods, Inc. | C | 72,705.00 | 23,871.50 | 13,436.50 | 0.00 | 37,308.00 | 08/08/03 | 12/01/23 | 11/30/28 | | 0.00 |
| P1-3 | 7962 | Extended Images T | C | 19,905.00 | 21,318.00 | 6,528.84 | 0.00 | 27,846.84 | 11/09/23 | 04/18/25 | 04/30/35 | | 23,449.80 |
| ANC3A | 3000 | Vacant Unit | | 7,500.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | | 0.00 |
| ANC3B | 3000 | El Festin Candy | C | 4,500.00 | 9,015.00 | 3,000.00 | 0.00 | 12,015.00 | 03/09/23 | 03/09/23 | 03/31/28 | | 10,710.00 |
| ANCH1 | 21450 | Garfield Beach CVS, LLC | C | 53,625.00 | 33,247.50 | 11,134.16 | 0.00 | 44,381.66 | 10/07/88 | 04/01/24 | 04/30/29 | | 0.00 |
| ANCH2 | 8000 | O'Reilly Auto Enterprise | C | 20,000.00 | 16,000.00 | 7,979.48 | 0.00 | 23,979.48 | 03/01/23 | 03/01/23 | 01/31/34 | | 0.00 |
| ANCH7 | 14031 | PMCA Temecula, LLC | C | 35,077.50 | 20,373.01 | 14,143.37 | 0.00 | 34,516.38 | 06/01/15 | 06/01/25 | 05/31/30 | | 7,725.00 |
| PAD2A | 3553 | Pacific Dental Services, | C | 8,882.50 | 12,213.44 | 3,544.30 | 0.00 | 15,757.74 | 06/17/10 | 10/19/20 | 10/18/30 | | 0.00 |
| PAD2B | 1451 | Go Wireless, Inc. VERIZ | C | 3,627.50 | 5,509.78 | 1,529.43 | 0.00 | 7,039.21 | 06/01/10 | 10/01/25 | 09/30/31 | | 0.00 |
| **Total** | | | | **389,720.00** | **261,818.40** | **99,429.89** | **0.00** | **361,248.29** | | | | | **120,441.79** |
| **Non-Residents** | | | | | | | | | | | | | |
| | 0 | Fairway Colima CA Seve | | 0.00 | 0.00 | 3,153.13 | 0.00 | 3,153.13 | | | | | 0.00 |
| | 0 | Temecula Town Homes | | 0.00 | 0.00 | 13,621.22 | 0.00 | 13,621.22 | | | | | 0.00 |
| | 0 | Vons Store #1962 | | 0.00 | 0.00 | 7,253.67 | 0.00 | 7,253.67 | | | | | 0.00 |
| | 0 | Target T - 359 | | 0.00 | 0.00 | 6,633.19 | 0.00 | 6,633.19 | | | | | 0.00 |
| | 0 | Mobile Oil Circle K | | 0.00 | 0.00 | 336.67 | 0.00 | 336.67 | | | | | 0.00 |
| | 0 | 27450 Office Building N | | 0.00 | 0.00 | 3,583.00 | 0.00 | 3,583.00 | | | | | 0.00 |
| | | | | | | **34,580.88** | **0.00** | **34,580.88** | | | | | **0.00** |

### Property Occupancy

| Type | Status | Market Rent | | Units | | Square Footage | |
|---|---|---|---|---|---|---|---|
| Total | Occupied | 326,210.00 | 83.7% | 35 | 76.1% | 131,684.00 | 83.8% |
| Total | Vacant | 63,510.00 | 16.3% | 11 | 23.9% | 25,404.00 | 16.2% |
| | | **389,720.00** | | **46** | | **157,088.00** | |

### Unit Type Occupancy

| Type | Status | Market Rent | | Units | | Square Footage | |
|---|---|---|---|---|---|---|---|
| Total | Occupied | 326,210.00 | 83.7% | 35 | 76.1% | 131,684.00 | 83.8% |
| Total | Vacant | 63,510.00 | 16.3% | 11 | 23.9% | 25,404.00 | 16.2% |
| | | **389,720.00** | | **46** | | **157,088.00** | |

Hilco Global
AN ORIX COMPANY

ONYX ASSET ADVISORS

# YNEZ SHOPS

## RENT ROLL SUMMARY 7/16/26

| Unit | Sq. Ft. | Residents | Status | Market Rent | Rent | Other Charges | Credits | Total | Move In | Lease Start | Lease End | Move Out | Deposits |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Current Tenants** | | | | | | | | | | | | | |
| C1 | 2000 | Thai Kitchen | C | 5,000.00 | 7,725.00 | 1,946.98 | 0.00 | 9,671.98 | 11/01/24 | 11/01/24 | 10/31/29 | | 9,464.98 |
| C5 | 940 | Vacant Unit | | 2,375.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | | 0.00 |
| D1 | 1200 | Juice Bar | C | 3,000.00 | 3,900.00 | 1,144.18 | 0.00 | 5,044.18 | 08/22/95 | 12/01/25 | 11/30/30 | | 11,392.00 |
| D3 | 800 | TrendSetter Collections | C | 2,000.00 | 2,006.01 | 824.00 | 0.00 | 2,830.01 | 07/01/24 | 07/01/26 | 06/30/27 | | 2,213.33 |
| D5 | 1190 | Hearx West | C | 2,975.00 | 3,126.02 | 1,134.64 | 0.00 | 4,260.66 | 03/03/19 | 06/01/24 | 05/31/29 | | 3,411.33 |
| O1 | 1859 | TSP Group, LLC BDATast | C | 4,647.50 | 5,935.79 | 1,728.87 | 0.00 | 7,664.66 | 09/07/23 | 09/07/23 | 07/31/33 | | 7,287.28 |
| O2 | 2916 | Rubio's Coastal Grill (Th | C | 7,290.00 | 8,962.03 | 3,837.84 | 0.00 | 12,799.87 | 11/01/14 | 11/01/24 | 10/31/29 | | 4,082.40 |
| H09 | 2600 | Beauty Systems Group, | C | 6,500.00 | 5,720.00 | 2,411.63 | 0.00 | 8,131.63 | 09/11/17 | 09/11/17 | 09/30/27 | | 0.00 |
| H13 | 700 | Vacant Unit | | 1,750.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | | 0.00 |
| H15 | 3399 | K Sushi Bar &Grill | C | 8,497.50 | 12,746.25 | 3,240.89 | 0.00 | 15,987.14 | 07/15/15 | 08/01/25 | 07/31/30 | | 10,536.90 |
| L01 | 1036 | Simon's Dole Whip &amp | C | 2,590.00 | 2,702.27 | 987.80 | 0.00 | 3,690.07 | 09/14/20 | 09/14/20 | 12/31/30 | | 3,135.63 |
| L03 | 1979 | Vibez Smoke Shop | C | 4,947.50 | 7,664.27 | 1,840.47 | 0.00 | 9,504.74 | 10/24/23 | 10/24/23 | 01/31/29 | | 7,065.03 |
| L07 | 950 | Postal Annex | C | 2,375.00 | 2,342.88 | 932.48 | 0.00 | 3,275.36 | 12/01/12 | 07/01/24 | 06/30/29 | | 1,710.00 |
| L09 | 977 | Vacant Unit | | 2,442.50 | 0.00 | 0.00 | 0.00 | 0.00 | | | | | 0.00 |
| L11 | 1000 | Poki Poki | C | 2,500.00 | 3,182.70 | 966.82 | 0.00 | 4,149.52 | 12/14/16 | 12/14/16 | 06/30/29 | | 3,170.00 |
| L13 | 1501 | Subway Real Estate, LLC | C | 3,752.50 | 4,586.14 | 1,675.76 | 0.00 | 6,261.90 | 06/05/89 | 03/01/24 | 02/28/29 | | 3,737.49 |
| L17 | 1499 | Vacant Unit | | 3,747.50 | 0.00 | 0.00 | 0.00 | 0.00 | | | | | 0.00 |
| M01 | 2641 | Phoenix Foods, LLC | C | 6,502.50 | 0.00 | 0.00 | 0.00 | 0.00 | 04/20/05 | 01/01/15 | 12/31/25 | | 0.00 |
| M05 | 990 | Vacant Unit | | 2,475.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | | 0.00 |
| M06 | 1320 | Vacant Unit | | 3,300.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | | 0.00 |
| M07 | 2772 | Mountain Mike's Pizza (D | C | 1,000.00 | 6,637.09 | 2,643.05 | 0.00 | 9,280.14 | 06/04/19 | 06/04/19 | 06/03/29 | | 7,964.88 |
| M11 | 3410 | Banfield Pet Hospital (M | C | 8,525.00 | 11,253.00 | 3,162.94 | 0.00 | 14,415.94 | 05/02/18 | 05/02/18 | 05/31/28 | | 0.00 |
| H01A | 2900 | Kitchen Fantasy | C | 7,250.00 | 7,395.00 | 2,765.10 | 0.00 | 10,160.10 | 10/01/12 | 10/01/25 | 02/28/31 | | 6,525.00 |
| H01B | 2415 | Vacant Unit | | 6,037.50 | 0.00 | 0.00 | 0.00 | 0.00 | | | | | 0.00 |
| PAD1 | 5362 | JP Morgan Chase Bank,N | C | 13,405.00 | 24,129.00 | 5,112.57 | 0.00 | 29,241.57 | 11/01/14 | 11/01/14 | 10/31/29 | | 0.00 |
| PAD5 | 800 | Enterprise Rent a Car | C | 2,000.00 | 6,652.39 | 2,285.66 | 0.00 | 8,938.05 | 05/15/15 | 05/15/15 | 06/30/31 | | 0.00 |
| ANCH8, KIOSK | 35292 | Launch Family Entertain | C | 88,230.00 | 0.00 | 0.00 | 0.00 | 0.00 | 07/30/25 | 07/30/25 | 07/31/26 | | 81,171.60 |
| **Total** | | | | **205,115.00** | **126,665.84** | **38,641.68** | **0.00** | **165,307.52** | | | | | **162,867.85** |

### Property Occupancy

| Type | Status | Market Rent | | Units | | Square Footage | |
|---|---|---|---|---|---|---|---|
| Total | Occupied | 182,987.50 | 89.2% | 20 | 74.1% | 75,607.00 | 89.5% |
| Total | Vacant | 22,127.50 | 10.8% | 7 | 25.9% | 8,841.00 | 10.5% |
| | | **205,115.00** | | **27** | | **84,448.00** | |

### Unit Type Occupancy

| Type | Status | Market Rent | | Units | | Square Footage | |
|---|---|---|---|---|---|---|---|
| Total | Occupied | 182,987.50 | 89.2% | 20 | 74.1% | 75,607.00 | 89.5% |
| Total | Vacant | 22,127.50 | 10.8% | 7 | 25.9% | 8,841.00 | 10.5% |
| | | **205,115.00** | | **27** | | **84,448.00** | |


Chase Bank - Ynez Shops



CVS Pharmacy - Temecula Town Center




27520, 27576, 27644, 27648 Ynez Rd. &
29640 Rancho California Rd., Temecula, CA

## LOCAL INFORMATION

Temecula has become a well-established retail and commercial hub in Southwest Riverside County, supported by a growing residential base, strong household incomes and a steady mix of local and regional consumers. The city has approximately 114,865 residents and has grown 4.4% since 2020, while household incomes remain above county averages. Ynez Shops is positioned at Ynez Road & Rancho California Road, two key commercial corridors with convenient access to Interstate 15. Nearby destinations including Temecula Town Center, Tower Plaza Center and other established retail centers along Ynez Road further strengthen the area's retail presence and help drive consistent consumer traffic.

The property also benefits from Temecula's sizable tourism and employment base. The Temecula Valley welcomed approximately 3.4 million visitors in 2024, generating roughly $1.1 billion in direct travel spending. Retail sales accounted for approximately $105 million, while arts, entertainment & recreation generated more than $385 million. The area's Wine Country, Old Town, restaurants and entertainment venues draw visitors from across Southern California, adding another layer of demand beyond the local residential trade area. With strong demographics, established retail activity, regional accessibility and significant visitor spending, Ynez Shops is well positioned to benefit from the continued strength of the Temecula market.

Hilco Global
AN ORIX COMPANY

ONYX
ASSET ADVISORS

Subject to U.S. Bankruptcy Court for the Central District of California (Santa Ana Division) Case No.: 8:26-bk-10694-SC, *In re:* Pro Temecula Town Center, LLC & Case No. 8:26-bk-10693-SC, *In re:* Ynez Shops, LLC - Jointly administered. The information contained herein is subject to inspection and verification by all parties relying on it to formulate an offer. No liability for its inaccuracy, errors, or omissions, are assumed by the Sellers or Brokers, their representatives or Broker. ALL SQUARE FOOTAGE, ACREAGE AND DIMENSIONS HEREIN ARE APPROXIMATE. This offering is subject to prior sale and may be withdrawn, modified or canceled without notice at any time. This is not a solicitation nor offering to residents of any state where this offering may be prohibited. © 2026 Hilco Global.

## SALE INFORMATION

### BID PROCEDURES

This sale is being conducted subject to the Bid Procedures, available for download from the Hilco Global website at www.HilcoRealEstateSales.com.

### ON-SITE INSPECTIONS

By Appointment Only

### BID DEADLINE

October 1 by 5:00 p.m. (PT)

### BID SUBMISSIONS

Bids should be submitted on provided Purchase and Sale Agreement (PSA), outlining the purchase price, earnest money deposit and closing timeline. All bids must be submitted to Christian Koulichkov at ckoulichkov@hilcoglobal.com and Cooper Jones at cjones@hilcoglobal.com.

### DATA ROOM

A Virtual Data Room has been assembled and contains important due diligence documents on the property. To gain access to these documents, interested parties will need to register at www.HilcoRealEstateSales.com.

**Christian Koulichkov**
847.449.7757
ckoulichkov@hilcoglobal.com

**Cooper Jones**
937.760.3309
cjones@hilcoglobal.com

**Paul Buie**
213.246.2837
pbuie@thinkonyx.com

855.755.2300
HilcoRealEstateSales.com